IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

No. 21-CR-00648 KWR/JFR

SARA MONTOYA o/b/o
L.M. a minor child,

        Plaintiffs,

v.

RIO RANCHO PUBLIC SCHOOLS,
BOARD OF EDUCATION and
GEORGE ARCHULETA in his
Individually and official capacity,

        Defendants.

## DEPOSITION OF

## MILLAN BACA

### MAY 16, 2022
1:00 P.M.
500 4th Street, NW Suite 105
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:    TODD J. BULLION
              ATTORNEY FOR PLAINTIFFS

REPORTED BY:  EDWINA CASTILLO, CCR #407
              PAUL BACA COURT REPORTERS
              500 4th Street, NW Suite 105
              Albuquerque, New Mexico 87102

# EXHIBIT A

Page 2

```
 1              APPEARANCES
 2   For the Plaintiff SARA MONTOYA o/b/o
     L.M. a minor child:
 3
         Todd J. Bullion
 4       4811 Hardware Drive N.E., Suite D-5
         Albuquerque, New Mexico 87109
 5       (505)452-7674
         todd@bullionlaw.com
 6
     For the Defendant RIO RANCHO PUBLIC SCHOOLS, et al.:
 7
         Jerry A. Walz
 8       Walz & Associates
         133 Eubank Blvd NE
 9       Albuquerque, NM 87123-2709
         (505) 275-1800
10       (505) 275-1802
         jerryawalz@walzandassociates.com
11
12       David C. Mann
         Rio Rancho Public Schools
13       500 Laser Rd NE
         Rio Rancho, NM 87124-4517
14       (505) 896-0667
         david.mann@rrps.net
15
16   For the Defendant GEORGE ARCHULETA:
17       Carlos M. Quinones
         Quinones Law Firm LLC
18       1223 S Saint Francis Dr Ste C
         Santa Fe, NM 87505-4053
19       (505) 992-1515
         (505) 992-1714
20       quinoneslaw@cybermesa.com
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2   THE WITNESS                          PAGE:
 3   MILLAN BACA
 4       Examination by Mr. Bullion         6
         Examination by Mr. Walz          124
 5       Futher Examination by Mr. Bullion 161
         Futher Examination by Mr. Walz   169
 6
         Reporter's certificate           172
 7
 8
...
25
```

Page 4

```
 1              EXHIBITS
 2   No.  Description                    Page:
 3   1) SEC-02                              26
 4   2) Search and Seizure Policy          152
 5   3) CHS Feud with Pictures              80
 6   4) Safety and Security Incident Report 100
 7
 8
 9       Respondent's Exhibits
10       To be attached:
11   J.S. Student File                     122
12   D.M. Student File                     122
13
...
25
```

Page 5

```
 1       THE COURT REPORTER: We're on the record.
 2   May I have appearances, please?
 3       MR. MANN: My name is David Mann. I'm
 4   general counsel for the Rio Rancho Public School
 5   District and I'm observing only today.
 6       MR. WALZ: Todd, why don't you go first
 7   since you represent the Plaintiff.
 8       MR. BULLION: Yes. Todd Bullion, I
 9   represent the Plaintiffs D.M., E.S. and J.S. in
10   these matters.
11       MR. WALZ: I'm Jerry Walz. I represent the
12   Rio Rancho Public Schools and Board of Education.
13       And by agreement, this deposition is being
14   taken relating to all three plaintiffs that
15   Mr. Bullion just identified.
16       MR. QUINONES: Carlos Quinones on behalf of
17   Defendant George Archuleta for all three cases.
18       THE WITNESS: My name is Millan Baca. I'm
19   the assistant principal for the Class of 2022 at V.
20   Sue Cleveland High School.
21       MR. WALZ: And this is Jerry Walz again on
22   for the record again. I'm representing Mr. Baca at
23   this deposition based on his position with the Rio
24   Rancho Public Schools, a named defendant.
25       Thank you.
```

Page 10

1   I'm in charge of most of the discipline
2   for the Class of 2022, but being that our classes
3   are so large, we very often help each other.  Okay.
4       Freshmen year, I'd be getting -- next
5   year, I'll inherit the Class of 2026.  I guarantee
6   I'll be asking my other five administrators for help
7   just because freshmen come to a school and they're a
8   little bit more prone to not following the rules
9   than, say, our seniors.
10      Q.  Okay.  Is that pretty much everything?
11      A.  No.  I'm in charge of standardized
12  testing.  I'm in charge of the SAT.  I work with
13  security.  I work at building maintenance.  I work
14  with SEILs, the Special Ed Instructional Leaders, to
15  try and make sure that students on IEPs are having
16  their IEPs in a timely fashion.
17      I work with the building engineers to be
18  sure that the environment is conducive to learning.
19  I work with the athletic director making sure that
20  students that are participating in athletics are, in
21  fact, keeping up their grade point averages.  I work
22  with the activities director to make sure to make
23  that we're offering a well-rounded group of
24  activities so that all students that come on this
25  campus can feel as if there is a place where they

Page 11

1   will be welcome.
2       I can't say that that covers all of it but
3   I would say that covers most of it.
4       Q.  Okay.  You mentioned working with security
5   and also mentioned handling student discipline.  Are
6   those two things, you know, that go hand-in-hand or
7   are they kind of separate concepts?
8       A.  They can go hand-in-hand depending on the
9   severity of the infraction that a student is accused
10  of committing.
11      Q.  Okay.
12      A.  If it's a student -- if it's a student
13  that simply has tardies, I probably won't have
14  security involved.  If it's a more severe
15  infraction, then security probably will get
16  involved.
17      Q.  Okay.  What are some examples of serious
18  infractions which would involve security?
19      A.  Weapons.  Threats to the school.  Verbal
20  assault of a staff member.  Verbal assault of
21  another student.  Physical assault of another
22  student.  Drugs.  Alcohol.  Nicotine usage.  Those
23  would all involve security.
24      Q.  Okay.  How long have you been at V. Sue
25  Cleveland?

Page 12

1       A.  Six years as an administrator and then one
2   year -- and then I taught 11th grade English here
3   for one year prior to becoming an administrator.
4       Q.  All right.  Where did you work before
5   coming to Cleveland?
6       A.  Do you want my whole educational history
7   or just within the Rio Rancho Public Schools?
8       Q.  Your whole history, just give us a quick
9   run down of it.
10      A.  John Adams Middle School 2001-2002 school
11  year for one year.  Peñasco Independent High
12  School -- no middle school, '03-'04.  Carlos Watkins
13  Middle School.  Cypress-Fairbanks Middle School,
14  that was at Cypress Springs Public Schools Houston,
15  Texas.  And I've been with the Rio Rancho Public
16  Schools ever since.
17      Q.  Okay.  In those previous positions, were
18  involved with security?  Working with security?
19      A.  Not very much.  I was a classroom teacher.
20      Q.  Okay.
21      A.  Like anything else, there was no security.
22      Q.  Okay.  All right.  Do you direct, as part
23  of your job, security guards to search students for
24  contraband?
25      A.  If I believe there's reasonable -- if I

Page 13

1   believe there's reasonable individualized suspicion,
2   yes.
3       Q.  All right.  What does that mean to you?
4       A.  To me it means that there's grounds for
5   suspecting that a student, that the search will turn
6   up evidence that a crime has been committed, is
7   being committed or will be committed, and not just a
8   crime, but also the infraction of a school rule.
9       Q.  Okay.  How often are you directing
10  security to search students on like a weekly or
11  daily basis?
12      A.  Senior year, rarely.  Probably about once
13  every two weeks, at the most, sometimes even once a
14  month.  Freshman year, much more often.
15      Q.  Can you give me a ballpark?
16      A.  Freshman year, probably three times a
17  week.
18      Q.  All right.  And how about sophomore year
19  students?
20      A.  Probably about the same.  Sophomore year
21  is very similar to senior year.
22      Q.  And how about juniors?
23      A.  Half of that.
24      Q.  Okay.  When you direct security to do a
25  search, where do you direct it to take place?

