Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

No. 21-CR-00427 SMV/KRS

MARK MONDRAGON o/b/o
D.M. a minor child,

        Plaintiffs,
v.

RIO RANCHO PUBLIC SCHOOLS,
BOARD OF EDUCATION and
GEORGE ARCHULETA in his
Individually and official capacity,

        Defendants.

## DEPOSITION OF

## GEORGE ARCHULETA

MAY 17, 2022
3:30 p.m.
500 4th Street, NW Suite 105
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:    TODD J. BULLION
              ATTORNEY FOR PLAINTIFFS

REPORTED BY:    EDWINA CASTILLO, CCR #407
                 PAUL BACA COURT REPORTERS
                 500 4th Street, NW Suite 105
                 Albuquerque, New Mexico 87102

# EXHIBIT F

Page 14

1  A. I retired.
2  Q. Okay. You had been there 20 years was it?
3  A. Twenty years, ten months.
4  Q. All right. How soon after retiring did
5  you head to Rio Rancho Public Schools?
6  A. Like the next week I believe. I retired
7  and then the next week they had opened Cleveland
8  High and I applied for a job there and I -- I got
9  hired.
10  Q. Okay. Can you describe the hiring process
11  to me, please?
12  A. I went for an interview and they asked me,
13  I don't know five, ten questions and then that was
14  the extent of the interview. And then they called
15  me the next day and said I had the job.
16  Q. Okay. Just the one interview?
17  A. Yes.
18  Q. Okay. And you submitted an application
19  for employment?
20  A. Yes, I did.
21  Q. You remember how -- I know this was a long
22  time ago but do you remember about how long it was?
23  A. It was in 2009.
24  Q. Oh. I'm -- I'm sorry. Do you remember
25  like how extensive the application was, like how

Page 15

1  many pages the actual application was?
2  A. I don't remember. I -- I don't -- it was
3  online. I did it on the computer but I don't
4  remember.
5  Q. Okay. All right. So you were -- you were
6  hired. After being hired, how long was it before
7  you actually started working at Cleveland as a
8  security guard?
9  A. I went to a week -- a training there,
10  well, three, four days of training and then school
11  started and I went to work right away when school
12  started.
13  Q. All right. This three or four days of
14  training, was it right before you started the school
15  year?
16  A. Yes, sir.
17  Q. Can you describe that three or four days
18  of training to me, please?
19  A. They -- we went over the handbook, the
20  policies and procedures and then they had Poms and
21  Associates come in and we watched film and then
22  we -- they talked to us. They trained us about pat
23  searches and CPR and traffic, traffic duty, how do
24  direct traffic.
25  Q. Okay. And you said I think Pauls and

Page 16

1  Associates. Do you know how to spell that?
2  A. Poms. Poms. Poms and Associates.
3  Q. Okay. And I'm not familiar with them.
4  What kind of organization are they?
5  A. I -- I have no idea. They're out of
6  Albuquerque. I -- I don't know they've had them,
7  the school would take bring them in three, four
8  times. I mean, why I was employed there before
9  school would start, they'd come and give us some
10  training.
11  Q. And this Poms is spelled P-o-m-s?
12  A. Yes, sir.
13  Q. Okay. And was it just the one time you
14  trained with Poms is that like once a year?
15  A. No. Once a year.
16  Q. Okay. As part of the training that they
17  put on, was there like a slide show or visual aids
18  that went along with it?
19  A. Yes, there was slide shows.
20  Q. You mentioned that you were trained in
21  pat-down searches by the school. Can you describe
22  that training to me, please?
23  A. Yes. They had us -- showed us how to
24  pat-down a student. You stand behind them, have
25  them extend their arms, pat them down, the middle of

Page 17

1  the back, around the waistband, their legs, and then
2  if they're wearing a jacket, you have them remove
3  the jacket and you search the jacket or the hoody or
4  the sweater.
5  And then if the administrator wants the
6  backpack, if they have a backpack, if they want that
7  searched, you search the backpack. And if they're
8  driving a vehicle and the administrator wants the
9  vehicle searched, then we go search the vehicle.
10  Q. Okay. And would you mind standing up and
11  showing me on your body where you were trained to
12  pat the students?
13  A. Okay. Have them do that, go down their
14  arms, right here, go around there (indicating). Go
15  down their legs. Sometimes take off their shoes and
16  socks, and that was it.
17  Q. All right. How -- how far up the leg were
18  trained to go?
19  A. Right above the knee, about maybe three
20  inches above the knee.
21  Q. Okay. And how far -- and remind me, were
22  you trained to pat down the waist area?
23  A. Yeah, the waist, the beltline.
24  Q. Okay. And how -- did you pat-down ever
25  below the waist area?

