Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

No. 21-CR-00427 SMV/KRS

MARK MONDRAGON o/b/o
D.M. a minor child,

       Plaintiffs,
v.

RIO RANCHO PUBLIC SCHOOLS,
BOARD OF EDUCATION and
GEORGE ARCHULETA in his
Individually and official capacity,

       Defendants.

**DEPOSITION OF**

**DON MANGIN**

April 11, 2022
1:30 p.m.
500 4th Street, NW Suite 105
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:   TODD J. BULLION
              ATTORNEY FOR PLAINTIFFS

REPORTED BY:   EDWINA CASTILLO, CCR #407
                PAUL BACA COURT REPORTERS
                500 4th Street, NW Suite 105
                Albuquerque, New Mexico 87102

# EXHIBIT P

Page 6

1  works. You're under oath today and your testimony
2  could be used in court under certain
3  circumstances. If you were say unavailable to
4  testify at a -- at a trial, so everything you're
5  saying is being typed down by the court reporter
6  here, as are the questions I'm asking you. If I
7  ask you a question that you do not understand,
8  even if you are pretty sure that you understand,
9  but you're not a hundred percent sure, please let
10 me know. So that way we can talk about it, make
11 sure that we're on the same page.
12      The reason I want to do that is if you
13 are unsure what exactly what I'm asking, and you
14 don't express that verbally, it will appear on the
15 transcript, when the lawyers read it later, that
16 you've understood what I was asking and provided
17 an answer to it. So I want to make sure we're on
18 the same page and that later on when we're looking
19 the transcript over, we know that your answers are
20 accurate and reliable. All right?
21      We can take a break at any time, should
22 you want one, just let us know. And that's pretty
23 much it.
24      Have you had any drugs or alcohol in the
25 past two days?

Page 7

1   A. I had a drink yesterday.
2   Q. Okay. You're not under the effects of
3  alcohol right now, right?
4   A. No.
5   Q. Okay. And are there any reason you
6  can't give truthful answers to questions today?
7   A. No.
8   Q. Okay. Well, let's get started then.
9  All right. So what's your job title?
10  A. I am a security manager for the Rio
11 Rancho Public Schools.
12  Q. Okay. What are your job duties?
13  A. I'm security of the schools. I over --
14 I supervise individuals that are at the high
15 school, the middle schools, and also the
16 elementary schools, and the preschool on the north
17 side of Northern Boulevard in Rio Rancho.
18  Q. Okay. So that's -- is that four
19 different schools or is it more?
20  A. No. It's the high school, two middle
21 schools, five elementaries, and one preschool.
22  Q. Okay. So you've got your hands full.
23 Where do you physically work?
24  A. Out of Cleveland High School.
25  Q. Out of Cleveland High School, okay. Why

Page 8

1  do you physically work out of a high school given
2  the number of schools that you supervise security
3  at?
4   A. Cleveland is the busiest.
5   Q. Okay.
6   A. Cleveland and Rio Rancho. So both of
7  those security managers work out of the high
8  schools.
9   Q. Okay. When you say "busiest," what do
10 you mean?
11  A. We have a lot of, you know, activity
12 going on. There's 20- -- almost 2600 students at
13 the school, so there's constant security issues
14 that we have to deal with.
15  Q. What issues do you typically deal with
16 at the high school --
17  A. A lot of --
18  Q. -- at Cleveland?
19  A. -- a lot of vaping. That's probably the
20 majority.
21  Q. Vaping?
22  A. Vaping, yeah, like nic- -- nicotine or
23 THC.
24  Q. Okay. So when I was in high school, we
25 didn't have vapes. I'm not overly familiar with

Page 9

1  them. Can you describe what a vape pen looks like
2  to me, please?
3   A. It really looks like -- you remember the
4  old thumb drives? It looks like one of these
5  because it contains nicotine or THC.
6   Q. Like a USB thumb drive?
7   A. Basically, yeah, but they're a little
8  bit longer and some -- there -- there's -- they
9  come in many different variations.
10  Q. Okay. And you said that dealing with
11 students vaping is probably your most frequently
12 seen security issue?
13  A. Yes.
14  Q. Okay. And if you can help me ballpark
15 what exactly that means. Is that more than 50
16 percent of the issues you're dealing with relate
17 to vaping?
18  A. Yes.
19  Q. Over and under 80 percent?
20  A. I'd say maybe 80.
21  Q. Right on. So eight of out ten security
22 issues roughly deal with vaping?
23  A. Yes.
24  Q. At Cleveland High School?
25  A. Yes.