4 (Pages 10 to 13)

Page 18

1  wear pullover hoodies without any clothes underneath
2  them, and that's why we always ask that question.
3  Okay. We don't want to ask a student to take off
4  their pullover and then not have any clothes
5  underneath it.
6      Q. Okay?
7      A. At that point, typically they have the
8  student stand. They tell the student to -- well, I
9  tell the student that I'm going to request that the
10 security officer search them and to please follow
11 the directives of the security officer.
12     Okay. The security officer will then ask
13 the student to typically turn around first, ask the
14 student to spread its arms out. They'll press their
15 hands on the student's, down here I guess like here,
16 making sure there is nothing concealed in their
17 armpits because students for a while were hiding
18 vape devices underneath their armpits.
19     If it's a loose fitting piece of clothing,
20 you'll get tapped more. If it's tight fitting piece
21 of clothing where you can see that there's nothing
22 underneath it, sometimes they'll just look and say
23 okay, you're fine, okay, for upper body.
24 ==Lower body, they'll typically ask the==
25 ==students to empty out their pockets. They'll turn==

Page 19

1  ==their pockets inside out when that can be done.==
2  ==They'll pat-down their pockets. They'll, using the==
3  ==back of their hands when they're searching the==
4  ==pockets, they'll usually go with the back of their==
5  ==fingers to that to see if anything's there.==
6      They'll search the legs. And they'll pat
7  down their legs down all the way down to their
8  ankles. Very often we'll ask them to take off their
9  shoes and they'll search inside the shoes because
10 kids were hiding marijuana vape cartridges inside of
11 those because they're pretty small, it's about the
12 size of a -- some of those were about the size of a
13 top to a Bic pen.
14     They would have the students pull up their
15 pants and then they would pat-down their socks if
16 they're wearing socks that go up to the calf to make
17 sure there's not something hidden there.
18     Q. Okay. Thank you for that description.
19     As part of the pat-down search, is the
20 student's groin area ever searched?
21     (Discussion off the record.)
22     A. Is somebody talking?
23     Q. Yes.
24     THE COURT REPORTER: Yeah. It's in my --
25 I'm sorry. I'll mute myself.

Page 20

1      Q. (By Mr. Bullion) And, sorry, sir. I'd
2  asked you if during these pat-down searches if the
3  student's groin area is ever searched?
4      A. Very often during the pat-down search what
5  they'll use is a wand, a magnetic wand and we'll use
6  that near the crotch. And for girls, very often
7  we'll use that by their breasts.
8      Q. All right. You say very often that the
9  wand is used. How often in your experience are
10 these wands used?
11     A. 50 percent of the time.
12     Q. Okay. Okay. So a student's groin area
13 may be wanded over. Would it ever be physically
14 touched during a search?
15     A. No.
16     Q. All right.
17     A. No.
18     Q. Why not?
19     A. I think upper legs will be touched.
20     Q. All right. But as far as you know, based
21 on your observation, based on your role in working
22 with security, a student's groin area should not be
23 physical touched during a search?
24     A. No.
25     Q. Okay. Is there ever any circumstance

Page 21

1  where their groin area will be touched during a
2  search?
3      A. No. I'd even seen it, circumstances where
4  the wand will be going off and there's not a whole
5  lot we can do. We've had girls before that say it's
6  the wire in my underwire bra. And, you know, we're
7  not going to go there.
8      Q. Okay. So if I understand your testimony,
9  under no circumstances should a security guard be
10 touching a student's groin area during a search?
11     A. I haven't seen it happen.
12     Q. Okay. My question is, should they do it
13 under any circumstances?
14     A. If we suspected a weapon was present, then
15 I would think that under that circumstance, yes.
16     Q. Okay. And that would be the only
17 circumstance?
18     A. Possibly if we had students overdosing and
19 we thought that they had gotten drugs from the
20 student that we had in question and that they had
21 identified that student as the person that had the
22 drug.
23     MR. BULLION: Excuse me. One moment. Be
24 right back.
25     Jerry, Carlos, can we take a one-minute break?

6 (Pages 18 to 21)

Page 22

1  MR. QUINONES: That's fine with me.
2  MR. WALZ: Let's do five minutes.
3  MR. BULLION: Okay. Yeah, just my allergies
4  are acting up and this is not going to sound
5  pleasant.
6  MR. WALZ: Okay. All right.
7  MR. BULLION: Thank you for the break.
8  (Recess taken at 2:01 to 2:07.)
9  Q. (By Mr. Bullion) Okay. So before we broke,
10  sir, I was asking you about what, you know,
11  occasions, you know, could occur which would allow a
12  student's genitals to be physically touched during a
13  search. And you had identified two scenarios, one
14  where a student was suspected of having a weapon and
15  another scenario where if students overdosed on
16  drugs at your school and you suspected the person
17  who had provided the drugs was concealing the drugs
18  in their groin area.
19  Are there any other circumstances which
20  would allow a security guard to physically touch a
21  student's groin during a search at your school?
22  A. Not that I can think of.
23  Q. Okay. And have you ever actually seen a
24  guard touch a student's groin during a search?
25  A. I'm trying to think. If they have, it's

Page 23

1  always been with the back of their hands, a tap.
2  Q. Okay. Who have you seen tap a student's
3  groin with the back of their hands?
4  A. I don't recall who the security guard was.
5  I had a senior in 2018 that we found with multiple
6  weapons in his vehicle. And I don't recall which
7  security guard was searching him.
8  Q. Okay. Are -- you mentioned earlier when
9  you were describing these searches that the students
10  would turn their pockets out, right?
11  A. Yes.
12  Q. Are guards permitted to place their hands
13  in a student's pocket during a search at your
14  school?
15  A. If you have a student that you ask to turn
16  the pocket out, and they only turn the pocket out
17  partially, what typically will occur then is the
18  guard will then get the back of his hand, say this
19  the student's leg, and he will tap the part of the
20  pocket that is not turned out.
21  Q. Okay. Thanks for that description.
22  A. Not all pants have a pocket that can be
23  turned out.
24  Q. Okay. Yeah. That paints a pretty vivid
25  picture for me.

Page 24

1  Are there any other times where the guard
2  actually puts his hand in the student's pocket?
3  A. I've seen them go in back pockets.
4  Q. Okay.
5  A. Front pockets, I haven't seen. Back
6  pockets, I have.
7  Q. All right. What --
8  A. And that would be because back pockets on
9  some jeans are gigantic and they're very baggy and I
10  think it will be less intrusive to stick your
11  hand -- I think my guess is, they thinking that it's
12  less intrusive to stick the hands down the back of
13  pocket, if the pocket is hanging far away from the
14  body, than to tap against the pocket which then
15  actually means that there's more contact with the
16  student.
17  Q. Okay. So you've seen that happen on about
18  how many occasions?
19  A. Dozens.
20  Q. Dozens. Okay.
21  And did you ever think, you know, that was
22  not appropriately, or that the guards should be
23  doing their search in some other way when you
24  observed that?
25  A. No.