5 (Pages 14 to 17)

Page 18

1   A. No, sir.
2   Q. In between -- okay. So you were trained
3   to never pat down below the waist and three inches
4   above the knee?
5   A. Yes, sir.
6   Q. Okay. And were -- did they explicitly
7   tell you in training you were not to pat-down, you
8   know, the area between the -- below the waist and
9   three inches above the knee?
10  A. Yes, sir.
11  Q. Okay. And is there any circumstance at
12  all in which you as a security guard should touch a
13  student's genitals?
14  A. No, sir.
15  Q. Okay. So even -- well, what about
16  incidental or accidental contact? Should that even
17  be possible to occur during a pat-down search?
18      MR. QUINONES: Objection to the form,
19  foundation.
20      You can answer.
21  A. No, sir.
22  Q. (By Mr. Bullion) Okay. Because based on
23  your training, you know, that you described from the
24  school, you're not supposed to go below the waist or
25  more than three inches above the knee?

Page 19

1   A. That's correct. Yes, sir.
2   Q. Okay. And you'd agree with me that it
3   would be wrong to touch a student's genitals during
4   a search?
5   A. Yes, sir.
6   Q. When you were at Cleveland, did policy on
7   pat-down searches evolve or change over time?
8   A. No, sir.
9   Q. Okay. And actually where -- where are you
10  working now?
11  A. I work at Wal-Mart.
12  Q. Okay. How long did you work at the public
13  school district at Rio Rancho?
14  A. Ten years.
15  Q. Okay. What were you making per hour there
16  when you left?
17  A. Fourteen something but it was 182-day
18  schedule so that fourteen whatever was broke --
19  broken down. It was like really nine bucks an hour,
20  $9 a hour due to them paying us in the summertime
21  when we weren't working. So I would have to work --
22  I would volunteer. I wouldn't have to, I would
23  volunteer to work summer school so I can make decent
24  money.
25  Q. Okay. How much are you making at Wal-Mart

Page 20

1   now?
2   A. About $13 an hour.
3   Q. And what's your schedule?
4   A. I work four days and I'm off three.
5   Q. Okay. About how many hours a week is
6   that?
7   A. I work 32 hours a week.
8   Q. Okay. Are you making more or less money
9   now than you did at the school?
10  A. More money.
11  Q. Okay. Why was it that you left Cleveland?
12  A. Well, I was getting burnt out. And then
13  there was an individual I worked with that -- we
14  didn't get along. So I was -- due to him and being
15  burnt out, that's why I left. It was just time. I
16  was in security for 30 years and 30 years was enough
17  for me.
18  Q. And what do you do at Wal-Mart right now?
19  A. I'm in maintenance.
20  Q. Okay. And the individual you don't get --
21  you didn't get along with, what's their name?
22  A. Todd Mock.
23  Q. Okay. And what was the, I guess nature of
24  your disagreement?
25  A. He just harassed staff and I -- I

Page 21

1   didn't -- it was all right for awhile and then I
2   just -- it got old after awhile.
3   Q. Okay. But what exactly do you mean by
4   harassed staff?
5   A. Make fun of them, tease them, bully them
6   and it would just -- like I said, it was all right
7   for awhile but it gets old after awhile also. I
8   mean, we're adults. We're working. You know, we
9   shouldn't have to be going through that.
10  Q. All right. Did he ever bully or make fun
11  of you personally?
12  A. Yeah. Yes, he did.
13  Q. How so?
14  A. Saying how fat I was or -- or different
15  things. I mean, like when the school was -- they
16  were going to give guns to the security aids to
17  carry guns in school and stuff and he goes oh, you
18  don't need a gun. He goes, Hispanics, all they do
19  is drive-bys, you know, something like that. So
20  I -- I didn't find that very amusing.
21  Q. So that -- he made a racist statement
22  about Hispanics?
23  A. Yes, sir.
24  Q. Okay. Who -- who all heard him make this
25  statement about Hispanics doing drive-bys?