3 (Pages 6 to 9)

Page 18

```
 1        Q.  Yes.
 2        A.  -- it's my job to investigate it.
 3        Q.  All right.  And if you substantiated
 4   that it happened, what would happen?
 5        A.  There would be disciplinary action.
 6        Q.  What kind of disciplinary action?
 7        A.  I -- I would have to go to HR.  It would
 8   go to HR and they would deem what -- what will be
 9   done next.
10        Q.  Would you recommend a person be fired?
11        A.  That would be HR's decision.  I don't --
12   I don't fire.
13        Q.  Okay.  Would you do anything in addition
14   to what you've described or is that pretty much
15   all you would do?
16        A.  I would investigate the situation and
17   then report my findings to the HR department.
18        Q.  Okay.  And you'd agree with me that
19   guards shouldn't be conducting those kind of
20   searches, watching students urinate?
21        A.  Conducting a search and watch them
22   urinate?
23        Q.  Yeah, so let me -- let me rephrase, and
24   thank you for expressing that you didn't quite
25   understand that.  So you'd agree with me that
```

Page 19

```
 1   guards should not be making efforts to observe
 2   students urinating as part of their job?
 3        A.  Well, yeah, I would agree that that
 4   would be -- that wouldn't be the right thing to
 5   do.
 6        Q.  Okay.  How long have you worked with
 7   George Archuleta?
 8        A.  George worked at -- well, I -- I came
 9   from corrections at first, but I didn't work with
10   George in corrections.  I knew of him.  He worked
11   for the schools maybe with me for seven years.
12        Q.  Okay.  You said you knew of George when
13   you were a corrections officer?
14        A.  I knew he was a corrections officer over
15   at -- in Santa Fe.
16        Q.  And where were you a corrections
17   officer?
18        A.  I was a canine officer in Santa Fe.
19        Q.  Were you employed by the department of
20   corrections?
21        A.  Yes.
22        Q.  Okay.  And so you hadn't worked with
23   George, but you knew -- I'm -- I'm just trying to
24   understand.
25        A.  I was a canine officer so like when I
```

Page 20

```
 1   have to go in and do searches of inmates' living
 2   areas, he might have been working in one of the
 3   facilities, you know, and that's how we'd run into
 4   people.
 5        Q.  Okay.  Were you guys friends,
 6   acquaintances?
 7        A.  Acquaintances.
 8        Q.  Who started working at Cleveland first?
 9   You or George?
10        A.  George.
11        Q.  George.  Okay.  When you came to work at
12   Cleveland, did you get to know George better?
13        A.  I was a supervisor when I -- when I came
14   on.  I mean, I got to know all of my guys better.
15        Q.  Would you consider yourself to be
16   friends with George?
17        A.  No.
18        Q.  Ever socialize outside of work?
19        A.  Like after a state championship when
20   all -- all the school staff got together, that was
21   about it.  I've never been to his house or
22   anything.
23        Q.  Ever play golf together?
24        A.  No.
25        Q.  Okay.  You mentioned earlier -- well,
```