Page 25

1  Q. Is it against school policy for a guard to
2  place their hand in a student's front pockets during
3  a pat-down search?
4  A. Not to my knowledge.
5  Q. Okay. But what is your knowledge in the
6  school's search policy?
7  A. We follow the --
8  Q. I mean -- sorry. Go ahead. Go ahead.
9  A. Follow policy 1009 for searches and
10  seizures.
11  Q. All right. And what does that policy
12  state?
13  A. Relative to?
14  Q. Doing a pat-down search?
15  A. You want me to read it to you?
16  Q. Sure.
17  A. "Pat-down search of a person may be
18  conducted on the basis of the reasonable
19  individualized suspicion that such person is in
20  possession of contraband, weapons or explosive
21  devices. Any such search shall be conducted in
22  private by an authorized school official of the same
23  sex as the person to be searched and in the presence
24  of a witness of the same sex. Strip searches is not
25  permitted. However, with reasonable, individualized

Page 26

1  suspicion, coats, purses, backpacks, briefcases or
2  similar personal effects may be searched."
3       Q.  Okay.  And is there an accompanying
4  process and procedure SEC-02 that you guys follow?
5       A.  I'm not familiar with that.
6       Q.  Okay.
7          MR. BULLION:  I'll publish this as Exhibit 1
8  to the deposition.
9          (Exhibit 1 admitted.)
10      Q.  (By Mr. Bullion) Can you see this, sir?
11 Can you read it?
12      A.  Yes.
13      Q.  Okay.  Have you ever seen this document
14 before?
15      A.  Yes.
16      Q.  Okay.  And this is what I asked you about
17 earlier.  Process and procedure number SEC-02.
18          So you have seen this before?
19      A.  Yes.
20      Q.  Okay.  What is this?
21      A.  Looks like process and procedures for
22 search and seizures.
23      Q.  All right.  When was the last time that
24 you reviewed this?
25      A.  I don't recall.

Page 27

1       Q.  Okay.  Do you -- this will speed things
2  along.
3          Do you have an email address that I can
4  email you this document?
5       A.  Yeah.
6       Q.  All right.  One sec.
7       A.  First name dot, last name dot at RRPS.net.
8       Q.  First name, last name.  Okay.  One second,
9  please.  That's RRPS.net?
10      A.  Yes.
11      Q.  Okay.  I've emailed you that exhibit, sir.
12 And I copied Mr. Quinones and Mr. Walz and also sent
13 it to the court reporter.
14          Can you let me know when you receive that?
15      A.  Yeah, I'm refreshing now.
16      Q.  All right.  It bounced back to you.
17          Is Millan spelled M-I-L-A-N?
18      A.  No, two Ls.
19      Q.  Two Ls, okay.  I'll resend it.
20          All right.  So did it come through this
21 time?
22      A.  It's still refreshing.
23      Q.  And the reason I wanted to send the
24 document to you is, I'm going to ask you just to
25 read this and then I'm going to ask you some

Page 28

1  questions about it.  I figured it would be a little
2  bit easier if you had the document on your computer
3  and I didn't need to scroll for you.  But I don't
4  want to wait too much longer.
5          Do you have the document yet?
6       A.  No.  It's M-I-L-L-A-N.Baca, B-A-C-A at
7  RRPS.net.
8       Q.  Yes, that's where I sent it this last go
9  round.  Let's just work off of my screen here.
10          All right.  Can you please read Sections 1
11 and 2 and let me know when you're done and I'll
12 scroll down.
13      A.  Okay.
14      Q.  All right.  Let me know when you're done
15 with this part of Section 3 on the left-hand side of
16 the page.
17      A.  Okay.
18      Q.  All right.  And can you see everything on
19 the right-hand side of the page from Subsection C
20 through E?
21      A.  Yes.
22      Q.  All right.  Let me know when you've read
23 through Subsection E.
24      A.  Okay.
25      Q.  Okay.  Does this process and procedure

Page 29

1  allow for pat-down searches when looking for an item
2  other than a weapon?
3       A.  It disagrees with Search and Seizure
4  Policy 1009 C-3.
5       Q.  Okay.  You say "it disagrees," what do you
6  mean by that?
7       A.  School Board Policy 1009 Searches and
8  Seizure C-3 says, "A pat-down search of a person may
9  be conducted on the basis of a reasonable
10 individualized suspicion that such person is in
11 possession contraband, weapons or explosive
12 devices."  And this does not -- this only says
13 weapons.
14      Q.  Okay.  And I'm not surprised that you
15 caught that given your background as an English
16 teacher.
17      A.  Actually, yeah.  Go ahead.
18      Q.  Well, sorry, I didn't mean to interrupt.
19      A.  No, that's fine.
20      Q.  With searches here, it does specifically
21 mention weapon, drug or other contraband in the
22 searches section, right?
23      A.  Yes.
24      Q.  All right.  And this specifically says,
25 you know, "A pat-down consists of feeling the outer

Page 34

1  white to me.
2       MR. WALZ: Objection to form and foundation.
3       MR. QUINONES: Join.
4       Q. (By Mr. Bullion) It wasn't a rhetorical
5  question, sir. Could you explain how looking for
6  something other than a weapon would not violate this
7  process and procedure?
8       A. Perhaps I didn't know the process or
9  procedure.
10      Q. Okay. So you'd agree with me that looking
11 for something other than a weapon would violate this
12 process and procedure?
13      MR. WALZ: Objection. Form and foundation.
14      A. No.
15      Q. (By Mr. Bullion) Why not?
16      A. Different understanding of the process and
17 procedure.
18      Q. I'm not asking about subjective
19 understanding. I'm asking like literally as this is
20 written, looking for something and doing a pat-down
21 search for something other than a weapon, violates
22 process and procedure number SEC-02 3-D, right? I
23 mean that's -- that's just the objective truth of
24 the matter, right?
25      MR. WALZ: Objection. Form and foundation.

Page 35

1       MR. QUINONES: Join.
2       Q. (By Mr. Bullion) Sir, can you answer the
3  question, please?
4       A. Can you restate it, please?
5       Q. Yes. I'll ask it a different way.
6          What items under this process and
7  procedure are the -- could a security guard perform
8  a pat-down search for?
9       A. It looks to be a weapon.
10      Q. Anything other than a weapon?
11      A. According to D., no.
12      Q. Okay. And you indicated that you may not
13 have been aware of this process and procedure, and
14 you may not be able to answer this question because
15 of that, but do you know who put this process and
16 procedure together?
17      A. No idea.
18      Q. No idea, okay.
19      A. It says originating department being
20 safety and security, but I have no idea which person
21 within that department.
22      Q. Okay. Let me ask you now about your
23 interactions with the plaintiffs in this case. And
24 we'll go one at a time.
25         Starting with D.M., have you had

Page 36

1  interactions with Mr. M?
2       A. Yes.
3       Q. All right. About how many?
4          And, sir, are you grabbing something to
5  refer to?
6       A. Probably about ten.
7       Q. Okay. And were you looking at something
8  just now?
9       A. Referrals.
10      Q. Okay. So normally, you know, if we were
11 at an in-person deposition, you know, you would ask
12 to take a look at something.
13      A. Yeah.
14      Q. I understand we're over Zoom, but if
15 you're going to look at a document, I just ask that
16 you let us know because I want to know what's coming
17 straight from your recollection, what you need to
18 look at to refresh yourself on. And it's fine to
19 look at things to refresh yourself. I just want to
20 kind of be more in the know. Does that make sense?
21      A. Yeah. Sure.
22      Q. Okay. All right. So you said about ten
23 referrals for Mr. M?
24      A. Yeah. Probably close to that.
25      Q. Okay. And was he searched in your

Page 37

1  presence in any of these referrals?
2       A. I believe so.
3       Q. Okay. About how many times was he
4  searched?
5       A. In my presence, I believe twice. But I
6  can't -- I can't answer how many times he was
7  searched by other -- I can't answer how many times
8  he was searched by security guards under the
9  directions of another administrator.
10      Q. Okay. So we'll keep this limited to your
11 personal experience.
12         Do you have any documentation on these two
13 searches that was -- that were conducted in your
14 presence?
15      A. Yes.
16      Q. Okay. Have you reviewed those prior to
17 today's deposition?
18      A. Yes.
19      Q. Okay. And walk us through the first one.
20 What was the reason for the search, which security
21 guard conducted the search? You know, walk us from
22 start to finish throughout the material details of
23 that referral which resulted in a search.
24      A. I going to have to look at the paperwork
25 that I have because I have almost six hundred