Page 30

1 with syringes in their pockets?
2     A.  I didn't find one.
3     Q.  Not a single one?
4     A.  No, sir.
5     Q.  Okay.  And syringes, in the prison they'd
6 be used to inject intravenous drugs like heroin?
7     A.  Yes, sir.
8     Q.  Okay.  High school students are, in your
9 experience, less likely to inject heroin than hard
10 felons in prison, right?
11         MR. QUINONES:  Objection to form and
12 foundation.
13     A.  Yeah, I never -- I never -- like I said, I
14 never found a syringe but the -- yeah, I never found
15 a syringe on them.
16         MR. BULLION:  Could we take a two-minute
17 break?  I just need to refill my coffee.
18         MR. WALZ:  Let's make it five so we can
19 turn it into a restroom break too; is that okay?
20         MR. BULLION:  Yeah, that's fine.  Of
21 course.
22         MR. QUINONES:  Sounds good.  Thank you.
23         MR. WALZ:  Thanks.
24         MR. BULLION:  All right.  Be back at 9:47.
25         (Recess taken at 9:42 to 9:50.)

Page 31

1     Q.  (By Mr. Bullion) All right.  Mr. Archuleta,
2 during your training as a security guard at V. Sue
3 Cleveland, what were you told about reasonable
4 suspicion to search the students?
5     A.  Reasonable suspicion is if -- if you think
6 the student has something or you see the student
7 receive something from another student or get
8 information from the teacher that says this student,
9 I seen him with something he put in his pocket, then
10 I'd get the student and escort him to the assistant
11 principal of his grade level, the assistant
12 principal's office and take him to the office.
13         And then I'd explain to the assistant
14 principal what was going on, and then I'd say,
15 "Well, call so-and-so, and she could give you all
16 the details."
17         So then they would do that.  Once he got
18 off the phone or she got off the phone, then he'd
19 say, "Search the student."
20         I couldn't search the student on my own
21 without an administrator being present or giving me
22 the authorization to do so.
23     Q.  Okay.  You mentioned in your explanation
24 of how, you know, a search would occur, call so and
25 so to get more information.  What did you mean by

Page 32

1 that?
2     A.  Well, if a teacher called me and said go
3 get this student in my classroom has something that
4 appears to an e-cig or a bag of marijuana or so, I'd
5 get her name, her full name, I'd write down her full
6 name and escort the student to the grade level
7 assistant principal and then I'd explain to the
8 assistant principal what occurred.  And I'd say call
9 to the classroom where that teacher is to get all
10 the particulars.
11     Q.  I see.
12     A.  You know --
13     Q.  So are you making I guess the initial
14 determination about whether a student should be
15 searched when you escort them to the administrator?
16     A.  No.
17         MR. QUINONES:  Objection -- objection to
18 form and foundation.
19         You can answer.
20     A.  No, I'm not.  I'm not.  I'm just escorting
21 a student to the assistant principal and I let them
22 make the decision.
23     Q.  (By Mr. Bullion) So what I -- let me ask
24 this a different way.  Say a teacher calls you and
25 says, "You know, I think Tim, you know, has drugs."

Page 33

1         And you asked her, "Okay, why does Tim
2 have drugs?"
3         And she says, "I don't know," and she
4 provides no fact basis for -- for this hunch that
5 she has, would you still take the student to the
6 principal to give a phone like that?
7         MR. WALZ:  Object.  Form and foundation.
8         MR. QUINONES:  Join.
9     A.  Yes.  I would still escort the student to
10 the assistant principal and let him make the
11 determination, let her -- let him call the teacher
12 and get all the information and then let him make
13 the decision and either to direct me to search the
14 person, the kid or not to search the kid.
15     Q.  (By Mr. Bullion) Okay.  So your -- your
16 testimony is that as far as the decision to search a
17 student, it's never you making the decision?
18     A.  No, sir.
19     Q.  And it's always the principal who makes
20 the determination whether a student should be
21 searched?
22     A.  The assistant principal, the principal or
23 any administrator.
24     Q.  Okay.  If -- well let's go back to this
25 example that I gave you where a teacher says, "I

9 (Pages 30 to 33)

Page 50

1  back for you.
2      MR. QUINONES: You don't have to answer
3  that.
4      (Video played.)
5      Q. (By Mr. Bullion) All right. So I asked you
6  earlier where you were. You said you went to your
7  brother's to get an oil change. You went to a gas
8  station and you also went to the grocery store. I
9  asked you if you went anywhere else, you indicated
10 no. You hadn't mentioned a thing about being in
11 your backyard, did you?
12     A. Yeah, he mentioned that, yes.
13     Q. Were you in your backyard at 2:25 p.m.
14 during Mr. M's deposition?
15     A. I was downstairs. I mean, I'm -- I don't
16 have a backyard. I was downstairs but I -- I was
17 downstairs and like I said, I don't know what time
18 it was.
19     Q. So you were home at 2:25?
20     A. No, I wasn't home.
21     Q. Well, you -- you just said you were
22 downstairs.
23     A. I live in an apartment. Downstairs is
24 outside.
25     Q. Okay. Who's responsible for the