Page 21

```
 1   actually, do you -- do you have video surveillance
 2   at Cleveland?
 3        A.  Yes.
 4        Q.  Can you describe the security setup to
 5   me?
 6        A.  They're set up in all the hallways.  We
 7   can't have them in the classrooms.  We can't have
 8   them in the bathrooms.  They're in the library.
 9   They're in the gym.  They're in the field house.
10   And I believe there's approximately 200 and -- 217
11   cameras, maybe more now because we keep adding --
12   oh, we also have in them in the parking lots.
13        Q.  Okay.  And are the -- is the footage
14   from that recorded and kept somewhere?
15        A.  Well, I don't know the life of the --
16   the videos themselves.  Each one of them differs
17   because of the traffic.  But if a -- if an
18   incident has been asked to be recorded, we do
19   record them and keep them.
20        Q.  All right.  Explain that to me if
21   you're -- if you're asked to keep a recording.
22        A.  If there's a fight that happened and
23   they know that it's possibly going to go to a
24   hearing, they'll say, "Do you have video footage
25   of the fight?  And if so, can you record it and
```

Page 22

1  then download and sent it to the hearing
2  officers."
3     Q. Okay. I think I understand. So unless
4  you specifically receive a request to preserve
5  video, it doesn't get kept?
6     A. Sure.
7     Q. How long can you go back and look for a
8  video?
9     A. Like I said, I couldn't tell you the
10 answer. It -- it varies because some videos, like
11 some cameras have a lot of more traffic so if the
12 storage isn't going to be as long. And then you
13 might have another one that there's hardly any
14 traffic and the video will be around quite, you
15 know, a little bit longer.
16    Q. Okay. So are they motion-activated
17 cameras?
18    A. No, they're automatic.
19    Q. So you're -- you're mentioning traffic.
20    A. A lot of traffic. So like if I have one
21 and let's just say in the first floor hallway on
22 the east side, and there's -- there's constant
23 traffic when the kids are between periods, are
24 going from class to class, so that's a lot of
25 camera footage. But you might have an area, say

Page 23

1  the baseball field that until baseball season, you
2  really don't have any traffic.
3     Q. So does the camera not record
4  continually? It turns on at certain points in
5  time.
6     A. No, it's continual.
7     Q. Okay. I know you said it varies from
8  cameras to camera, but say someone asked you to
9  find the video of a fight that happened like a
10 week ago.
11    A. There's a good possibility it -- it's
12 there.
13    Q. All right. How about two months ago?
14    A. I couldn't tell you that.
15    Q. How are searches of students documented
16 at V. Sue Cleveland High School?
17    A. They're gone -- they're put on an
18 incident report.
19    Q. Okay. And is that done each and every
20 time there's a search of a student?
21    A. Any time that an administrator requests
22 one of my security individuals to conduct a
23 search, they have to do an incident report. It's
24 basic -- it's a basic information report.
25    Q. Okay. And what about a security officer

Page 24

1  doing a search on their own volition without being
2  requested by administration, do they make a report
3  then?
4     A. If they would do that on their own, but
5  they don't do it. They're -- they're told not to
6  do that. You have -- over at Cleveland V. Sue --
7  at any of the schools I oversee, my guys are told
8  they will not conduct a search unless requested by
9  an administrator.
10    Q. Okay. Is that -- how is that
11 communicated to them?
12    A. I -- I tell them or I send it through an
13 e-mail, possibly. And they're also told once
14 they're hired.
15    Q. Okay. Is that -- would you consider
16 that to be a school policy?
17    A. Yes.
18    Q. Okay. And --
19    A. Or formality.
20    Q. Another way to describe it would be a
21 practice or a custom. That's how business is done
22 according to you; no search unless an
23 administrator tells you to search?
24    A. Yes.
25    Q. Okay. Why is that the case?