Page 38

1  students and I can't remember any specific date that
2  I ever searched any one student.
3      Q. That's fine. Go ahead and take a look.
4      A. Okay.
5      Q. All right. Can you describe that first
6  referral that led to a search, please?
7      A. There was a search that happened on the
8  24th of January, 2019. And the circumstances was a
9  CHS staff member reported that D.M. dropped a vape
10 pen when he entered the restroom west end first
11 floor and it was a purple SMOK brand Novo model
12 vape.
13     Q. Okay. So someone saw him drop a vape pen?
14     A. Yes.
15     Q. And that provided -- that observation
16 provided reasonable suspicion to search him?
17     A. Yes.
18     Q. All right. What did it provide reasonable
19 suspicion to look for?
20     A. Contraband.
21     Q. Well, what kind of contraband?
22     A. Drugs.
23     Q. Walk me through, you know, the thought
24 process of seeing a student drop a vape pen and
25 suspecting that they may have drugs on their person,

Page 39

1  specifically in this instance with D.M.
2      A. Specifically in this instance with D.M.?
3      Q. Yes, sir.
4      A. By this point, me and D.M. had a decent
5  relationship in terms of we knew each other fairly
6  well. Security called me up to the front office to
7  let me know that D.M. was up there and he had been
8  caught with a vape pen.
9          When I asked him if he had a vape pen with
10 him, he said -- he denied it. Okay. When the
11 individual had seen D.M. with the vape pen, he
12 quickly picked it up and he put it in his pocket and
13 then was escorted by security up to the front
14 office.
15         When I got up to the office, I believe he
16 was in Mr. Affentranger's small conference room.
17 And I asked him if he had a vape device on him and
18 he claimed no. The entire time he had been in the
19 presence of a CHS staff member or security guard.
20 And I told him well, they're telling me that you
21 have a vape device on you. And he's saying no, I
22 don't have one.
23         So we asked him to remove his jacket for a
24 search. And when he removed the jacket for the
25 search, the security guard, I don't remember if it

Page 40

1  was Kerry Platow. I don't remember who the security
2  guard was. When they searched his jacket, in the
3  inner lapel pocket is where we found the vape
4  device.
5      Q. Okay. Thank you for explaining. With the
6  initial description, my impression was it was that
7  D.M. had not picked the vape pen back up and placed
8  it in a pocket. So thank you for explaining that.
9          You'd agree with me that had he left the
10 vape pen on the floor, there wouldn't reasonable
11 suspicion to search him, right?
12     MR. QUINONES: Objection. Form and
13 foundation.
14     A. Very often when we find a student with one
15 vape device, we find them with numerous vape
16 devices, the majority of the time.
17     Q. (By Mr. Bullion) Okay. So if you see a
18 student with a vape, there's a hunch that there may
19 be more than one vape?
20     A. Yes. We're dealing with an adolescent
21 brain very often that is dealing with an addiction
22 to either nicotine or marijuana.
23     Q. Okay.
24     A. And students have a propensity to carry
25 around multiple devices, very often empty devices.

Page 41

1  They have no more of the active ingredient in them.
2      Q. Okay. Well, let's talk a bit about this.
3  I want to see where, I guess, the outer limit is for
4  reasonable suspicion when someone's been observed
5  with a vape.
6          Say a student's observed with a vape pen
7  on Monday, could they be searched with that
8  additional observation information on Friday for
9  contraband?
10     A. No.
11     Q. Why not?
12     A. It's not timely.
13     Q. Okay. What would be timely in your
14 opinion?
15     A. That could depend on their change in
16 behavior. We've had students ingest drugs and they
17 sit with us for hours, and at the beginning of the
18 conversation, they're cognizant and two hours later,
19 they might be showing signs of being under the
20 influence. At that point, I think it would be fair
21 to justify a search.
22     Q. Okay. I mean I could see that making
23 sense in that situation.
24         What about specifically with -- with vape
25 pens? You know, what -- how long is too long to

Page 46

1  device by security when he was out on the bus lot.
2  Q. Okay. Was this before school or after
3  school on March the 4th?
4  A. This was after school, March the 4th was a
5  Wednesday which means he would have been getting out
6  of school. School ends on Wednesdays at 1:20,
7  rather than 2:29, and he was found at the -- he was
8  found in the bus lot. There was a girl that had
9  handed him, his statement says, "At the bus parking
10 lot, this girl Elaine asked me if I wanted some
11 gummies and I thought they were gummies because the
12 small little box was colorful. Security came and
13 got me and pulled it out and it happened to be a
14 vape stick that wasn't out of the package."
15 Q. Okay.
16 A. They let D.M. get on the bus and go home
17 that afternoon. And the next morning, he was
18 brought to my office and I was going to process the
19 referral for him.
20 Q. Okay.
21 A. While he was my office, I asked him if he
22 anything on him and he said no. And then he started
23 digging around in his pockets and trying to push
24 something down into his pocket and I asked to get
25 his hands out of his pockets. And asked him if he

Page 47

1  had anything in his pockets and he said no. And I
2  asked him to keep his hands up on the table.
3  And over and over and over, he kept
4  sticking his hands in his pockets trying to push
5  something I don't know where. Okay. At that point,
6  I did direct security to search him because I felt
7  he was acting suspicious.
8  Q. Okay. And is this observation of D.M.
9  acting suspicious not following your directives to
10 keep his hands out of his pockets, is that
11 documented in this referral?
12 A. No.
13 Q. All right. You'd agree with me that
14 that -- well, as I understand it, him acting
15 suspicious in your presence was the reason that he
16 was searched?
17 A. Yes.
18 Q. Okay.
19 A. Yeah.
20 Q. So why isn't that fact documented in the
21 referral?
22 A. Because he was not -- because he was not
23 disciplined for any reason on -- because there was
24 nothing found during the search on the 5th.
25 Q. Okay.

Page 48

1  A. He was disciplined for the vape device
2  that security found him with on the 4th.
3  Q. Okay. I asked you earlier to describe,
4  you know, the referrals that had taken place and,
5  you know, how searches were done, not all of the
6  material details, and you indicated that you had
7  something over 600 students per year, have a lot of
8  interactions that you would need to look at
9  documents, right?
10 A. Yes.
11 Q. All right. And this particular bit of
12 testimony that D.M. was acting suspicious and
13 looking in his pockets, that wasn't documented in
14 any of the documents you reviewed just now, right?
15 A. No.
16 Q. Okay. So did you have an independent
17 recollection of that before looking at the
18 documents?
19 A. Yes.
20 Q. Okay. Out of, you know, the 600 or so
21 students, why is it that this particular detail from
22 an incident that happened years ago, why does that
23 stick out in your mind, yet you needed to look at
24 documents to refresh your recollection of other
25 details?

Page 49

1  A. I have no idea.
2  Q. Okay. Who conducted that second search,
3  the one that we were just talking about?
4  A. I can't recall which of the security
5  guards would have conducted that search. At that
6  point, I was working with six different security
7  guards.
8  Q. Okay. It was, in fact, George Archuleta
9  who performed the second search, right?
10 A. It could have been. I believe it was him
11 and Kerry Platow that were in the room.
12 Q. Okay. Do you recall D.M. making any
13 statements during this search?
14 A. I remember him saying, "I don't know why
15 you're searching me." And I explained to him we
16 were searching him because he couldn't keep his
17 hands out of his pockets.
18 Q. Do you remember him making any other
19 statements or complaints?
20 A. His main complaint was that he was in
21 trouble and not the girl that had handed him the box
22 of gummy bears that had the vape device in it. And
23 I remember having a conversation with him about
24 possession is the law. And had he not taken
25 possession of the box, he would never have gotten

Page 50

1  possession of the vape device and what I'll -- she
2  did something that was unfair, possibly, in his
3  eyes, handing him a box of the vape device that he
4  didn't know was there he, it was still his
5  responsibility to know what he was accepting.
6      Q.  Okay.  And do you recall D.M. making any
7  statements to Mr. Archuleta?
8      A.  No.
9      Q.  Do you recall Mr. Archuleta making any
10 statements to D.M.?
11     A.  No.
12     Q.  Okay.  Let me see if this jogs your memory
13 or not.
14        Do you recall D.M. making any comments
15 about not wanting George to touch his dick?
16        MR. QUINONES:  Objection to form.
17     A.  No.
18     Q.  (By Mr. Bullion) Okay.  You don't recall
19 anything like that being said?
20     A.  No, sir.
21        MR. QUINONES:  Same objection.
22     Q.  (By Mr. Bullion) Okay.  Do you recall if
23 George retrieved a condom from Mr. D.M.'s pocket or
24 wallet?
25     A.  No.