Page 51

1  landscaping in your apartment?
2      A. The -- the apartment complex. They --
3  they contract that out to somebody. I don't know.
4      Q. So you wouldn't have to do yard work in
5  your apartment?
6      A. Sometimes I do.
7      Q. Just for fun?
8      A. No, I do because I like to have a clean
9  area when I'm walking up. I like to have the steps
10 swept. I like to have the needles off the grass
11 raked up. I do some of that.
12     Q. Okay. You -- that's part of your rent.
13 You pay people to do that for you but you just do it
14 for fun sometimes?
15     A. Well, it ain't for fun. I'm just a clean
16 individual. I like to have clean stuff.
17     Q. Okay. So when we started this, you were
18 put under oath and you -- you indicated that you,
19 you know, were obligated tell the truth. You do
20 understand that you're obligated to tell the truth
21 here today, right?
22     A. I do. Yes.
23     Q. Okay. Now, did you or did you not laugh
24 after hearing Mr. M say that he was always looking
25 out for you?

Page 52

1      A. I did not laugh. No.
2      Q. Okay. And let's talk a minute about your
3  interactions with Mr. M. How often did you interact
4  with him?
5      A. Not very often at all.
6      Q. You ever search him?
7      A. One time.
8      Q. Describe that to me, please.
9      A. I walked into the bathroom and him and
10 J.S. were fighting. I escorted them to Mr. Baca's
11 office and explained what happened.
12     Mr. Baca gave me a directive to search him
13 and I searched him and left him there and Mr.
14 Baca -- after the search, I left him there. Mr. --
15 and went to the office, to our office, security
16 office.
17     Q. Describe the search to me, please.
18     A. I had him extend his arms out, searched
19 his arms, his back down the middle, around his belt
20 line, his legs. He had nothing. That was the
21 extent of the search.
22     Q. Did you have any other interactions with
23 Mr. M?
24     MR. MANN: Mr. Bullion? I apologize.
25 Mr. Bullion, I apologize. Jerry Walz just called me

Page 53

1  and indicating he's trying to get back into the call
2  and he's been in a waiting room. I apologize for
3  interrupting.
4      THE COURT REPORTER: Sorry. And I wasn't
5  looking at the screen. I'm letting him in now.
6      MR. BULLION: No. Thank you, Mr. Mann. I
7  was looking at my phone and hadn't noticed he
8  dropped off.
9      MR. WALZ: Okay. Thank you, Todd. Thank
10 you, David for interceding. I apologize but I don't
11 control the Internet. I got bumped off about the
12 last three and half minutes or so and I apologize,
13 but I couldn't help that. So anyway, here I am.
14     MR. BULLION: Do you want the last couple
15 minutes read back to you?
16     MR. WALZ: Well, where we left off --
17 yeah, I think that would be good based on the
18 subject matter.
19     MR. BULLION: Okay. Ma'am would you mind
20 reading back some of the prior testimony?
21     And, Mr. Walz, if you could help --
22     MR. WALZ: I will. Yeah, well, let me
23 tell -- let me tell you where I got bumped off. Mr.
24 Bullion was questioning Mr. Archuleta. How did
25 Mr. Quinones state that he was out in the garden

Page 58

1     MR. QUINONES: Objection to form.
2     A.  Well, what I had heard was I thought was
3  enough.
4     Q.  (By Mr. Bullion) Okay.  Let's go back to
5  talking about Mr. M here.  You describe one instance
6  in which you searched him.  Did you touch his
7  genitals during that search?
8     A.  No, sir.
9     Q.  Okay.  And it would be wrong to touch his
10 genitals during the search, right?
11    A.  Correct.
12    Q.  Both, it's morally wrong and contrary to
13 your training?
14    A.  Correct.
15    Q.  Okay.  Did Mr. M say during this search,
16 "Don't touch my dick?"
17    A.  I didn't believe so.  No.
18    Q.  Okay.  And who was the principal that
19 directed you to search Mr. M?
20    A.  Mr. Baca.
21    Q.  Okay.  And any other occasion did you
22 search Mr. D.M.?
23    A.  Yes.  There was an occasion at the bus
24 route where there was a large group of kids behind
25 the buses after school.  And when I started to