Page 25

1     A. Because an administrator is -- he --
2  he's the authority that can ask, request for a
3  search to be done.
4     Q. All right. Security guards, on their
5  own, can't decide to search someone?
6     A. No.
7     Q. All right. How -- how did you come to
8  doing business like this at your high school?
9     A. It's the way it has been since I -- I
10 started there.
11    Q. Since you started, okay. If you found
12 out that a guard was doing searches without being
13 directed to by administration, how would that be
14 dealt with by you?
15    A. I would -- it would be immediately
16 investigated.
17    Q. How serious of a violation of policy is
18 that, in your mind, if it were to happen?
19    A. Well, I mean, we -- you don't -- how
20 serious? You just don't -- you don't put hands
21 on -- on a kid unless you're requested and also
22 the kid gives you permission to conduct a search.
23    Q. Okay. You -- you mentioned students
24 giving permission to conduct a search.
25    A. Yeah, if a --

Page 30

1  A. Yes.
2  Q. Do you guys ever use wands --
3  A. We have.
4  Q. -- during searches? All right. When
5  are those used?
6  A. What? Excuse me.
7  Q. When are those used?
8  A. Usually we'll use those if they feel
9  that they might be concealing that they can't pat.
10 Q. What do you mean?
11 A. My guys have taken students up to the
12 front before and as they're on their way,
13 they'll -- they'll see a kid put something into
14 their pants and knowing that security can't pat
15 them there.
16 Q. Okay. Why can't they pat them in their
17 pants?
18 A. That's -- we're not trained to search
19 that part of their body.
20 Q. And by "that part of their body," you're
21 referring to the groin, to the genital area?
22 A. Yes.
23 ==Q. Okay. So during this pat-down search,==
24 ==there shouldn't be even incidental contact with a==
25 ==student's genitals?==

Page 31

1  ==A. Yeah, no. They're trained to just pat==
2  ==the pockets.==
3  ==Q. Okay. And are there any circumstances==
4  ==in which it would be acceptable for a security==
5  ==guard to intentionally touch a student's genitals==
6  ==during a search?==
7  ==A. No, that's not the way they're trained.==
8  ==Q. Okay. And you'd agreed with me that==
9  ==would be wrong?==
10 ==A. If it was to happen, yes.==
11 ==Q. Yeah. You'd agree with me that could==
12 ==cause a student to suffer emotional harm and feel==
13 ==bad about themselves?==
14 ==A. I -- I've never -- it's never been==
15 ==reported to me anything like that has ever==
16 ==happened so I wouldn't know what they're feeling==
17 ==would be.==
18 Q. Okay.
19    MR. BULLION: So we're not -- we're not
20 video recording this, right?
21    THE COURT REPORTER: We are recording
22 the audio.
23    MR. BULLION: Yeah. So I sometimes, you
24 know, when you make gestures, it gets kind of lost
25 in translation in the transcript. Would -- would

Page 32

1  you mind standing up and just showing me, you
2  know, because you -- you've patted your body a
3  couple of times. Would you mind doing that again
4  and describing for the court reporter each part of
5  your body that you're -- that you're actually
6  patting?
7  A. Yeah. Basically, you have them stand
8  up, they spread their arms. You come around here.
9  You pat here, here, go around the waistline, pat
10 here, here, and go down the legs, and have them
11 remove their shoes.
12 Q. Okay. So I saw you touch the outside of
13 your hips, the outsides of your pockets.
14 A. This is the waistline.
15 Q. The waistline.
16 A. The pock -- the outside pockets, the
17 pockets, and then down.
18 Q. All right. So you're not touching the
19 student's buttocks?
20 A. Just the pockets.
21 Q. Okay. And do you use the palm of your
22 hand or the back of your hand?
23 A. I would use the palm of my hand.
24 Q. Okay. And when I -- you can sit down.
25 Thank you. When I saw you doing that I -- I

Page 33

1  noticed you did not get anywhere near the groin
2  area.
3  A. True.
4  Q. All right. And the way you demonstrated
5  that for me, is that the same that your security
6  guards are taught to do a search? Do you do a
7  similar demonstration for them at the start of the
8  year?
9  A. Yes.
10 Q. Okay. And I noticed you didn't -- you
11 didn't pat the inner -- upper inner thigh of your
12 leg either.
13 A. True.
14 Q. Is that another area that security
15 guards should not touch when doing a pat-down
16 search at your school?
17 A. Well, they're not trained to touch.
18 Q. Okay. Has -- have you ever had a
19 security guard say, "Hey, boss, you know, can I
20 pat-down like the groin or inner thigh area?"
21 A. Never.
22 Q. If someone were to say that to you, how
23 would you react?
24 A. That's not in our policy and we're going
25 to stay away from that area.