Page 51

1      Q.  No?  Okay.
2      A.  We find condoms pretty often on young men.
3  I don't recall there ever a condom being associated
4  with D.M.
5      Q.  Okay.
6         MR. BULLION:  Can we go off the record for a
7  minute?
8         MR. WALZ:  Sure.  Do you want to have a
9  conference with counsel or just go off the record or
10 what do you want to do?
11        MR. BULLION:  I just want to talk about
12 timing.
13        (Recess taken at 2:55 to 3:36.)
14        THE COURT REPORTER:  We're back on the
15 record.
16     Q.  (By Mr. Bullion) All right.  Mr. Baca,
17 before we broke, we were talking about your -- some
18 of your interactions with D.M. and we talked about
19 two instances in which he was searched.  I've got a
20 couple more questions about the second instance that
21 he was searched.
22        So you testified that the basis for the
23 search in that instance was D.M. acting suspicious
24 and putting his hands in his pocket?
25     A.  Yes.

Page 52

1      Q.  Okay.  And he was searched and no item was
2  actually in his pocket, right?
3      A.  No.
4      Q.  Okay.  And during that search, was he
5  patted down?
6      A.  Yes.
7      Q.  Okay.  And what was being looked for
8  during the pat-down search?
9      A.  Whatever he was trying to push deep into
10 his pocket.
11     Q.  So you had no particular suspicion that he
12 had any particular thing in his pocket?
13     A.  I suspected a weapon or contraband.
14     Q.  Okay.  You said a weapon or contraband.
15 Tell me each fact that supports your suspicion that
16 Mr. M. had a weapon on his person.
17     A.  When we asked him to take his hands out of
18 his pockets, he was refusing.  When we asked him to
19 keep his hands out of his pockets, he was refusing.
20 When we asked him what was in his pockets, he
21 wouldn't reply.
22     Q.  Okay.  And that -- so there's -- sounds
23 like three things there.
24        Any other facts that supported reasonable
25 suspicion that he had specifically a weapon?

Page 53

1      A.  No.  Other than he wouldn't say what was
2  in his pocket.
3      Q.  Okay.  And you said weapon or contraband.
4  You had no idea if something was in his pocket, what
5  it was, right?
6      A.  No.
7      Q.  Okay.  And when he came into your office,
8  you and the security guard had the opportunity to
9  observe him before he sat down, right?
10     A.  To the best of my recollection.
11        I believe I was working on something else
12 when they brought him in.
13     Q.  Okay.  Did you and the security guard
14 notice any type of bulge or any other visual cues
15 that there may be in something in D.M.'s pocket?
16     A.  I did not.  But I also have to say that I
17 did not examine him visually before he sat down
18 across from me.
19     Q.  Okay.  So -- all right.  We've talked
20 about weapons.
21        Are there any -- well, let me know each
22 fact that supports your suspicion that he had
23 contraband at this time.
24     A.  Sorry, can you say that again?
25     Q.  Yeah.  Tell me each fact that supports

14 (Pages 50 to 53)

Page 54

1  your opinion, your thought that there was reasonable
2  suspicion that D.M. had contraband.
3     A.  His inability to keep his hands out of his
4  pockets when we asked him numerous times to stop
5  going in there and his unwillingness to tell us why
6  he was going into his pockets and what was in them.
7     Q.  Okay.  And that's it?
8     A.  From what I can -- yes, from what I
9  recall.
10    Q.  Did D.M. appear to be under the influence
11 of any kind of alcohol or drug?
12    A.  In my mind, no.  But I'm not -- you know,
13 in my mind, no.
14    Q.  Okay.  And he wasn't taken to see the
15 school nurse on this occasion, right?
16    A.  No.
17    Q.  All right.
18       MR. BULLION:  And I'm sorry, this is the
19 court calling.  I mentioned this earlier.  I just
20 need to step away just for a second.  Be right back.
21       (Recess taken at 3:41 to 3:43.)
22    Q.  (By Mr. Bullion) All right.  Mr. Baca,
23 sorry I had to step away for a second there.
24       We were discussing this second search in a
25 bit more detail.  Is there any other fact about that

Page 55

1  search that you remember that we haven't discussed?
2     A.  No.
3     Q.  No?
4     A.  No.
5     Q.  Okay.  Can you tell me which pocket D.M.
6  was, I guess, fidgeting with?
7     A.  Both.
8     Q.  Both of them?  Okay.
9     A.  Both front pockets.
10    Q.  What kind of pants was he wearing?
11    A.  I believe pants that were the style at
12 that point that had a -- I think they were made out
13 of denim but it's like a thin almost acid wash denim
14 and I believe the bottom had an elastic cuff, if I
15 recall.
16    Q.  Okay.
17    A.  It was quite the style for boys that year.
18    Q.  Okay.  Are these tighter fitting clothes,
19 looser fitting clothes?  I can't say that I'm
20 familiar with these jeans.
21    A.  Loose at the top, tight at the bottom.
22 The style seemed to have died during COVID.
23    Q.  Okay.  Are the pockets in these jeans --
24 I'm calling them jeans, but I guess they're pants --
25 are the pockets in these pants, you know, like your

Page 56

1  normal jeans pocket or do they differ in some way?
2     A.  I have no idea.  I've never worn any of
3  these and I've never touched any of these.  I've
4  just seen them.
5     Q.  Okay.  You mentioned eight other referrals
6  that you had with Mr. M.  I don't believe we need to
7  go through each and every one in detail like we've
8  gone over these two, but can you give us a brief
9  description of each of these eight referrals?
10    A.  If I can look at my folder, yeah.
11    Q.  Yeah, sure.
12    A.  But otherwise, no.
13    Q.  Okay.  Yeah, go ahead.
14    A.  I can't promise the number is eight or
15 ten.  That was just an estimate.
16       All right.  So it looks like first meeting
17 between myself and D.M., let me see, would have been
18 September 9th, 2018.
19    Q.  Okay.  And can you give us just a brief
20 description of that referral?
21    A.  From what I can see, he wrote a statement
22 in the 9th grade office where he says, "in 7th
23 period Ryan," that would be R.R., another freshman
24 at that point.
25       "After the fight, told me that he'd fight

Page 57

1  me if I do anything else dumb."  And he's saying
2  that was in 7th period on Tuesday.
3     Q.  Okay.  Was D.M. a freshman at this time?
4     A.  Yes.  That would have been probably his
5  fifth week of his freshman year at Cleveland High
6  School.
7     Q.  Okay.  And is this a type of referral
8  atypical for a freshman boy?
9     A.  So this is not a referral, this is a
10 voluntary student statement --
11    Q.  Okay.
12    A.  -- that D.M. would have written.
13    Q.  Okay.  So D.M. wasn't -- but did someone
14 get in trouble because of this other than D.M.?
15    A.  I believe there was a fight that had
16 occurred that he was on the periphery of.  I believe
17 one of the boys that was involved in the altercation
18 had threatened D.M. that he would fight him if he
19 did anything else dumb.
20    Q.  Okay.  And D.M. informed the school of
21 this threat?
22    A.  Yes.
23    Q.  Okay.  Is that typical that if a student
24 threatens another student, it goes in their student
25 file?