Page 59

1  approach where all the kids were, they started to
2  disperse.  And I seen a female student give Mr. M
3  something and he placed it in his pocket.  So when I
4  approached him, I asked him, I go, "What do you have
5  your pocket?"
6         And he voluntarily pulled it out and he
7  said, "An e-cig."
8         And I said, "Okay."
9         And so my supervisor Don Mangin and
10 Richard McCool were standing there.  That's where
11 they're assigned after school and I informed Don.
12 And Don said, "Well, what grade is he in?"
13        And I told him.  And he said, "Well, take
14 him to Millan Baca in the morning and have them deal
15 with him."  So that's what happened.  I told the
16 kid, "Go report to Millan."
17    Q.  Okay.  And did you accompany him to see
18 Mr. Baca the following day?
19    A.  Yes.
20    Q.  All right.  And did Mr. Baca direct you to
21 search Mr. M?
22    A.  Yes.
23    Q.  Did you search Mr. M?
24    A.  Yes.
25    Q.  Did you touch his genitals during this

Page 60

1  search?
2     A.  No.
3     Q.  At this search, did Mr. M say, "Don't
4  touch my dick?"
5     A.  No.
6     Q.  Okay.  Have you had any other interactions
7  with Mr. M?
8     A.  No.
9     Q.  Okay.  Would you ever speak to Mr. M in
10 the hallways of the school?
11    A.  No.
12    Q.  Had you ever seen him in the hallways of
13 the school?
14    A.  Yes.
15    Q.  Would you ever follow him in the hallways
16 of the school?
17    A.  No.
18    Q.  Why not?
19    A.  There's no reason to.
20    Q.  Okay.  Is D.M. a troublemaker at the
21 school base on your recollection?
22        MR. QUINONES: Objection to form and
23 foundation.
24    A.  I don't know.  I don't know if he is or
25 not.

Page 61

1     Q.  (By Mr. Bullion) Okay.  As a security
2  guard, you would rove throughout the school, right?
3     A.  Say again.
4     Q.  Your day-to-day as a security guard would
5  involve you walking throughout the school looking
6  for people breaking the rules, right?
7     A.  Yes.
8     Q.  Okay.  And having worked there, you know,
9  every single day of the school year, you'd be
10 familiar with students who are more prone to
11 breaking rules than other students, right?
12        MR. QUINONES: Objection to form and
13 foundation.
14    A.  I don't -- I don't look at students like
15 that.  I'm not out to look for -- you know, I -- I
16 just do what I'm supposed to do and that's it.
17    Q.  So you would consider a student's past
18 interactions with security or disciplinary referrals
19 and making suggestions to administration that a
20 student should be searched?
21        MR. QUINONES: Objection to form --
22    A.  Well, I can't --
23        MR. QUINONES: Hold on.  Hold on.
24        THE WITNESS: Oh.
25        MR. QUINONES: Objection to form and

16 (Pages 58 to 61)

Page 62

1  foundation.
2      Now you can answer.
3      A. I can't make that determination. It has
4  to come from an administrator.
5      Q. (By Mr. Bullion) Okay. But the
6  administrator's not walking around the hallway,
7  right? If you notice, you know, that, you know, you
8  mentioned earlier a student hands something to
9  another student, you initiate that whole search
10 process by alerting the administrator by taking the
11 student to see the administrator, right?
12     MR. QUINONES: Objection to form.
13     A. Yes. I see him receive something from a
14 female student so I -- yes.
15     Q. Okay. And had you ever spoken to Mr. M at
16 school outside of the two occasions in which you
17 searched him?
18     A. No.
19     Q. Okay. What -- what does the word jito
20 mean to you?
21     MR. QUINONES: The word -- the word what?
22     THE WITNESS: Jito.
23     MR. BULLION: Jito.
24     A. It's like son or a family member. That's
25 it.

Page 63

1      Q. (By Mr. Bullion) Okay. A term of, you
2  know, a closeness. A term of endearment is how it
3  typically used?
4      A. Yeah.
5      Q. All right. Like you wouldn't call me a
6  jito, right?
7      A. No.
8      Q. Okay. You wouldn't call Mr. Walz jito,
9  right?
10     A. No.
11     Q. What kind of person would you call, you
12 know, jito?
13     A. Like my brother. A good friend. That's
14 it.
15     Q. All right. Typically, you know, is the
16 person -- the person be younger if you're referring
17 to them as your jito?
18     A. Would a person be younger; is that what
19 you're asking?
20     Q. Yeah.
21     A. Not necessarily, no.
22     Q. Okay. Would it -- have you ever referred
23 to any students as jito?
24     A. No.
25     Q. Would that be appropriate if you did?