Page 50

1   children?  They're getting in trouble a lot?
2       A.  On a year-to-year basis, you run into,
3   you know, some of them that are causing problems.
4       Q.  Okay.
5       A.  That's how you learn of them.  The
6   majority of the kids get through and --
7       Q.  Yeah.  I -- I don't want you to name
8   names, but if I were to ask you for like the top
9   three or five, you know, people who get referrals,
10  you could tell me who they are right now, right?
11      A.  No.
12      Q.  No?
13      A.  Not me.  My officers probably could
14  because they're dealing with it more.
15      Q.  Okay.  As far as you're aware, were
16  either D.M., E.M, or J.S. frequently getting into
17  trouble?
18      A.  Not that I know of.
19      Q.  I think we're about done.  Let me -- let
20  take five minutes and make sure I'm not forgetting
21  --
22      A.  Okay.
23      Q.  -- anything.  And I would hate to bug
24  you again.
25          THE WITNESS:  Okay.

Page 51

1           MR. WALZ:  Okay.
2           (Recess taken at 2:11 to 2:38 p.m.)
3       Q.  (By Mr. Bullion) Sir, you ever heard of
4   any complaints being made against Mr. Archuleta?
5       A.  No.
6       Q.  No?  Have you ever heard of complaints
7   made against any of your security officers during
8   your ten years as supervisor?
9       A.  From students?
10      Q.  Yes.
11      A.  No.
12      Q.  No?
13          I don't have any further questions for
14  you.  Thank you.
15          MR. WALZ:  Carlos?
16          MR. QUINONES:  Yeah, I have no questions
17  for Mr. Mangin.
18          MR. WALZ:  You -- you know, I think I
19  just have a couple.
20                  EXAMINATION
21  BY MR. WALZ:
22      Q.  Counsel showed you a couple of board
23  policies.  Do you recall that?
24      A.  Yes.
25          MR. WALZ:  Will -- will you hand me the

Page 52

1   other one, too?  Do you -- do you have the other
2   one?
3           THE COURT REPORTER:  Yes, I do.  Sorry.
4           MR. QUINONES:  And what are the exhibit
5   numbers on these, Counsel?
6           MR. WALZ:  They're -- they're one and
7   two.  Okay?  One and two.
8           MR. QUINONES:  Thank you.
9           MR. WALZ:  Okay.
10      Q.  (By Mr. Walz) Now, when you were asked
11  about searches, do you recall that line of
12  questioning when you could do a pat-down or not?
13      A.  Yes.
14      Q.  All right.  Now, the first -- the first
15  policy Counsel showed you is Exhibit 1, and that's
16  RRPS Defendant 000206 and it's Policy 1009.  Would
17  you -- would you take a minute real quick to take
18  a look at that?  Just tell me when you're done
19  there.
20      A.  Okay.
21      Q.  All right.  Now you just reviewed that
22  searches and seizures policy, correct?
23      A.  Yes.
24      Q.  Did you see anything in Policy 1009 that
25  said that pat-down searches can only be utilized

Page 53

1   while searching for a weapon?
2       A.  No.
3       Q.  What is your interpretation and belief
4   of when you can do pat-down searches pursuant to
5   Policy 1009?
6       A.  When a search is requested to -- to
7   search a person.
8       Q.  To look for what?
9       A.  Contraband.
10      Q.  Okay.  And I think that Counsel had you
11  define contraband, but to follow-up on Counsel's
12  question, would a vape pen be considered
13  contraband?
14      A.  Yes.
15      Q.  Assuming that there was reasonable
16  suspicion to believe that the student had placed a
17  vape pen in his waistband -- do you follow my
18  hypothetical so far?
19      A.  Yes.
20      Q.  How would you search for that?
21      A.  You pat the waistband around the waist,
22  and if you feel the object, you ask them to remove
23  it.
24      Q.  Okay.  So again pursuant to this Policy
25  1009, in -- in your belief, that would be