15 (Pages 54 to 57)

Page 70

1  there could be a -- I guess a group versus group
2  fight?
3      A.  Yes.  And honestly, if there's a group
4  versus group fight, we would be outnumbered.
5      Q.  Okay.  Did -- you know, following calling
6  the parents of the children involved, was there
7  ongoing concern that somebody would bring a weapon
8  or a gun to school?
9      A.  Yes, there was definitely.
10     Q.  Okay.  And how was that addressed and
11 dealt with?
12     A.  Calling parents and asking them if these
13 students had access to weapons and trusting that the
14 parents were being honest with us.
15     Q.  Okay.  Was there a concern following this
16 Snapchat that D.M. would be in possession of a gun
17 or other weapon?
18     A.  No.
19     Q.  No?
20     A.  No.
21     Q.  Okay.
22     A.  Not D.M., no.
23     Q.  Okay.  To try to expedite things, with the
24 other referrals, are there any -- do any of the
25 referrals deal in any way with drugs, guns or other

Page 71

1  contraband?
2      A.  Let me look at them.
3      Q.  Okay.
4      A.  No.
5      Q.  Okay.  I think we're probably done with
6  Mr. -- questions about Mr. M. then.
7          Is there anything else about your
8  interactions with D.M. and your knowledge about D.M.
9  that you think is important that we haven't talked
10 about?
11     A.  No.
12     Q.  Okay.  Let's talk now about L.M.
13         Have you ever had any interactions with
14 Mr. L.M.?
15     A.  Not that I recall.  And that -- he was not
16 a member of the Class of 2022.  I don't ever
17 remember having any interactions with him.
18     Q.  Okay.  And who would his, you know,
19 principal have been, or I guess his year principal
20 have been?
21     A.  Rudy Galindo.
22     Q.  Okay.  And if you had any involvement with
23 L.M. -- hold on a second.  Sorry about that.
24     A.  No, that's fine.
25     Q.  If you did have any interaction with L.M.,

Page 72

1  would it be documented with a referral or something
2  like that?
3      A.  Yes.  Well, I don't remember ever having
4  any interactions with him.  I can have interactions
5  with students and not have referrals written.
6      Q.  Okay.  If L.M. had been searched at your
7  direction and in your presence, there would be
8  documentation to that effect, right?
9      A.  Not necessarily.  He could have been
10 searched, and if nothing was found, there would
11 probably be no documentation.  If something was
12 found, that would probably have gone to his
13 assistant principal of record, Mr. Galindo.
14     Q.  Okay.  So I want to go over this a little
15 bit.  If a student is searched and nothing is found,
16 there's not a report done or any kind of
17 documentation that a search occurred?
18     A.  I believe security does a report,
19 administrators do not.
20     Q.  Okay.  And to prepare for today's
21 deposition, did you, you know, think about whether
22 you had any interactions with Mr. L.M. and look for
23 any documents that might refresh your recollection?
24     A.  Yes.  I don't have any documents relative
25 to him.  So I didn't think -- so I didn't recall any

Page 73

1  incidents that involved him.
2      Q.  Okay.
3      A.  He was listed in a document I had created
4  in the '19-'20 school year when he had quite a blow
5  up of violence or threatened violence on the campus
6  of Cleveland High School that even extended to Rio
7  Rancho High School.
8      Q.  Okay.  Can you describe this document to
9  me and why L.M. was included in it?
10     A.  He was included because he was -- I asked
11 the other principals "Who could be involved in
12 this?"  And he was listed as being on the periphery.
13     Q.  Okay.  So --
14     A.  And he was loosely backing up one of the
15 two parties that we were afraid was going to get
16 into a large fight or have a violent confrontation
17 either on campus or off campus.
18     Q.  Okay.  And do you still have this
19 document?
20     A.  I believe so.
21     Q.  Is it readily accessible to you?
22     A.  I believe so.
23     Q.  All right.  I'm going to ask that you
24 please email this to me.  And if we take another
25 break, I'll review it then.  Can I give you my email

Page 78

1  notes like it says "backs R.R. or backs J.R. and
2  Jess R."
3       What does it mean backs, you know,
4  something?
5       A.  Side one and side two, the first column
6  would be R.R. and the column that's underneath him
7  would be the people that would back him up.  The --
8       Q.  Oh, I see.
9       A.  -- X.D., the column under him might
10 loosely back him up.
11      Q.  What does that mean "loosely back" someone
12 up?
13      A.  They might jump into a fight if a fight
14 actually did occur.  And there were quite a few
15 fights that happened between these two groups.  Most
16 of them off campus.
17      Q.  Okay.
18      A.  If you read -- so L.M. is -- all that we
19 knew -- all that we knew is that R.R. considered him
20 a close friend.
21      Q.  Okay.
22      MR. QUINONES:  I apologize.
23      THE WITNESS:  He had been told -- he had
24 been told by X.D. that L.M. would back him R.R. in a
25 large fight.

Page 79

1       MR. BULLION:  Okay.  And Carlos, I was so
2  fascinated by this, I forgot to forward it.  I just
3  forwarded it.
4       MR. QUINONES:  Okay.  That's just what I was
5  going to ask about.  Sorry for interrupting.
6       MR. BULLION:  No.  No.  Thank you for
7  reminding me.
8       Q.  (By Mr. Bullion) Okay.  Is -- Mr. Baca, are
9  the -- is this -- it's 14 pages long, there's quite
10 a few students here.  I understand that there's, you
11 know, various columns for side one and side two.
12      Is there any rhyme or reason as to why
13 individuals are on a particular page?
14      A.  No.  Well, no, not necessarily.  I just
15 did it based on, I guess you can say that the
16 further up they are, the higher our concern was for
17 them.  That was the original intent.  But this -- it
18 was a fluid document.
19      Q.  Okay.
20      A.  Where I was adding information to it as it
21 came to me.
22      Q.  Okay.
23      MR. BULLION:  And I'll admit, mark this as
24 Exhibit 3 to the deposition.  Let me forward it to
25 the court reporter.

Page 80

1       (Exhibit 3 admitted.)
2       MR. BULLION:  And I'm sending it to both the
3  receptionist and the assistant email.
4       Q.  (By Mr. Bullion) All right.  And this is
5  the document to which you're referring, sir?
6       A.  Yeah.
7       Q.  And this is Mr. L.M. on page ten, I think?
8       A.  Yes.
9       Q.  Okay.  And the only information here is
10 that he backs R.R.
11      A.  Yes.
12      Q.  Okay.  What -- how did L.M. end up in this
13 document?
14      A.  X.D. had told me when we asked him when he
15 sat down with us, what students will back R.R. if
16 this turns into a large assault.
17      Q.  Okay.  I noticed also on page three, I
18 think it's page three, that Mr. J.S. is on here.
19      A.  Uh-huh.
20      Q.  And we'll come back and talk to you about
21 that, actually.
22      Is there any other information regarding
23 Mr. L.M. that you're aware of with regard to him
24 being searched at school?
25      A.  No.

Page 81

1       Q.  No?  To your knowledge, had he ever been
2  suspected of possessing a weapon?
3       A.  No.
4       Q.  No?  Okay.  Well, I think that does it for
5  Mr. M.
6       With Mr. J.S., let's talk about him now.
7  And let's start with this document, with this
8  Exhibit 3 here.
9       How did J.S. end up in this document?
10      MR. BULLION:  And I'm sorry.  I messed up
11 the screen sharing somehow.  Let me see if I can get
12 this to work.  Screen sharing is paused.  All right.
13 I'll just share the entire screen, see if that
14 works.
15      Okay.  Can everyone see this document?
16      MR. QUINONES:  Yes.
17      MR. WALZ:  I can, yes.
18      Q.  (By Mr. Bullion) Okay.  Sir, how did J.S.
19 end up in this document?
20      A.  I would have placed him on there.
21      Q.  Okay.  And it says in the right-hand side,
22 and this highlight is not original.  I highlighted
23 that earlier.
24      It says, "backs R.R. Refused to cooperate
25 with the investigation in the 10/3 incident where

Page 82

1   A.V. came on to campus and suspended from 10/7 to
2   10/16."
3       So, you know, what's the thinking that J.S
4   was going to back Ryan here?
5       A. One second. I have to answer this.
6       Q. Yeah, go ahead.
7       A. Okay. Can you repeat the question?
8       Q. Yeah. What is the facts that you're aware
9   of that led you to believe that J.S. was going to
10  back R.R. and potentially be involved in a group
11  fight?
12      A. He had told people that he would.
13      Q. Okay. Who had he told?
14      A. He had stated -- well, according to --
15  give me a second. Is there a way for me to -- here,
16  give me a second.
17      In the verbal statements we had gotten for
18  side two, they had told us that J.S. would back up
19  R.R.
20      Q. Okay. So some students told you that J.S.
21  had told them that he would back up R.R?
22      A. Yes.
23      Q. Okay. So you've got some students telling
24  you that J.S. said some things. Anything else?
25      A. Him and R.R. were very close.