Page 64

1      A. No.
2      Q. Why would it not be appropriate?
3      A. Because there they have a first name or a
4  last name and that's the way I would address them.
5      Q. And calling a student jito would imply a
6  certain closeness that would not be appropriate
7  between a student and a security guard, right?
8      A. Yeah, I wouldn't -- I wouldn't address
9  them by jito.
10     Q. Okay. Have you ever told Mr. M that you
11 were going to search him at a later date and not
12 actually search him?
13     A. No.
14     Q. That your -- it's your testimony you've
15 never threatened the man that you're going to search
16 him?
17     A. No.
18     Q. That would be inappropriate, right?
19     A. Correct.
20     Q. That would be bullying and harassment,
21 right?
22     A. Correct.
23     Q. All right. Because D.M. if he was told
24 that would be in constant fear of being searched,
25 right?

Page 65

1      MR. QUINONES: Objection to form.
2      A. Right.
3      Q. (By Mr. Bullion) Let's talk about Mr. E.M.
4  What interactions did you have with Mr. E.M.?
5      A. I received a call from Coach Heath
6  Riddenhower that there was some kids in a locker
7  room smoking. So me, myself, and Phillip Ulibarri
8  went down to the locker room and there was E.M. and
9  two other students in there. And I asked them their
10 grade and they told me so I called for Mr. Rudy
11 Aragon -- Galindo. I'm sorry. Rudy Galindo who was
12 the assistant principal for E.M.'s grade. And Rudy
13 answered and I told him I had a student in the boys'
14 locker room and if he could come down there. So
15 Rudy went down there. When he arrived, I explained
16 the particulars to him and he asked me and Phillip
17 to search him.
18     Q. Okay. Did you search E.M.?
19     A. Yes.
20     Q. All right. Was any -- any contraband
21 found on his person?
22     A. I believe so, yes.
23     Q. What was it?
24     A. I think was an e-cig.
25     Q. Okay. Was this a pat-down search you

17 (Pages 62 to 65)

Page 66

```
 1   performed on E.M.?
 2        A.  Yes.  That's the only kind of searches
 3   we're allowed to do at the school.
 4        Q.  Okay.  Had you ever used a wand to search
 5   a student instead of physically touching them?
 6        A.  Yes.  I have used a wand before, yes.
 7        Q.  Okay.  So you said it's -- a pat-down is
 8   the only search you're permitted to do.
 9        A.  Well, I'm sorry.  I have used a wand once
10   or twice before.
11        Q.  Okay.  Why in those circumstances did you
12   use a wand?
13        A.  Because if you feel that there's something
14   in their mid-section and their genital section,
15   that's why you use a wand so you don't have to
16   touch -- because that ain't a correct way to search
17   somebody.
18        Q.  So you said if you "feel something in
19   their mid-section or genital section?"
20        A.  Well, I didn't say that, sir.  I didn't
21   say --
22            MR. QUINONES:  Objection to form.
23        A.  I didn't say that.  I said if you feel
24   that they had something there, you use a wand.
25        Q.  (By Mr. Bullion) Okay.  Thank you for
```

Page 67

```
 1   clarifying.
 2        A.  And "feel" I mean "think."
 3            That's the word, "think."
 4        Q.  Okay.  Did you have any other interactions
 5   with Mr. E.M.?
 6        A.  No.
 7        Q.  Okay.  Did you ever speak to him in the
 8   hallways?
 9        A.  No.
10        Q.  Ever threaten to search him?
11        A.  No.
12        Q.  Okay.  You'd -- you'd agree with me that
13   threatening the search of a child would be morally
14   wrong?
15        A.  Correct.
16        Q.  Reprehensible?  Would you agree with me
17   that it's reprehensible?
18        A.  Well, I don't know what reprehensible
19   means.
20        Q.  Really, really bad.
21        A.  Yes.  It would be really, really bad, yes.
22        Q.  Let's talk about J.S.  What interaction
23   did you have with Mr. J.S.?
24        A.  One time we escorted him to the office.  A
25   teacher called me and myself and Todd Mock escorted
```

Page 68

```
 1   him to Mr. Baca's office.
 2        Q.  All right.  Tell me more.
 3        A.  I believe I -- to be honest, I don't know
 4   if Mr. Baca asked us to search him or not.  I'm not
 5   sure of that.  I don't remember.
 6        Q.  Okay.  Did you -- you mentioned reviewing
 7   your reports.  Were there any reports you reviewed
 8   of you searching J.S.?
 9        A.  Yes.
10        Q.  Okay.  So did -- did you search him on
11   this occasion?
12        A.  Let me see.
13            MR. QUINONES:  Counsel, he's reviewing
14   that report.
15            MR. BULLION:  Okay.  What's the Bates
16   number on that?
17            MR. QUINONES:  I'm not sure if I have it
18   on this copy.
19            MR. BULLION:  Okay.
20        A.  Yes.  Mr. Baca asked me to search him and
21   I found an electronic cigarette in his backpack
22   along with a bottle of e-juice that goes in the
23   electronic cigarette.
24            MR. BULLION:  Okay.  Did you ever have any
25   suspicion that J.S. was selling e-cigarette
```