Page 74

1   Q. Okay. So that's -- that carves out an
2  exception where school personnel themselves can
3  conduct if reasonable suspicion exists, where
4  security personnel are authorized to conduct a
5  pat-down search for safety reasons; is that
6  correct?
7   A. Yes.
8   Q. Okay. Then as we go through the search
9  procedures, and I believe that this was read to
10 you this morning or perhaps in the first
11 deposition, it-- it tells what procedures are to
12 be used in connection with this section, okay. I
13 want you to focus though where it says, "pat-down
14 searches." Will you read number six, the
15 preliminary paragraph?
16  A. "Pat-Down Searches. A 'pat-down'
17 consists of feeling the outer clothing for an
18 object or item that could be a weapon. Factors to
19 consider when determining the possession of a
20 weapon are..."
21  Q. Okay. Now, when -- wehn we read that
22 definitional section, does it reference back, in
23 your opinion, to 3 B where it's giving security
24 personnel authorization to conduct a pat-down
25 search for a student in possession of a weapon for

Page 75

1  safety reasons?
2   A. Yes.
3   Q. Okay. So there's no limitation is there
4  that you can see in this policy Exhibit 2? Or in
5  Exhibit 1 that somehow hinders, prohibits the
6  ability or authority based on reasonable suspicion
7  for an administrator at the direction of school
8  officials to request, if reasonable suspicion
9  exists, a pat-down search even if you're not
10 looking for a weapon? You're just looking for
11 contraband. Can you do that?
12  A. Can you do a pat-down search?
13  Q. Yes.
14  A. If you're not looking for a weapon?
15  Q. Yes. If authorized or requested by a
16 school authority.
17  A. If requested, yes.
18  Q. Okay. Thank you.
19     To your knowledge, have -- has any
20 lawsuit ever been brought against you or any of
21 the -- Mr. Archuleta for alleged violation of
22 illegal searches?
23  A. No.
24  Q. And how many students have walked
25 through the schools that you -- that you have been

Page 76

1  security, a director, if you can even project that
2  many students since the time you -- your
3  employment began at Rio Rancho?
4   A. That I oversee the schools, I oversee
5  approximately 8500 students so ...
6   Q. Is that each year?
7   A. That's each year.
8   Q. Okay. So can you even project how many
9  students there have been?
10  A. Whatever 8500 times ten would be,
11 80,500.
12  Q. If we had known that, we'd become
13 doctors, right? No, we get it. It's a very large
14 number, correct?
15  A. Yes.
16  Q. Okay. But you would agree that even in
17 authorized pat-downs, it's impermissible to
18 intentionally touch or fondle a student's
19 genitalia?
20  A. Yes.
21  Q. I don't have any other questions.
22     MR. BULLION: I promise we'll eventually
23 be done, maybe, but the last time I went back and
24 forth in a depo like this -- oh, nevermind.
25     (Continue on to next page)

Page 77

1       FURTHER EXAMINATION
2  BY MR. BULLION:
3   Q. Sir, with -- I just want to clarify.
4  You testified earlier that pat-down searches
5  should not be done absent an administrator telling
6  the security guard do a pat-down search. Is that
7  still your testimony?
8   A. Unless a weapon's involved.
9   Q. Unless a weapon's involved. Okay. So
10 if an officer's looking for contraband like a vape
11 pen, they would have to have direction from a
12 school administrator to perform a pat-down search?
13  A. Yes.
14  Q. Okay. And -- actually, no, that's it.
15 We're good. Thank you.
16     MR. WALZ: We're good. We'll read and
17 sign.
18     I'm sorry, Mr. Quinones, do you have any
19 questions?
20     MR. QUINONES: No, I have no questions
21 for Mr. Mangin.
22     MR. WALZ: Thank you. We'll read and
23 sign, please. Thank you, Madam court reporter.
24     Thank you, Counsel.
25     MR. BULLION: That means you'll get the