Page 83

1       Q. Okay. I also noticed on there that it
2   says that J.S. sold cartridges. Can you tell me
3   about that?
4       A. That was the suspicion that myself and the
5   security department were operating under.
6       Q. All right. What was the basis for that
7   suspicion?
8       A. Him always being right next to where the
9   cartridges were being sold and students telling us
10  that that's where they got them from when they were
11  caught with cartridges.
12      Q. Okay. How many people told you that they
13  had gotten cartridges from J.S. when they were
14  caught with cartridges?
15      A. Probably one.
16      Q. Okay. So just --
17      A. Well, told me one. But in terms of told
18  other administrators, I can't say.
19      Q. Okay. But you personally just the one
20  time?
21      A. Yes. Now, I can't promise that that was
22  the truth because we had two sides of a conflict
23  that were trying get the other ones in trouble all
24  the time. And when I had shared this document with
25  security and Rio Rancho Police Department, I had

Page 84

1   told them that they could take none of this as being
2   one hundred percent factual and they understood
3   that.
4       Q. Okay. And that's specifically because the
5   two sides of this, I guess, dispute, these two
6   different collections of friends were trying get the
7   other people in trouble?
8       A. Yes.
9       Q. And that was a constant occurrence?
10      A. Yes. Yes. Yeah. We were incredibly busy
11  especially the fall of their sophomore year trying
12  to keep these two groups of boys from hurting each
13  other.
14      Q. Okay. And did J.S. ever actually get into
15  a fight?
16      A. The only fight that I ever knew J.S. to
17  get involved in was oddly enough with D.M.
18      Q. Okay. Just briefly tell us about that.
19      A. Let me go to D.M.'s file.
20      So on the 21st of February, 2019. So the
21  spring semester of their freshman year.
22      Q. Uh-huh.
23      A. The semester before this document was
24  created, J.S. and D.M. were both suspended for
25  fighting.

Page 85

1       Q. Okay.
2       A. There -- I have statements from both of
3   them, if you'd like me to read them.
4       Q. No. That's all right. Why don't tell me
5   what your take away from, I guess -- yeah, go
6   ahead.
7       A. During the freshman year for both of these
8   individuals, so '18-'19, fall of '18, spring of '19,
9   there were quite a few boys at Cleveland High School
10  that were engaging in an activity that was against
11  rules and they didn't quite understand it, why it
12  was against the rules.
13      They would challenge the other to a game
14  that they called bodies. And they called it a game.
15  I called it an assault. Okay. D.M. and J.S.were
16  both being egged on to go "bodies" with each other,
17  as the term was -- that was a term that they used
18  for this "game."
19      Q. Uh-huh.
20      A. Before first period, they went to the
21  restroom and I believe they both rode the same bus.
22  J.S. that D.M. was showing off to a friend or they
23  were walking down the hall and that D.M. challenged
24  J.S. to go to the restroom and do bodies with him.
25      Well, J.S. is also not one to back down,

22 (Pages 82 to 85)

Page 118

1  agitated.
2  Q. Okay. Is that your full answer to that
3  question?
4  A. When a student gets agitated to that
5  point, we typically think that they have something
6  on them.
7  Q. Okay. So that's a little different. You
8  said that maybe he had a weapon. Now you're saying
9  that if a student is agitated, your concern that
10 they may have something on them. So --
11 A. Yeah.
12 Q. -- what was the specific concern that J.S.
13 had a weapon on him on October 4, 2019?
14 A. His agitation.
15 Q. Okay. His agitation?
16 A. Yes.
17 Q. Are all students who show agitation at
18 your school searched for weapons?
19 A. No.
20 Q. Okay. So why was J.S. searched?
21 A. I believe he became incredibly agitated.
22 And he wouldn't definitively answer if we searched
23 him if we would find nothing on him.
24 Q. Okay. So the -- and we've talked about
25 this for a while now. As your recollection

Page 119

1  improved, are you, in fact, the person who directed
2  Mr. Archuleta to search J.S. on October 4, 2019?
3  A. I can't say.
4  Q. Okay. So you recall these specific facts
5  that J.S. was agitated, that he was involved in this
6  thing the day before, that he appeared very
7  agitated, that he wouldn't say what was in his
8  pockets, you remember that?
9  A. Yeah.
10 Q. But you don't remember if you were the
11 person who instructed him to be searched?
12 A. No, I don't. But if Mr. Archuleta wrote
13 it and Mr. Mangin approved it, then it's probably
14 true.
15 Q. Okay. Are there any other facts or
16 observations about J.S. that you could share with us
17 that we haven't discussed that you feel are
18 important?
19 A. No.
20 Q. Okay. Have you ever observed or heard of
21 George Archuleta searching a student at his own
22 direction?
23 A. No.
24 Q. Okay. And that would be in violation of
25 school policy if he were to search a student without

Page 120

1  being told by an administrator to do so, right?
2  A. Unless there's exigent circumstances where
3  he would think that the student was in possession of
4  a weapon.
5  Q. Okay. And he would be obligated to a
6  report stating what the exigent circumstances were
7  and reasonable suspicion that a student had a
8  weapon, right, if that were to happen?
9  A. Yes. If that were happen, and after doing
10 so, he would have to bring the student up to the
11 office and let us know why he had searched them and
12 if the student search produced anything. And at
13 that point -- yeah.
14 Q. Okay. So even if he does a search on his
15 own, he's obligated to inform you after the fact?
16 A. Yes.
17 Q. Okay. Do you recollect --
18 A. Myself or an administrator.
19 Q. Okay. Do you recollect ever that ever
20 happening, Mr. Archuleta coming to you and informing
21 you that he had done a search of any particular
22 student?
23 A. No.
24 Q. No? Okay. Have you ever received any
25 complaints from students regarding Mr. George

Page 121

1  Archuleta?
2  A. No, not that I recall.
3  Q. Okay. Have you heard any complaints about
4  him third hand, any students saying anything about
5  him?
6  A. No.
7  Q. No? Okay.
8  MR. BULLION: Jerry and Carlos, I think I'm
9  pretty much done. If I could have just a second to
10 check my notes to make sure I don't forget anything
11 here.
12 MR. QUINONES: I need a restroom break.
13 Maybe we can come back at 6 p.m.?
14 MR. BULLION: Sounds good.
15 MR. WALZ: Sounds good. Thank you.
16 MR. QUINONES: Thank you.
17 (Recess taken at 5:54 to 6:02.)
18 Q. (By Mr. Bullion) All right. Mr. Baca,
19 thank you very much for answering questions today.
20 Before I break, before I pass you over to Mr. Walz
21 to ask some questions, did you understand all my
22 questions today?
23 A. Yeah.
24 Q. Okay. We don't need to clarify any of
25 your -- any of my questions or your answers?