Page 69

```
 1   cartridges to students?
 2        A.  No.
 3        Q.  No?  Have you discussed any suspicion
 4   about him engaging in activity like that with Millan
 5   Baca?
 6        A.  No.
 7        Q.  Never discuss -- had anyone discussed with
 8   you that there was a suspicion that J.S. was selling
 9   contraband to other students?
10        A.  No.
11        Q.  Had you ever suspected that D.M., E.M., or
12   J.S. were in possession of a weapon while at school?
13        A.  No.
14        Q.  Okay.
15            MR. BULLION:  Counsel, I'd like to take a
16   five-minute break.  We're moving a little -- frankly
17   a little quicker than I thought we would.  There are
18   definitely additional questions I'd like to ask, but
19   I'd like to take a quick break, grab some more
20   coffee and review my notes if that's okay with
21   everyone?
22            MR. QUINONES:  Yeah, can we come back
23   around 11.  Give us ten minutes?
24            MR. BULLION:  Sure.
25            MR. WALZ:  This is Jerry Walz.  I concur.
```

Page 70

1  Let's make it 11:00.
2      Thanks, Todd.  Thanks, Carlos.
3      (Recess taken at 10:52 to 11:02.)
4  Q.  (By Mr. Bullion) Sir, I asked you earlier
5  if any of the three plaintiffs in this case have
6  been disrespectful to you and you indicated that
7  they hadn't, right?
8  A.  Right.
9  Q.  All right.  And you also indicated you
10 didn't even know who they were initially.  That you
11 had to look back at reports of searches that were
12 done to remember who they were.
13 A.  Right.
14 Q.  Okay.  Why is it do you think that -- did
15 you review the complaints in these cases?
16 A.  No.
17 Q.  Do you know what the allegations are
18 against you --
19 A.  Yes.
20 Q.  -- by these three boys?
21 A.  Yes.
22 Q.  Can you describe your understanding of
23 what the allegations are against you?
24 A.  I describe them as being terrible and
25 they're just terrible.  I -- I can't believe it.

Page 71

1  Q.  Okay.  So -- so all three boys have
2  indicated that you groped their genitals while
3  searching them, right?
4  A.  That's what they indicate, yes.
5  Q.  All right.  Now, was there any animosity
6  between you and any of these children?
7  A.  No.
8  Q.  No?  You indicated that hadn't really
9  interacted with them at all outside of these
10 searches that you performed on them at the direction
11 of the school administrator, right?
12 A.  Right.
13 Q.  All right.  Why then would there be no
14 hostility, no previous disrespect shown towards you?
15 You know, why -- why are they all indicating that
16 you did these things to them?
17     MR. WALZ:  Objection to the form and
18 foundation.
19     MR. QUINONES:  Yeah, join in objection.
20     Now you can answer.
21 A.  I don't know.  I have -- I -- I don't
22 know.
23 Q.  (By Mr. Bullion) I mean you -- you deny
24 that you groped their genitals, right?
25 A.  Right.

Page 72

1  Q.  Okay.  So you deny that you groped D.M.?
2  A.  Right.
3  Q.  You deny that you groped E.M.?
4  A.  Right.
5  Q.  You deny that you groped J.S.?
6  A.  Right.
7  Q.  Okay.  How many other guards are there at
8  V. Sue Cleveland?
9  A.  Seven.
10 Q.  Seven?  Okay.  So if your -- your
11 contention is that they -- that D.M., E.M., and J.S.
12 just fabricated these allegation against you, right?
13 A.  Right.
14 Q.  All right.  What -- why did they pick you?
15     MR. QUINONES:  Objection to form and
16 foundation.
17 A.  You know, that's a good question.  I don't
18 know.  I've been wondering that myself.
19 Q.  (By Mr. Bullion) Can you think of any
20 motive on their part to want to, you know, single
21 you out?
22 A.  No, I can't.
23 Q.  Let me ask you about report running
24 obligations as your job as a security guard at V.
25 Sue Cleveland.  Under what circumstances were you