Page 130

1  children. And I believe that there were more one
2  than instance where his grandmother actually showed
3  up to reinstatement meetings.
4  **Q. During any of the meetings with J.S. or**
5  **the mother or grandmother that you recall, did J.S**
6  **or the adults ever take responsibility of that J.S.**
7  **was, in fact, violating classroom decorum and being**
8  **insubordinate or did they blame it on someone else?**
9      MR. BULLION: Form. Foundation.
10  **Q. (By Mr. Walz) You can answer.**
11     A. J.S. would rarely accept responsibility
12  for his actions. He was prone to justification,
13  rationalization, downplaying that his events,, that
14  his actions were disruptive. Very often he would
15  say well, when I did this, my friends were laughing.
16  But in a special education classroom, very often we
17  have students that are on -- that are in there for
18  learning disabilities, they have no behavioral
19  issues and they're mixed with students that have
20  more behavioral issues.
21     And what I could never get them to
22  understand was there was some students in the room
23  with him that generally wanted to learn, that were
24  cognizant of the fact that they had disabilities
25  that were impeding their ability to learn like the

Page 131

1  average freshman or sophomore, and I couldn't get
2  J.S. to understand that. He wasn't -- his happiness
3  was not the main thing that mattered in that room.
4  **Q. Okay.**
5     A. And I relate to him, what happened to me
6  when I was sophomore in high school. Because when I
7  was a sophomore in high school, I couldn't keep my
8  mouth shut either. And the best thing that ever
9  happened to me is my best friend in world turned
10  around and told me "For God's sake just shut up."
11  Because I could learn after hearing something once
12  and my friend had to learn after hearing it five
13  times.
14     And I explained to J.S. that when my
15  friend -- when my friend that told me to be quiet,
16  instead of Mr. Lopez, my principal, that that's when
17  I actually changed. And I started to respecting the
18  classroom environment as a place where there was
19  learning happening. And I also explained to him
20  that what he needed to realize was I didn't like
21  disciplining kids, but if I have a classroom of 33
22  students, and 32 of them want to mess around but
23  there's one student in there that wants to learn, my
24  responsibility as an administrator is to protect
25  that environment and discipline the 32 students so

Page 132

1  the one student can learn.
2     It's not about a teacher's delivering
3  instruction, it's about a student being able to
4  receive instruction. And that's something he was
5  never able to really comprehend, and if he did, he
6  didn't care about it.
7  **Q. So it sounded like, or correct me, please,**
8  **that you related some of these circumstances and**
9  **stories about your life as a student when you had**
10  **various meetings with J.S.; is that correct?**
11     A. Yes, definitely.
12  **Q. Were you trying help him to get on the**
13  **right path?**
14     A. I try and help every student because I was
15  lucky enough to have a great Principal Nelson Lupez
16  that was willing to tolerate me in the ninth and
17  tenth grade. And twelve years later, I was lucky
18  enough to work at his school.
19  **Q. So about how many times would you say that**
20  **you had some type of a detention lunch with J.S.**
21  **where the two of you were sitting across a table or**
22  **desk from one another during his freshman and**
23  **sophomore years?**
24     A. A minimum of six. He served many more
25  than six lunch detentions in my office. I would try

Page 133

1  and stay in my office when I had given a student
2  lunch detention. But very often I wasn't able to
3  remain there. Very often I'm pulled up to the front
4  office because another student needs my attention.
5     I used to be in charge of the park testing
6  which would take six weeks of me essentially
7  disappearing and not being able to discipline or
8  speak with students and the other administrators
9  would take over for me. But I would think at least
10  six times J.S. was in my office, not always by
11  himself. When students had lunch detention with me,
12  very often there'd be two or three at a time and I
13  have a little table in any room and I would tell
14  them to go get their lunch and they were supposed to
15  spend a half hour with me. Very often they would
16  show up for five minutes. As long as they showed up
17  for five minutes, though, I counted the day for
18  them.
19  **Q. Okay.**
20     A. If I wasn't there when they came and they
21  would have sat with Ms. Martinez or Ms. Nelson, the
22  two secretaries I had in this time span with this
23  class.
24  **Q. All right. The teachers, were those staff**
25  **school members during J.S.'s freshman and sophomore**

34 (Pages 130 to 133)

Page 134

1  years, were these write ups from just one teacher or
2  multiple teachers over a period of time?
3     A.  They came from multiple teachers.  Some of
4  the teachers that wrote up J.S., Ms. Adamson.  She
5  rarely writes up students.  Okay.  She's a very well
6  respected, very highly experienced English, Language
7  Arts, Special Educational instructor.  And if she
8  writes up a kid, it tells me that she has done
9  everything in her power to try and motivate the
10 student to comply with her expectations.  Okay.
11    She's not a person who writes up students
12 very often.  Okay.  We joke at the school that when
13 she dies that she's going to get a sling shot to
14 heaven.  And we say that because I think she's
15 adopted five or six students that are heavily,
16 heavily disabled and some of them are going to live
17 with until she dies or they die.  Her patience is
18 that of a saint.  And if she writes up a student, I
19 have to respond to that write up taking her word as
20 an indication that she needs assistance to protect
21 the other students in the room.  Even if it's just
22 for a short reprieve.  Even if it's just to speak to
23 the students and they give the student a warning.
24    Q.  So let me ask you this:  Based on your
25 interactions with J.S. and your knowledge of the

Page 135

1  teachers and the write ups, did you see any kind of
2  effort to, for lack a better, let's just target J.S.
3  and see what we can do to find something that he's
4  done wrong or get the goods on him to discipline him
5  or kick him out of school, did you see any kind of
6  movement like that occurring?
7     A.  Never.  I -- I would say that Cleveland
8  High School never operates from the point of view
9  that we need to get students off campus.  Okay.
10 When I call parents, I very often tell them when
11 they get angry at me, I tell them that those phone
12 calls are the least enjoyable part of my job.  But
13 my duty as an administrator is to inform them how
14 their child's behavior is getting in the way of
15 either their learning or the learning of their
16 classmates.
17    Q.  Let me ask you this a little differently.
18 Did you do everything in your scope as an educator,
19 as an administrator in your own personal educational
20 history that you have mentioned, do everything that
21 you possibly could to keep J.S. in the mainstream of
22 the educational process?
23    A.  Yes.  I tried to keep him in classrooms as
24 often as I could.  When I felt that it was to his
25 benefit, and also where he would respect the

Page 136

1  environment of his peers.
2     Q.  Okay.  Let's move to another topic that
3  Mr. Bullion touched on, and that's the groups that
4  might have been ready for combat or were having some
5  off-campus skirmishes.  In the world of education
6  now, and we've all read the news or heard the news
7  about these shootings and fights, et cetera in all
8  these different school districts throughout the
9  country.
10    Is that a real issue that we should be
11 worrying about here at Rio Rancho Public Schools and
12 in New Mexico or is it just blown out of proportion
13 that school districts really shouldn't, you know,
14 make a chart like you were working on to try to
15 figure who is connected to who or whatnot, in terms
16 of maybe preventing violence?  Is this real or is
17 this just something that's just to think about?
18    MR. BULLION:  Form.  Foundation.
19    Q.  (By Mr. Walz)  You may answer.
20    A.  I believe -- I believe it's incredibly
21 real.  We had a shooting on the campus of Cleveland
22 High School Valentine's Day of J.S.'s freshman year,
23 to that would be 2019.  Luckily, nobody was injured.
24 Luckily, it was a child who was having mental
25 issues.  I caught a senior in the -- in the fall

Page 137

1  semester of 2018, 2017, with numerous firearms in
2  his vehicle.
3     I assume that there's firearms on this
4  campus every day.  If I had it my way, we would have
5  metal detectors to come into the school.  I have two
6  daughters that come to school here.  In my mind,
7  this is the most dangerous place they typically are.
8  And I say that because we have 2,500 children here.
9  And 2,500 children in one place, to me is a recipe
10 for eventually having somebody commit a great act of
11 violence.
12    When those two groups of students were
13 having the interactions that they were, and students
14 and parents were sending us emails with or phone
15 calls where they had taken a screenshot of a
16 Snapchat and it was showing some type of handgun or
17 automatic rifle, we were incredibly worried that
18 there would be a shooting at school.  Okay.
19    X.D.'s parents told us that they were at
20 work and they had a car that looked like the
21 Rodriguez and -- the Rodriguez and G.M.'s car that
22 went by their business and fired guns into the
23 building.  One of the students involved in that
24 whole situation is J.L.  J.L. has been on the news
25 numerous times in the past year for possibly