Page 73

1  obligated to write reports when you interacted with
2  a student?
3  A.  When we search a student, when we find
4  contraband on a student.
5  Q.  Okay.  There's -- there's two answers
6  there.  When you search a student or when you find
7  contraband on a student?
8  A.  Yes.
9  Q.  And any instance in which you search a
10 student, you're obligated to write a report?
11 A.  Yes.
12 Q.  Okay.  And you testified earlier that you
13 can't search students at your own discretion.  You
14 have to be instructed to do so by an administrator?
15 A.  Correct.
16 Q.  Okay.  Have you ever searched a student
17 without direction from an administrator?
18 A.  No, sir.
19 Q.  Okay.  And when searches are conducted,
20 they're supposed to be witnesses present, right?
21 A.  An administrator, yes.
22 Q.  Okay.  Have you ever searched D.M. by
23 yourself without a witness present?
24 A.  No.
25 Q.  Have you ever searched E.M. by yourself

Page 74

1  without a witness present?
2     A.  No.
3     Q.  Have you ever searched J.S. by yourself
4  without a witness present?
5     A.  No.
6     Q.  Okay.  And it's your testimony that
7  whenever you do a search, you have to write on it?
8     A.  Yes.
9     Q.  Okay.  What all needs to go in your report
10 when you are writing a report when you search a
11 student?
12    A.  The body of the report you have to
13 indicate why you searched the student, who directed
14 you to search the student, and what was found on the
15 student or his personal belongings.
16    Q.  Okay.  When you were employed at V. Sue
17 Cleveland, were you issued a body worn camera?
18    A.  Yes, I was.
19    Q.  All right.  Can you describe that camera
20 to me, please?
21    A.  It's a lapel camera and you attach it to
22 your shirt and -- and every time you dealt with a
23 student, you turn it on to record and I had one of
24 them.
25    Q.  Sorry.  Was -- was there more to --

Page 75

1     A.  I was going to indicate that I had one and
2  it didn't work at the beginning of the school year.
3  I asked my supervisor for another one and said I'll
4  check at district office.  And he said they don't
5  have anymore so I didn't have one.
6     Q.  What school year was this?
7     A.  My last year there I think.  I don't
8  remember.
9     Q.  So would be your last year, maybe the year
10 before your last year?
11    A.  I have no idea.  I don't remember, sir.
12 It's been awhile.
13    Q.  After you indicated to -- was it your
14 supervisor that you told your camera wasn't working?
15    A.  Yes.
16    Q.  And would that be Don Mangin?
17    A.  Yes.
18    Q.  Okay.  After you told Mr. Mangin your
19 camera wasn't working, did you, following that, ever
20 receive a functional camera to use during your job?
21    A.  Did I have -- did I receive one, no.
22    Q.  Okay.  And you don't remember when this
23 is?
24    A.  No, I don't.
25    Q.  Okay.  And you said that you were

Page 76

1  obligated to turn the camera on whenever dealing
2  with a student, right?
3     A.  Yes.
4     Q.  So not having a camera, you know would
5  essentially prohibit you from complying with that
6  policy?
7        MR. QUINONES:  Objection to form.
8  Foundation.
9     A.  I don't think there's a policy on that but
10 there's other cameras in the school.
11    Q.  (By Mr. Bullion) All right.  Well, you said
12 earlier that you were obligated to record, you know,
13 whenever you're dealing with a student.  If you were
14 in a place that doesn't have a camera, how are you
15 going to record your interaction with the student if
16 you don't have a functioning body camera?
17       MR. QUINONES:  Objection to form.
18    A.  If I was in a place and I called for
19 assistance to have another security aide with me.
20    Q.  Okay.  And, okay, would you download that
21 security aide's and upload as, you know, going with
22 your report?
23    A.  Yes.  If they had a camera.
24    Q.  All right.  Did you have a video record
25 any of the searches that you've described of D.M.,

Page 77

1  E.M. or J.S.?
2     A.  No.
3     Q.  Okay.  And let me -- let me break that
4  question down a bit.  So I asked if you recorded
5  them.  And by that I meant did you personally record
6  them with a video camera that you were wearing?
7        MR. QUINONES:  Objection to form and
8  foundation.
9     A.  No.
10    Q.  (By Mr. Bullion) Okay.  Did any other guard
11 come to assist you and record these searchings being
12 performed?
13    A.  I don't know.
14    Q.  All right.  If you didn't have a
15 functioning camera and there's no camera in the
16 room, you would need to have done that so there's a
17 recording of the search, right?
18       MR. QUINONES:  Objection to form.
19 Foundation.
20    A.  Say the question again.
21    Q.  (By Mr. Bullion) So if you were searching a
22 student in a room that did not have video cameras,
23 you would need -- and you didn't have a camera that
24 was working, you would need to call another guard to
25 video record the searches occurring, right?

20 (Pages 74 to 77)