**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**MARK MONDRAGON, o.b.o. D.M.,**
**a minor child,**

      **Plaintiffs,**

**vs.**                          **Case No. 1:21-cv-00427 KK/JMR**

**RIO RANCHO PUBLIC SCHOOLS BOARD OF EDUCATION and**
**GEORGE ARCHULEETA, in his individual and official capacity,**

      **Defendants.**

**and**

**SARAH MONTOYA, o.b.o L.M.,**
**a minor child,**

      **Plaintiffs,**

**vs.**                          **Case No. 1:21-cv-00648 KK/JMR**

**RIO RANCHO PUBLIC SCHOOLS BOARD OF EDUCATION and**
**GEORGE ARCHULEETA, in his individual capacity, Defendants.**

**and**

**ANGELA SALAZAR, o.b.o J.M.,**
**a minor child,**

      **Plaintiffs,**

**vs.**                          **Case No. 1:21-cv-00751 KK/JMR**

**RIO RANCHO PUBLIC SCHOOLS BOARD OF EDUCATION, and**
**GEORGE ARCHULEETA, in his individual capacity, and JOHN**
**DOE # 1, in his individual capacity,**

**Defendants.**

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY</u>**
**<u>JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY</u>**

Sarah Montoya, as representative of L.M.[1], Mark Mondragon as representative of D.M., and Angela Salazar as representative of J.M.[2] (collectively "Plaintiffs" or "Children"), through undersigned counsel, responds as follows to Defendant George Archuleta's Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. No. 66, "Def. Mot." or "Motion"). As explained below, the Motion lacks merit and should be denied in its entirety.

## I.     STATEMENT OF FACTS

Plaintiffs' Disputed Material Facts and Additional Material Facts are stated in a separate document titled Plaintiffs' Joint Statement of Material Facts which has been filed contemptuously with this motion response (Doc. 76). Plaintiffs' Material Facts are lettered and are referred to as PAF as a shorthand for Plaintiffs' Additional Material Facts. Defendants' Material Facts are numbered and are referred to as DUF as shorthand for Defendants' Undisputed Material Facts. Material facts that the Defendants asserted and Plaintiffs have disputed are numbered and are referred to as Disputed Material Facts or DF.

## II.     OVERVIEW

Defendant George Archuleta was employed by Defendant Rio Rancho Public Schools as a security guard while the Plaintiffs attended school at Rio Rancho Public High School. DUF 7. Mr. Archuleta abused his position of authority and power over the Plaintiffs by repeatedly molesting and groping them during searches for supposed contraband on their persons. PAFs Y, AA, JJ, KK, LL, OO, QQ, FFF, GGG, HHH, III, KKK, LLL, SSS, TTT, VVV, WWW, XXX, YYY, ZZZ, BBBB, CCCC, IIII.  These acts involved touching and fondling the children's genitals during pat down searches as well as sticking his hands in the children's pockets as a means of grabbing and rubbing the children's genitals. *Id*.  Mr. Archuleta also tormented the Plaintiffs after molesting them by telling them he was going to be searching them again.  PAFs LLL, SSS, and IIII.

It is undisputed fact that the Plaintiffs were never suspected of having weapons at school. PAFs P-T. At most the only reason that could be provided for searching each of the Plaintiffs in

---

[1] L.M. is referred to in deposition transcripts and statements of fact as both L.M. and E.M.
[2] J.M. is referred to in deposition transcripts and statements of fact as both J.M. and J.S.

the first place was concern that they may be in possession of an e-cigarette device referred to as a vape or vape pen. *Id*. Mr. Affentranger, Rio Rancho Public School's main principal reluctantly admitted in his deposition that possession of a vape pen does not pose an inherent danger to other students. PAF D. He also admitted that the level of intrusion permissible in a search to look for a vape pen would be much less than what would be allowed when searching a student for a weapon. PAF E.

Mr. Archuleta was required to document each search he performed by writing a report on the search and also video recording the search. PAFs HH and WW-ZZ. Mr. Archuleta never video recorded his searches of the Plaintiffs stating that he had been issued a non-functioning lapel camera by the School District. PAFs WW-ZZ. Mr. Archuleta did not document each search of the Plaintiffs on a report. PAF FF. For these reasons there is a lack of objective corroborating evidence that would readily show which side is telling the truth as to what happened. Where a video recording would show us exactly what happened we do not have that evidence because Mr. Archuleta failed to create it in the first place. PAF WW-ZZ. This case is really Mr. Archuleta's word against the Plaintiffs' word. Mr. Archuleta's word is meaningless given that he repeatedly perjured himself during his deposition. PAF KK and OO. What's worse – he perjured himself because he did not want to admit that he had laughed at one of his victims expressing that they were in fear of him. PAF KK and LL.

Mr. Archuleta sat in on the deposition of D.M. During that deposition D.M. expressed that when he was at school he was constantly looking around for Mr. Archuleta because he did not want to see him or run into him. PAF JJ. D.M. was afraid of Mr. Archuleta. *Id*. After D.M. said this audible laughter could be heard over the zoom call the deposition was taking place on. *Id*. After counsel for Plaintiff insisted that each person on the Zoom call speak so it could be determined who had laughed at D.M.'s statement Mr. Archuleta disconnected from the call and did not return for the remainder of D.M.'s deposition. *Id*.

Mr. Archuleta gave a deposition and strenuously denied that he had laughed at anything that D.M. had said though he did readily admit that laughing at a child who said they were afraid

of him and constantly looking out for him at school would be deeply inappropriate and offensive. PAF KK and LL. Mr. Archuleta concocted an elaborate story to explain he was not home and could not have been heard laughing at one of his victims. *Id*. Mr. Archuleta eventually admitted that he laughed at D.M.'s statement that he was afraid of seeing Mr. Archuleta at school after producing phone records which conclusively proved he had lied multiple times in his deposition. PAF MM-OO.

Precedent exists for disregarding a Party's statement of facts that are blatantly contradicted by the record to the point a reasonable jury could not believe the party. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment…Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.") In the instant case Mr. Archuleta's repeated perjury and other evidence shows that his statement of facts is not trustworthy and not believable by a reasonable jury and should be disregarded. *Id*.

### III.   LEGAL STANDARD

#### A.  Summary Judgment

Summary judgment may only be granted where no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ. P. 56(a). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if the movant meets that burden is the nonmovant required to put in the record facts showing that a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). Factual allegations must be supported by evidence, such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A).

4

In resolving a motion for summary judgment, all evidence is viewed in the light most favorable to the nonmovant, and reasonable inferences are drawn in the nonmovant's favor.

## B.  Qualified Immunity

In addition to establishing a violation of constitutional rights, to defeat a qualified immunity defense a plaintiff must also show that the right "was clearly established at the time of the conduct in question[.]" *Dahn*, 867 F.3d at 1185. "[T]o show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (citations omitted). However, "a plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (citations omitted). That is because "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful[.]" *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997) (quotations omitted) (modification original). *See also*, *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.") Although it is the plaintiff's burden to satisfy the two-part test for defeating a qualified immunity defense, the Court must still "review the evidence in the light most favorable to the nonmoving party[.]" *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). A Plaintiff's facts are accepted as true on motions for summary judgment asserting qualified immunity when those facts are supported in the record. *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016).

### a.   Taylor v. Riojas and Clearly Established Law

A recent Supreme Court opinion, *Taylor v. Riojas* has clarified that a Plaintiff does not need to provide a case that is exactly factually on point to give notice to individuals that their

actions violate clearly established law. Trent Taylor was incarcerated in a Texas prison. *See Taylor v. Riojas*, 141 S. Ct. 52, at 53 (2020). He alleged that, in September 2013, correctional officers kept him in a pair of disturbingly unsanitary cells for six full days. *Id*. The first cell was covered in "'massive amounts' of feces": there was waste on the floor, walls, windows, and even "packed inside the water faucet." *Id*. (quoting *Taylor v. Stevens*, 946 F.3d 211, 218 (5th Cir. 2019)).  Taylor did not eat or drink anything for almost four days for fear that his food or water would be contaminated. *Id*. Officers then moved him to a second cell, which was extremely cold and lacked a bed and a toilet. *Id*.  A clogged drain in the floor provided the sole means of disposing of human waste. *Id*. The drain ultimately did overflow, covering the floor with feces. *See Taylor*, 141 S. Ct. at 53. Confined without clothing, Taylor was forced to "sleep naked in sewage." *Id*.

Taylor brought a civil rights action against the correctional officers under 42 U.S.C. § 1983. He alleged his conditions of confinement violated his rights and that the officers were indifferent to the violatons. The district court found that although Taylor's conditions of confinement "may have been quite uncomfortable," they were not unconstitutional and therefore that the officers had qualified immunity. *See Taylor v. Stevens*, No. 14-CV-149, 2017 U.S. Dist. LEXIS 227537, at *25 (N.D. Tex. Jan. 5, 2017). It also rejected Taylor's deliberate indifference claims, finding that Taylor had not alleged more than de minimis injuries. *Id*. The court therefore granted summary judgment to defendants on the unconstitutional conditions and deliberate indifference claims. *Id*.

On appeal the Fifth Circuit affirmed in part and reversed in part holding that the correctional officers were entitled to qualified immunity on Taylor's conditions-of-confinement claim. *Taylor v. Stevens*, 946 F.3d 211, 227 (5th Cir. 2019). The Fifth Circuit also held that although the cell conditions alleged by Taylor violated the Eighth Amendment and that the defendants were deliberately indifferent to such violation, the law was not "clearly established" at the time of the violation. *Id*. at 222. "Though the law was clear that prisoners couldn't be housed in cells teeming with human waste for months on end, [the Fifth Circuit] hadn't previously held that a time period so short violated the Constitution." *Id*.  Since it was not clear that confinement in these conditions for such a short period of time violated the Constitution, the officers in Taylor's

case did not have "fair warning" that their specific acts were unconstitutional. *See Taylor*, 946 F.3d at 222 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

On appeal the Supreme Court vacated and remanded. See *Taylor*, 141 S. Ct. at 54. The Court held that "any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution." *Id*. Following *Hope v. Pelzer*, the Court reasoned that general Eighth Amendment principles made it obvious that Taylor's cell conditions violated the Constitution noting that there was no evidence that the conditions of Taylor's confinement were necessary or that they could not have been mitigated. *Id*.

    b.   The 10th Circuit's Application of Taylor v. Riojas to Determining Which Cases May Clearly Establish Law for Qualified Immunity Purposes

The 10th Circuit has interpreted *Taylor v. Riojas* as creating a significant change in qualified immunity litigation. *Truman v. Orem City*, 1 F.4th 1227, 1240 (10th Cir. 2021)(Relying on *Taylor* to rule that the right to not be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established and that prosecutor fabricating evidence against a murder defendant violated clearly established law even though there was no 10th Circuit case directly on point).

In *Truman* the plaintiff alleged that the prosecutor fabricated evidence and provided that evidence to a medical examiner which led to him being wrongfully charged and wrongfully convicted. *Truman v. Orem City*, 1 F.4th 1227, 1233–34 (10th Cir. 2021). The medical examiner initially listed the death of the plaintiff's wife as "could not be determined". *Id*. A year later the prosecutor presented the medical examiner with a PowerPoint presentation that claimed that plaintiff had murdered his wife which led to a change in opinion of the medical examiner as to the cause of death and which caused the medical examiner to present materially inaccurate opinion testimony at trial:

"[The presentation] included a crime scene diagram depicting an approximately seven-foot distance between Mrs. Truman's feet and the hallway entrance where Mr. Truman claimed the shot was fired. Another slide stated Mrs. Truman's body was found over twelve feet away from the spot where Mr. Truman said he saw her after he heard the shot. Contrary to these representations, Mrs. Truman's feet were actually three-and-one-half feet from the hallway entrance and she moved only about nine inches from the spot where Mr. Truman said he first saw her after he heard the shot. Because it is physically impossible for someone who has been shot in the head to walk more than a step or two before collapsing, the medical examiner concluded someone else had shot Mrs. Truman. He then changed her manner of death to homicide."

After this meeting, Mr. Truman was charged with his wife's murder and with obstruction of justice. Mr. Truman alleges that, at trial, based on inaccurate information provided by the Orem City police officers and the prosecutor in the PowerPoint presentation, the medical examiner testified that Mrs. Truman's manner of death was homicide because she could not have moved the distance from the hallway to where her body lay if the wound were self-inflicted.

The prosecution also presented the jury a sketch of the layout of the house showing the location of the bathroom, kitchen, and body. On the night of the incident, Detective Thomas Wallace made a hand sketch of the house using a tape measure. When Detective Wallace later prepared a computer diagram of the scene, however, Mr. Truman alleges that Detective Wallace made a transcription error and typed 13.9 feet instead of 139 inches as the length of the hallway in the Truman home. This caused the diagram to inaccurately depict the length of the hallway as being about two feet and four inches longer than it really is. Significantly, the diagram also exaggerated the distance between the location of Mrs. Truman's body and the place where Mr. Truman claimed to have heard the shot. The measurements were used to generate a trial exhibit misrepresenting the dimensions of the rooms and the exact location of Mrs. Truman's body. The exhibit also significantly undermined the possibility of an accident or that Mrs. Truman committed suicide because the inaccurate diagram depicted Mrs. Truman's body as far more than a step or two from the shot location. After considering this evidence, the jury convicted Mr. Truman."

*Truman v. Orem City*, 1 F.4th 1227, 1233–34 (10th Cir. 2021)

This particular set of facts was *unique* in that no 10th Circuit case or any other case in the country dealt with a fact scenario exactly like this one – providing inaccurate information as to the dimensions of a crime scene to a medical examiner in a homicide case causing the medical

examiner to provide false testimony which in turn deprived a plaintiff of his liberty. *Id*. at 1239. The 10th Circuit identified *Pierce v. Gilchrist* as the closest case on point to the facts in *Truman* within the 10th Circuit and described the facts and holding in that case as follows:

> "In *Pierce*, a plaintiff wrongly convicted of rape sued a police department forensic chemist under 42 U.S.C. § 1983 for the constitutional tort of malicious prosecution. 359 F.3d at 1283–84. The complaint there alleged that the forensic chemist performed a forensic analysis on hair samples from the crime scene and concluded many were "microscopically consistent" with the plaintiff. *Id*. at 1282. It further alleged the forensic chemist's findings were knowingly false, without a scientific basis, and led to the plaintiff's wrongful conviction. This court held the forensic chemist was not entitled to qualified immunity. Citing Supreme Court precedent, we explained it was clearly established that a criminal defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction."

*Truman v. Orem City*, 1 F.4th 1227, 1239 (10th Cir. 2021)

Notably in addition to the facts being different the actual cause of action the Plaintiff in Pierce brought their claim as a malicious prosecution claim rather than a claim of a general right to not be deprived of liberty as a result of fabricated evidence by a government agent utilized in *Pierce* differed from the cause of action used in *Truman*. *Truman v. Orem City*, 1 F.4th 1227, 1236 n.3 (10th Cir. 2021). The 10th Circuit determined that this difference also did not matter for the purpose of determining whether *Pierce* put the prosecutor on fair notice that he was violating clearly established law because malicious prosecution and fabrication of evidence claims both implicate the Constitution. *Id*.

The 10th Circuit held that the same constitutional right at issue in *Pierce* was at issue in *Truman* and held that for that reason the right not to be deprived of liberty as a result of the fabrication of evidence of a government officer was clearly established by *Pierce* at the time of

the prosecutor's actions in 2013.[3] The 10th Circuit stated that *Taylor v. Riojas* was "instructive" in reaching its holdings describing the pertinent facts in *Taylor* and the Fifth Circuit granting qualified immunity because the Plaintiff could not identify a case that said that an inmate confined to extremely unsanitary cells for six days offends the Constitution and the Supreme Court's subsequent reversal of the 5th Circuit's grant of qualified immunity. *Id*. at 1240. The 10th Circuit went on to say that the proposition asserted in *Taylor* that a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question applied in *Truman*:

> "This proposition applies with equal force here. The right not to be deprived of liberty as a result of the fabrication of evidence by a government officer is a general constitutional rule identified in decisional law prior to the prosecutor's conduct. *See, e.g.*, *Mooney*, 294 U.S. at 112, 55 S.Ct. 340; *Whitlock*, 682 F.3d at 585 ("[T]he deliberate manufacture of false evidence contravenes the Due Process Clause."); *id*. at 585–86 (collecting cases); *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001)("[T]he wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious ... [so] that the right to be free from such charges is a constitutional right."). And it applied with obvious clarity to the specific conduct in question— the prosecutor's alleged fabrication of evidence and use of it against Mr. Truman, resulting in his conviction. *See Whitlock*, 682 F.3d at 585–86 (denying qualified immunity to prosecutor who allegedly fabricated evidence by encouraging and bribing witnesses to lie and then using that perjured testimony at trial to secure a conviction because the unconstitutionality of such acts was clearly established). Just like any reasonable correctional officer should understand the inmate in *Taylor*'s conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."

*Truman v. Orem City*, 1 F.4th 1227, 1240–41 (10th Cir. 2021).

## IV.   ARGUMENT

A.   <u>Archuleta's Actions Violate the Clearly Established 4th Amendment Right to be Free from Unreasonable Search and Seizure</u>

---

[3] The *Truman* Court held that in addition to the law being clearly established by Pierce the facts present also constituted an "obvious" constitutional violation. *Truman v. Orem City*, 1 F.4th 1227, 1240 (10th Cir. 2021).

In *Terry v. Ohio* the Supreme Court stated that the Fourth Amendment right to be free from unreasonable search and seizure is of inestimable importance and that "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S. Ct. 1868, 1873, 20 L. Ed. 2d 889 (1968). *Terry* discusses pat down searches – in particular pat down searches for weapons based on reasonable suspicion. *Id.*

A search for Fourth Amendment purposes occurs when a careful exploration of outer surfaces of a person's clothing in an attempt to find a weapon or other item. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877, 20 L. Ed. 2d 889 (1968). A pat down search is a particular type of search that is both a search *and* a seizure under the Fourth Amendment. *Id.* at 1879 ("In this case there can be no question, then, that Officer McFadden 'seized' petitioner and subjected him to a 'search' when he took hold of him and patted down the outer surfaces of his clothing"). The Supreme Court has drawn a clear and meaningful distinction between a government actor patting down a person's outer clothing as a search method compared to a government actor sticking their hands into a person's pocket as a search method:

> "Even assuming arguende that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man.

Such a search violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents."

*Sibron v. New York*, 392 U.S. 40, 65–66, 88 S. Ct. 1889, 1904, 20 L. Ed. 2d 917 (1968)

*Sibron* clearly establishes that searching a person's pocket for drugs without first performing a less invasive search such as a pat down violates the Fourth Amendment as a matter of law. *Id*. The 10th Circuit has interpreted *Sibron* as establishing that a search inside a person's pockets for weapons without first conducting an initial limited exploration is unreasonable under the 4th Amendment. *United States v. King*, 990 F.2d 1552, 1558 (10th Cir. 1993)("[P]rotective search for weapons unreasonable when officer reached inside defendant's pocket without first conducting initial limited exploration")(Citing *Sibron v. New York,* 392 U.S. 40, 65).

A hunch of inchoate and unparticularized suspicion is insufficient to give rise to reasonable suspicion. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994). Reasonable suspicion exists by examining the totality of the circumstances. *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585–86; *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992)). Particularized facts to an individual are required to establish reasonable suspicion to search a student in a school. *A.M. v. Holmes*, 830 F.3d 1123, 1158 (10th Cir. 2016).

The Supreme Court has held that not only police officers, but also school administrators are state actors bound by the Fourth Amendment. *Pacheco v. Hopmeier*, 770 F. Supp. 2d 1174, 1181 (D.N.M. 2011)(citing *New Jersey v. T.L.O.,* 469 U.S. 325, 333–37, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). In *Pacheco* a security guard searched a student because it was suspected that the student was a witness to a crime. *Id*. at 1179. A security guard patted down the student and without having felt any items that could be contraband or weapons placed his hands in the student's pockets and then searched his pockets as well as his wallet and shoes. *Id*. at 1180. The Court in *Pacheco*

determined that *New Jersey v. T.L.O.* establishes that the legality of a search of a student in school should depend on: (1) whether the officers initially had justification for the search; and (2) whether the scope of the search was reasonably related to the circumstances that initially justified the interference. *Pacheco v. Hopmeier*, 770 F. Supp. 2d 1174, 1189 (D.N.M. 2011)(citing *New Jersey v. T.L.O.,* 469 U.S. 325).

The Court in *Pacheco* determined that the scope of the search in Pacheco was unreasonable because 1) there was no suspicion that the student was carrying a weapon or drug; 2) searches must be reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction; 3) an initial pat down search reveled nothing that might be a weapon or drug. *Id*. at 1190l. Based on these findings the court determined, that the scope of the search, allowing the guard to search the student's pockets, was unconstitutional. *Id*.

The Supreme Court has described making a jump from searching a student's outer clothes and backpacks to searching a student's intimate parts as a "quantum leap". *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373–77, 129 S. Ct. 2633, 2641–43, 174 L. Ed. 2d 354 (2009)("**We do mean, though, to make it clear that the *T.L.O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts**. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions")(emphasis added).

Here the Plaintiffs' intimate areas were searched – not by visual inspection but through touching. PAFs FFF, III, TTT, WWW, BBBB, CCCC. Each of the Plaintiffs described

13

experiencing feelings of degradation, fright, humiliation and embarrassment during and immediately after the searches of their genital areas.  PAFs HHH, III, MMM, UUU, WWW, BBBB, CCCC. The 10th Circuit examined *Safford* and stated that the search in that case in which a middle school girl was required to shake her bra and briefly expose her pelvic area was unreasonable when a school nurse was searching for drugs – when reasonable suspicion had existed to search the child for drugs*. A.M. v. Holmes*, 830 F.3d 1123, 1161 (10th Cir. 2016); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 368, 129 S. Ct. 2633, 2637, 174 L. Ed. 2d 354 (2009). The 10th Circuit emphasized the following legal reasoning that drove the Supreme Court to arrive at its holding that the scope of the search in *Safford* was unreasonable under *T.L.O.*:

> "[t]he very fact of [the student's] pulling her underwear away from her body in the presence of the [school] officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.
>
> [**The student's] subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, frightening, and humiliating**. *Id.* at 374–75, 129 S.Ct. 2633. The distinction appears clear: whereas reasonable suspicion (as enunciated in *T.L.O.*) supporting a fair probability of finding contraband permits a search of *outer* clothing, **a higher level of justification is necessary to proceed with a search that will expose a student's intimate areas**."

*A.M. v. Holmes*, 830 F.3d 1123, 1161 (10th Cir. 2016)(citing *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374, 129 S. Ct. 2633, 2641(2009))(emphasis added).

In *Holmes* specific particularized facts were observed that F.M. may be in possession of drugs, specifically marijuana, to search F.M. *A.M. v. Holmes*, 830 F.3d 1123, 1160–61 (10th Cir. 2016). The search of F.M. involved him removing outer layers of clothing. *Id*. He was not required and did not remove any clothes other than his outer clothing. *Id*. At all times during the search his intimate areas were covered by clothing, "[W]hen the search concluded, he was still wearing a

long-sleeved shirt, a pair of athletic shorts, and underwear. Soon afterward, he got dressed as he

had been prior to the search." *Id*. There is no indicia in *Holmes* that F.M. was physically touched

by any government actor as part of this search. *Id*. The 10th Circuit compared the search in *Holmes*

to the search in *Safford* and described the distinction between the cases as follows:

> "The distinction appears clear: **whereas reasonable suspicion (as enunciated in**
> ***T.L.O.*) supporting a fair probability of finding contraband permits a search of**
> ***outer* clothing, a higher level of justification is necessary to proceed with a search**
> **that will expose a student's intimate areas**."

*A.M. v. Holmes*, 830 F.3d 1123, 1161–62 (10th Cir. 2016)(emphasis added).

    The 10th Circuit's analysis of this case and the legal principle at play is consistent with the

Supreme Court's holding in *Safford* that to move the scope of the search of a student beyond

searching outer layers of clothing to exposing, i.e. searching, a student's intimate areas constitutes

a "quantum leap" in the invasion of a student's privacy. To make such a leap the school would

need a correspondingly important interest to justify the scope of the search. *Safford Unified Sch.*

*Dist. No. 1 v. Redding*, 557 U.S. at 377.

### B.   The Plaintiffs were Not Suspected of Possessing Weapons

    The Defendants have not asserted any governmental interest that would justify searching

the inside of a student's pocket or a child's genital area under *T.L.O.*, *Safford*, and *Holmes*. DF

NOs. 6, 12-16, 19-21; PAFs D-F, I, J, L, N-V. On the contrary the evidence is undisputed that the

children were not suspected of possessing weapons. PAFs J and P-T. Defendant Archuleta claims

in his motion at pages 11 and 12 that a general atmosphere of concern existed at the school that a

"great act of violence" would occur at the school citing to DUF 36 to support that contention. Mr.

Archuleta also alleges that there was a concern that a large fight or violent confrontation may occur

on or off campus citing to DUF 35. Mr. Archuleta claims that school officials were receiving

Snapchat screenshots from unidentified persons depicting guns which cause a concern that there would be a shooting at the school citing to DUF 39 and 40 to support that claim. Finally, Mr. Archuleta alleges that both L.M. and J.M. were "believed to be involved, or peripherally involved, with the two groups that school officials were concerned about" citing to DUF 39 to support that contention.

The facts Defendant relies on to make these arguments, DUFs 35, 36, 39, 40 and 41, are all disputed facts; the reasoning of which with specific reference to and analysis of the record is stated at length in DF 14, 15 and 16. In addition to the facts themselves being in dispute even if they were taken as true generalized concerns about violence, even gun violence, is not sufficient to provide the type of particularized facts which are required to form the basis for reasonable suspicion to search a student. *A.M. v. Holmes*, 830 F.3d 1123, 1158 (10th Cir. 2016)(holding that particularized facts are needed to establish reasonable suspicion). Working on general feelings of unease about the state of the school without particularized facts falls within the realm of a hunch. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994)(Inchoate and unparticularized suspicion is insufficient to give rise to reasonable suspicion).

What's more, the general atmosphere and state of the school as described by the school's security manager was markedly different than Mr. Baca's description of a school that may suffer a so called "great act of violence" at any moment. Mr. Mangin stated that roughly 80% of the security issues at V. Sue Cleveland concern the use of vaping devices which can contain nicotine or THC. PAF B. Vape pens cannot be mistaken for hand guns and are not inherently dangerous. PAFs C and D. Mr. Mangin in his role as security supervisor is notified whenever a student has a weapon or is suspected of having one. PAF J. Mr. Mangin is certain that none of the Plaintiffs was ever suspected of possessing weapons at V. Sue Cleveland High School. *Id.*

The record is also clear that the only time a guard would be permitted to search a student's pockets is if the student were suspected of having a weapon. PAFs F, I, J, O. The Plaintiffs were not suspected of having weapons. PAFs J and P-T. In each of the instances in which Mr. Archuleta reached inside the Plaintiffs' pockets he had not located any suspected contraband during a preceding search of the Plaintiffs' outer layer of clothing. These searches are discussed individually for the sake of clarity in the record.

C.   Searches of D.M.'s Person that Included Inappropriate Touching of D.M.'s Intimate Areas

a.   *The Bathroom Fight Search*

D.M. was searched once his freshman year by George Archuleta and that no administrators were present for the search. PAF FFF. On this occasion Mr. Archuleta took Daniel to a private office on the second floor in the sophomore office with no administrator, teacher or other person around. *Id*. He started searching D.M.'s pockets with his hands. D.M. felt Mr. Archuleta feeling around his thighs and buttocks. D.M. felt Mr. Archuleta touch the tip of his penis. *Id*.  Mr. Archuleta made a swirly motion around D.M.'s penis with his finger and said "What's this?" *Id*. Mr. Archuleta had taken D.M. to this office because he observed that D.M. had a black eye from fighting another student. *Id*. No administrator was present for this search. Merely observing a child in a fight does not provide reasonable suspicion to search the child. *Id*. Mr. Archuleta admitted to performing this search but claimed it was at the direction of an administrator. *Id*.

Mr. Archuleta asserts at 12 page of his motion that D.M. was observed by Mr. Archuleta in a fight which is a serious infraction and a violation of the school code of conduct. Mr. Archuleta further argues that because a school shooting had occurred a week prior Mr. Archuleta had reasonable suspicion to search D.M. for weapons. Defendant's Motion at p 14. No explanation or argument is given as to how this provides an articulable basis to search even the outer layer of

D.M.'s clothing under *T.L.O.* and *Safford*. It is questionable in this circumstance that even a pat down of outer clothing would be permissible but it is crystal clear that no facts exist to warrant expanding the scope of the search to the inside of D.M.'s pocket and his genitals. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373–77. This search was also not justified at its inception due to the lack of articulable reasonable suspicion for a search in the first place. *Id*. However, we know that Mr. Archuleta *did not* search D.M. for weapons because he testified that he never suspected D.M. of possessing a weapon at school. PAF S. The Defendant's asserted rationale for this search finds no support in the record and should not be considered by this Court. *Scott v. Harris*, 550 U.S. 372, 380.

### b. The Stale "Vape" Search

D.M. was searched on another occasion due to observations that happened the day prior to the search. PAF III; D.M. Deposition 79:9-80:4 and 81:13-21. During this search Mr. Archuleta put his hands in D.M.'s pockets and pulled a condom out of D.M.'s wallet. Mr. Archuleta then referred to D.M. as a "little guy." *Id*. During this search Mr. Archuleta touched the tip of D.M.'s penis with his hands in D.M.'s pockets. *Id*. Mr. Archuleta also touched D.M.'s buttocks. This made D.M. feel really embarrassed and scared. *Id*.

Observing D.M. with a vape device which he handed over to Mr. Archuleta the day prior to being searched cannot serve as the basis to search D.M. again the following day. There were no individualized facts that would reasonably lead a security officer or school official to believe that D.M. would have any prohibited items on his person a day after he was seen with a vaping device. *Fernandez*, 18 F.3d 874 at 878. There is certainly no discernible rationale for expanding the scope of a search from a pat down of D.M.'s outer clothing to the inside of D.M.'s pocket or genital area. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373–77.

D. <u>Searches of L.M.'s Person that Included Inappropriate Touching of L.M.'s Intimate Areas</u>

*a. The v-line search*

On one occasion Mr. Archuleta searched L.M. he stuck his hands in L.M.'s pockets and felt around his though and then moved to the v line – the area between the thigh and groin in the pelvic area. PAF BBBB. L.M. felt shocked and that he was being violated. *Id*. Mr. Archuleta continued to feel around with his hands in L.M.'s pockets. *Id*. While his hands were in L.M.'s pockets he grabbed and fondled L.M.'s penis and testicles for approximately five second. *Id*. L.M. verbalized his discomfort with the situation by saying "woah dude" and backing away from Mr. Archuleta. *Id*. Backing away was ineffective because Mr. Archuleta still had his hand in L.M.'s pocket. Nothing was found on L.M.'s person on this occasion. *Id*. This incident made L.M. feel "gross and disgusting". *Id*.

Defendant argues at page 18 of their motion that this search was not unreasonable citing to *H.Y. ex rel. K.Y. v. Russell Cnty. Bd. of Educ.*, 490 F. Supp. 2d 1174 (M.D. Ala. 2007). This is an Alabama Federal District Court case that has never been cited by the 10th Circuit or any other Circuit Court and which has since 2007 been cited a total of seven times. This case predates *Safford* by two years. To the extent *H.Y. ex rel. K.Y.* is inconsistent with the Supreme Court precedent and 10th Circuit precedent cited by Plaintiff in this response – Plaintiffs' precedent is controlling.

Defendant also cites to an unpublished Federal District Court case from the Southern District of New York to assert that incidental contact with a suspect's genitals during a pat down search is a de minimis intrusion and not a Fourth Amendment violation. Defendant's Motion at p. 18. *Golden* is markedly different in its facts than the present case and the cases Plaintiff has cited to support their claims because *Golden* does not involve the search of a student in school. *Golden* at *1. *Golden* concerned a challenge as to the constitutionally of a pat down search conducted on

19

the roadside following a traffic stop of an adult motorist. *Id. Golden's* holding relies on the search being reasonable because the contact at issue in *Golden* was incidental. In the present case Mr. Archuleta has affirmatively stated he made no incidental contact with any of the Plaintiffs' genitals during a search. PAF AA. Furthermore the cases cited by Plaintiff from the Supreme Court and the 10th Circuit control over an unpublished case from another judicial district.

We know that this search was not motivated by reasonable suspicion that L.M. possessed a weapon because Mr. Archuleta stated this in his deposition. PAF S. This is exactly the kind of search *Safford* expressly prohibits because it is a severe and pervasive invasion of a student's privacy. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. at 377  In a circumstance where a guard is not looking for weapons it is inconceivable that any governmental interest would exist that would justify an intrusion of this severity under *T.L.O.* and *Safford. Id.* This search was unreasonable at its inception and the scope of the search could not possibly be reasonably related to the interest at stake. The facts as stated also run contrary to testimony from Mr. Mangin and Archuleta that a search of the inside of a student's pocket may only take place when a security officer is looking for a weapon. PAFs F, I, L, and V.

*b.   The Penis Rubbing Search*

L.M. was observed using a vape pen in a bathroom. PAF CCCC. L.M. gave the vape device he was observed with to school personnel prior to being searched. *Id*. Decision was made by Mr. Archuleta and a principal to search L.M. to see if he had any other contraband on his person. *Id*. In this instance Mr. Archuleta searched L.M. and placed his hands in L.M.'s pockets. *Id*. Mr. Archuleta groped and rubbed L.M.'s penis for about five seconds, in L.M.'s words long enough to "get some feels in", and then withdrew his hand from L.M.'s pocket. *Id*.  L.M. described this experience making him feel a sense of loathing and defeat which L.M. expressed as follows, "I

never—never spoke on it. It, honestly, put me in, like, a – I don't want to say shock, but it put me in a place where I was just, like, "I—I hate school. I hate this. I hate going—having to go through this. I can't wait. I just want to go home. Screw this."" *Id*. There were no facts supporting a search of L.M.'s person in this instance. PAF DDDD. He had been observed with a vape pen and voluntarily gave that vape pen to the security officer. *Id*.

It has been claimed by RRPS that observing a student with contraband on one occasion gives the school cart blanche to search the student again because "they could have more contraband on them." PAF EEEE. When asked if it was possible that a student voluntarily relinquishing an item would do that precisely to avoid being searched Mr. Affentranger admitted it was possible but dismissed the possibility as being unlikely. *Id*.

Defendant claims at page 19 of his motion that despite L.M. having handed over the vape device he was found with there was reasonable suspicion to perform a search of L.M.'s outer clothing and backpack because when a student is found with one vape device they often have multiple vape devices in their possession. Defendant cited to DUF 20 to support this statement. DUF 20 was contested by Plaintiff and is DF 6. Mr. Baca stated in his deposition that the basis for DUF 20 was a hunch on his part. DF 6. Furthermore, no foundational evidence was provided that L.M. possessed a propensity to have multiple vaping devices due to any addiction to vaping or any other reason. *Id*. The alleged fact that supported reasonable suspicion is not a particularized fact to L.M. and is also a inchoate hunch. *Id*. In addition to this this search was not reasonable at its inception. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. at 377.

The scope of the search could not have and should not have expanded to beyond a search of L.M.'s outer clothing and backpack. *Id*. L.M. was not suspected of having a weapon. PAF S. According to DUF 20 the rationale to search L.M. would have been to find additional vape devices.

Vape devices are not dangerous to the student body. PAF D. The governmental interest in finding one or more vaping devices on a boy's person at age 14-15 does not warrant searching inside the child's pocket and then moving the interior of the pocket towards the child's penis and touching the penis. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. at 377. Here Mr. Archuleta went beyond merely touching the penis and rubbed L.M.'s penis and testicles for approximately five seconds. PAF CCCC. There is no discernible reason to expand the scope of this search to fondle L.M.'s penis and testicles – particularly rubbing them. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (5th Cir. 1994)("[T]here is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it"). This search was clearly not reasonably related in scope to any initial justification to perform the search and violated L.M.'s 4th Amendment rights.

E. Search of J.S.'s Person that Included Inappropriate Touching of J.S.'s Intimate Areas

a. *Search Resulting in Touching of J.S.'s Left Testicle for Several Seconds*

Mr. Archuleta instructed Mr. Salazar to flip his waistband inside out, take off his shoes and socks, take out the insole of his shoes, and then instructed J.S. to turn around. PAF TTT. Mr. Archuleta stuck his hands in J.S.'s pocket. *Id*. Mr. Archuleta asked if J.S. was wearing shorts underneath his pants and if J.S. was wearing shorts to remove the shorts. *Id*. J.S. told Mr. Archuleta that he was not comfortable removing any of his clothing. *Id*. Mr. Archuleta then became angry and continued to search J.S. Mr. Archuleta began patting down J.S.'s legs while J.S. was facing the wall. *Id*. Mr. Archuleta moved really high up on J.S.'s left thigh during this pat down search. *Id*. Mr. Archuleta continued patting J.S.'s leg moving upwards until he was touching J.S.'s testicle. *Id*. Mr. Archuleta left his hand on J.S.'s testicle for a few seconds. *Id*. This search took place in

an isolated area of the school with no witnesses and no administrators present during the search. *Id*.

Defendant at page 21 of his motion claims that it was reasonable to search J.S. in this manner because, "As noted, the search occurred during a time of heightened concern regarding the potential for school violence, and school officials were worried that the violence could involve guns. UMF 35, 36." DUF 35 and 36 are disputed with the rationale being provided at length in DF 14, 15 and 16. In addition to the facts themselves being in dispute even if they were taken as true generalized concerns about violence, even gun violence, is not sufficient to provide the type of particularized facts which are required to form the basis for reasonable suspicion to search a student. *A.M. v. Holmes*, 830 F.3d 1123, 1158 (10th Cir. 2016)(holding that particularized facts are needed to establish reasonable suspicion). Working on general feelings of unease about the state of the school without particularized facts falls within the realm of a hunch. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994)(Inchoate and unparticularized suspicion is insufficient to give rise to reasonable suspicion). This supposed generalized concern about potential gun violence in the school considered in conjunction with observing J.S. on a security camera as having been present at an incident where a school fight was supposedly to take place does not provide reasonable suspicion to perform even a mildly invasive search of J.S – especially given that J.S. was called in to the principal's office for a search the day after he was observed on this security camera. Defendant's Motion at p. 20.

No articulable reason is provided as to why the scope of any pat down search could be permissibly expanded from the outer clothes and backpack to J.S.'s groin area. *Id*. Mr. Archuleta knows he is to not search a student's groin area. PAF U-Y. Mr. Archuleta also knows that if he follows the school's training and does not touch more than three inches above a student's knee that

it should be physically impossible for him to touch a student's genitals during a search – even through incidental contact. *Id*. Mr. Archuleta knows that in addition to being contrary to his training that it is morally wrong to touch a child's genitals during a search. PAF QQ. Mr. Archuleta affirmatively disclaimed that he incidentally touched any of the Plaintiff's genitals – his position was that it did not happen at all not that he had accidentally touched any of the children. PAF AA.

The description provided by J.S. of Mr. Archuleta gradually working his touches up his leg combined with Mr. Archuleta's statements that he knows it is wrong to touch a student's genitals during a search and that he positively did not accidentally touch any plaintiff's genitals provides a strong inference that Mr. Archuleta intentionally searched J.S.'s groin area and intentionally touched his testicle. On summary judgment all reasonable inferences must be drawn in favor of the non-moving party. This inference should be drawn here – that Mr. Archuleta intentionally touched J.S.'s testicle during this search.

This search moved beyond a normal search because Mr. Archuleta searched an intimate area of J.S. which requires a higher level of justification to perform. *A.M. v. Holmes*, 830 F.3d 1123, 1161–62 (10th Cir. 2016); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. at 377 (holding that searching, a student's intimate areas constitutes a "quantum leap" in the invasion of a student's privacy). There is no discernible reason to expand the scope of this search to J.S.'s groin. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (5th Cir. 1994)("[T]here is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it.").

   *b.  Incident Where Mr. Archuleta "grabbed everything"*

The second incident in which Mr. Archuleta touched J.S.'s genitals also occurred in an isolated area of the school with no witnesses or administrators present. PAF WWW. Mr. Archuleta

instructed J.S. to flip out his waistband. *Id*. Mr. Archuleta looked inside of J.S.'s socks and then told J.S. to face the other direction. *Id*. Mr. Archuleta began a pat down search of J.S. and then grabbed both of J.S.'s testicles and his penis. Mr. Archuleta held J.S.'s penis and testicles with his hand for a few seconds. *Id*. J.S. felt disgusted when this happened and did not want to look at Mr. Archuleta afterwards. *Id*.

Mr. Archuleta addresses this search at page 22 of his motion. He does not aver that he is searching J.S. for anything in particular or provide any reason why this search would be performed – he instead claims that the search never happened. Defendant's Motion at p. 22. We do know that Mr. Archuleta could not have been searching for a weapon on this occasion because he never suspected J.S. of having a weapon. PAF S. Mr. Archuleta also claims at page 22 of his motion that there is no evidence in the record that any contact by Mr. Archuleta of J.S.'s genital area, "was ever anything other than incidental or accidental". Yet Mr. Archuleta affirmatively stated he never accidentally or incidentally touched any of the plaintiff's genitals. PAF AA. Mr. Archuleta asserts that grabbing J.S.'s penis and testicles does not amount to a constitutional violation – with zero citation to case law, other legal authority, or any facts in the record. Defendant's Motion at p. 22.

This is exactly the kind of search *Safford* expressly prohibits because it is a severe and pervasive invasion of a student's privacy. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. at 377  In a circumstance where a guard is not looking for weapons it is inconceivable that any governmental interest would exist that would justify an intrusion of this severity under *T.L.O*. and *Safford*. *Id*. This search was unreasonable at its inception and the scope of the search could not possibly be reasonably related to any interest at stake given that J.S. was not suspected of having a weapon.

F.   Additional Facts Concerning the Searches

D.M., L.M. and J.S. each described in their own words feeling disgusted, violated, and shocked as a result of these searches. PAFs III, MMM, UUU, WWW, BBBB, and CCCC. This is exactly the kind of harm by bodily intrusion the 4ᵗʰ Amendment is designed to prevent and which Courts have placed an emphasis on in distinguishing reasonable searches from unreasonable searches:

> "**Savana's subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, frightening, and humiliating.** The reasonableness of her expectation (required by the Fourth Amendment standard) is indicated by the consistent experiences of other young people similarly searched, whose adolescent vulnerability intensifies the patent intrusiveness of the exposure. See Brief for National Association of Social Workers et al. as *Amici Curiae* 6–14; Hyman & Perone, The Other Side of School Violence: Educator Policies and Practices that may Contribute to Student Misbehavior, 36 J. School Psychology 7, 13 (1998) (strip search can "result in serious emotional damage").

> T**he indignity of the search does not, of course, outlaw it, but it does implicate the rule of reasonableness as stated in *T.L.O.*,** that "the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place."

*See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373–77, 129 S. Ct. 2633, 2641–43, 174 L. Ed. 2d 354 (2009)(emphasis added).

Mr. Archuleta knew that touching the children's genitals during a search was wrong. PAF QQ. Mr. Archuleta testified he never suspected any of the Plaintiffs to possess any weapon. PAF S. Mr. Archuleta understood that he was to never touch a student's genitals during a search, that he was in fact not permitted to physically touch a student's body in the area between three inches above a student's knee up to a student's waist, and Mr. Archuleta stated that if he followed the training provided to him on how to search students that it would be "impossible" to touch a student's genitals during a search. PAFs U-Z.

Mr. Mangin clearly stated that guards at V. Sue Cleveland are to never put their hands in a student's pocket, unless they are retrieving a weapon. PAF F. Mr. Mangin's testimony made it

crystal clear that a student should never be touched in the genitals during a search for an item other than a weapon. PAF I.

Given the fact that if the Plaintiffs were being searched for anything at all they were searched for non-dangerous contraband there was no reason to touch the student's genitals or go into the student's pockets. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373–77. None of the searches at issue were reasonably related to the circumstances that initially justified the interference and the scope of each search was unreasonable. *Pacheco v. Hopmeier*, 770 F. Supp. 2d 1174, 1189 (D.N.M. 2011)(citing *New Jersey v. T.L.O.,* 469 U.S. 325).

While *Pacheco* is a District Court opinion and is not binding on this Court *Pacheco* did determine over ten years ago that the Defendant in that case violated clearly established law when the Defendant searched the inside of the Plaintiff's pocket as being excessively intrusive and not reasonably related to the circumstances that justified the initial search under *T.L.O.* where 1) the Defendant did not allege that he suspected the Plaintiff of carrying any weapon or drug and 2) the initial pat-down search revealed nothing that might be a weapon or drug. *Pacheco v. Hopmeier*, 770 F. Supp. 2d 1174, 1190 (D.N.M. 2011). The record before the court is similar to the record in *Pacheco* – it follows that if *Pacheco* was a violation of clearly established law over 10 years ago a similar case would definitely violate clearly established law in the instant case, particularly in light of the holdings of *Taylor* and *Truman* which were both published years after *Pacheco*.

G.  The Acts Described Are Obvious 4th Amendment Violations

The cases cited in this response make it inarguable that the searches Mr. Archuleta performed on the children violate clearly established law. The facts in the record additionally prevent the Defendant from obtaining qualified immunity because the acts are obvious 4th Amendment violations. A recent 10th Circuit case succinctly explains the doctrine as follows:

27

"This case arose from events involving David Bradshaw, a sheriff's deputy who was off duty, out of uniform, and driving his personal vehicle with his child in the front passenger seat. After a vehicle being driven by Mario Rosales legally passed Bradshaw, Bradshaw decided to follow Rosales. He then declined backup assistance from another deputy, followed Rosales all the way home, blocked Rosales in his driveway, and began shouting and yelling at Rosales, all before identifying himself as law enforcement. In response, Rosales became afraid and exited his vehicle with a legal and openly carried gun in his pants pocket, intending to protect himself and his property but also to deescalate the situation. Bradshaw, however, continued to shout and pointed his gun at Rosales. Though Rosales feared being shot, he remained calm and nonthreatening throughout the encounter. When Bradshaw eventually identified himself as law enforcement and told Rosales to put his gun back in his vehicle, Rosales complied, and the encounter wound down from there. As a result of this incident, Bradshaw's employment was terminated, and he was convicted in state court of aggravated assault and child endangerment.

Rosales then filed this action under 42 U.S.C. § 1983, alleging in part that Bradshaw violated his Fourth Amendment right to be free from unreasonable seizures. **The district court granted Bradshaw's motion to dismiss, ruling that he was entitled to qualified immunity because he did not violate clearly established law when he unreasonably pointed his gun at Rosales. The critical distinguishing fact, for the district court, was that Rosales was armed.**

We reverse. Under the facts as alleged in the complaint, Bradshaw violated Rosales's constitutional right to be free from unreasonable seizures, and his egregious and unlawful conduct was obviously unconstitutional. Bradshaw is therefore not entitled to qualified immunity, and Rosales's § 1983 claim against him may proceed."

*Rosales v. Bradshaw*, 72 F.4th 1145, 1147–48 (10th Cir. 2023)(emphasis added).

In *Bradshaw* the Defendant police officer committed a felony offense against another person while acting under color of law. Any reasonable police officer in Bradshaw's circumstance would know that they cannot arbitrarily commit felony gun crimes against other persons. Likewise, any security officer in Mr. Archuleta's position would know that they cannot search the inside of a child's pocket, grab a child's genitals, or fondle a child's genitals as part of a search for non-dangerous contraband in a school. *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir.

2023)("qualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional.") *See Taylor v. Riojas*, —— U.S. ——, 141 S. Ct. 52, 53–54, 208 L.Ed.2d 164 (2020) (per curiam).

H.  Archuleta's Actions Violate the Plaintiffs' Right to Bodily Integrity under the 14th Amendment

a.  *Sexual Assault or Molestation of a Student by a School Security Guard at School Constitutes a violation of the Clearly Establish Right to Bodily Integrity*

Sexual assault or molestation by a school teacher violates a student's substantive due process rights. This is referred to as the right to bodily integrity – it has been clearly established law in the 10th Circuit since 1996. *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996). The fact that Mr. Archuleta is a security guard and not a teacher is not the kind of fact that would make a difference in a constitutional analysis as to whether the law gave him fair warning that he could not sexually assault or molest students. Both teachers and security officers in school have the ability to exercise power and control over students by color of law by virtue of their status and role as authority figures in the school.

In *M.S. v. Belen Consol. Sch. Dist* a school resource officer, not a teacher, sexually abused a child. The child brought suit for violation of their right to bodily integrity under *Abeyta ex rel. Martinez*. In that case the Defendant did not even attempt to argue that the actions of the school resource officer did not violate clearly established law. The Court made it a point to state that in any event even if that challenge had been made it would have been dead on arrival:

> "The defense of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016). **The City does not challenge the notion that Esquibel's sexual abuse of M.S. (the occurrence of which it does not concede, but it assumes for the sake of argument), constituted a violation of**

**clearly established constitutional rights. Nor, in light of precedent, could the City reasonably support such a challenge**. *See*, *e.g. Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (recognizing that a woman's "right to bodily integrity, which is a substantive due process" right, was violated when she was sexually assaulted by a police officer); ***Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996) ("Sexual assault or molestation by a school teacher violates a student's substantive due process rights"); *Maldonado v. Josey*, 975 F.2d 727, 730-31 (10th Cir. 1992)** ("In the ... sexual abuse context[ ] a state actor directly inflicts the harm on the student and thereby implicates the Due Process Clause which ... imposes limitations on state conduct."); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994) ("It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment.")".

*M.S. v. Belen Consol. Sch. Dist.*, No. 15-CV-912-MCA-SCY, 2017 WL 3057662, at *2 (D.N.M. July 18, 2017).

If any doubt whatsoever exists that Mr. Archuleta's role as a security officer would create a distinction sufficient to avoid the holding in *Abeyta ex rel. Martinez* the Bradshaw case cited supra should clarify that doubt. In *Bradshaw* the district court granted qualified immunity to the officer defendant because the fact that the plaintiff was armed was considered a fact sufficient to differentiate from existing precedent. The 10th Circuit reversed for the reasons stated above. Here the distinction between a teacher and security guard is even less significant than the fact difference in the Bradshaw case. It is clear that no school employee acting under color of law in the 10th Circuit can sexually assault or molest a student at school. *M.S. v. Belen Consol. Sch. Dist.*, No. 15-CV-912-MCA-SCY, 2017 WL 3057662, at *2 (D.N.M. July 18, 2017).

> b.  *The Facts in the Record Establish that Mr. Archuleta Violated the Plaintiffs' Right to Bodily Integrity*

In the Tenth Circuit, sexual abuse of a student by a public school teacher violates the student's substantive due process right to bodily integrity when the abuse constitutes "a brutal and

inhuman abuse of official power literally shocking to the conscience." *Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1255, 1257-58 (10th Cir. 1996). Not all teacher-on-student sexual physical misconduct meets the threshold of being 'conscience-shocking.' *See S.M. v. Bloomfield Sch. Dist.*, Case No. 16-cv-823 SCY/WPL, 2017 WL 3159166, at *7 (D.N.M. June 12, 2017) (collecting cases in which sexually motivated touching of a student by a school employee was not found to be unconstitutional). Although the Tenth Circuit affirmed in *Abeyta* that a schoolteacher's "[s]exual assault or molestation" of a student violates that student's substantive due process rights, the *Abeyta* court did not delineate the type of misconduct that would constitute 'sexual assault or molestation.' 77 F.3d at 1255. Courts therefore undertake a "highly fact specific" inquiry to determine whether improper sexual touching of a student by a teacher is sufficiently offensive and egregious to be deemed conscience shocking. *See Garrity v. Governance Bd. of Cariños Charter Sch.*, Civ. No. 19-95 JAP/JHR, 2020 WL 5074385, at *3 (D.N.M. Aug. 27, 2020).

This fact-specific inquiry is guided by "general principles" that bear on whether conduct meets the high threshold of offensiveness and egregiousness required for a substantive due process violation. *See id.* First, "a teacher's sexually motivated, unwelcome physical contact with a student is not necessarily conscience shocking." *Id.* (quoting *N.F. on behalf of M.F. v. Albuquerque Pub. Sch.*, Case No. 14-cv-699 SCY/RHS, 2015 WL 13667294, at *4 (D.N.M. Jan. 30, 2015)). Second, "inappropriate touching of a student is much more likely to be actionable under the due process clause if it involves the touching of certain erogenous zones, such as the genitals, the breasts, or the buttocks." *Id.* Third, "teacher abuse is more likely to be considered brutal, inhumane, and conscience shocking if it happens more than once or repeatedly occurs over a long period of time." *Id.*

An opinion by Judge Yarbrough evaluating a bodily integrity claim brought by a student against a teacher is helpful in defining the contours of when facts reach the threshold of a bodily integrity violation. The facts of the case are as follows:

> "Specifically, Jehle stared at M.F's buttocks on multiple occasions and once attempted to get her to sit in his lap in a chair he referred to as the "Cuddle Chair." Then, around February 2014, Jehle "cornered" M.F. and lightly slapped her on her stomach, upper thighs, and buttocks. On a separate occasion, he reached into her back pants pocket to quiet a ringing cellphone. Finally, on roughly March 3, 2014, Jehle approached M.F. as she was seated on a railing and, while touching his upper thighs to her knees, dropped a lip gloss in her lap and intentionally slid his hand across her genitals to retrieve it."
>
> .

*N.F. on behalf of M.F. v. Albuquerque Pub. Sch.*, No. 14-CV-699 SCY/RHS, 2015 WL 13667294, at *1 (D.N.M. Jan. 30, 2015).

Judge Yarbrough held that applying the three aforementioned guidelines discerned from other bodily integrity cases much of the facts the Plaintiff asserted would not, standing alone, constitute a substantive due process violation. However, the Defendant's actions taken together including the instance in which the Defendant "intentionally slid his hands across M.F.'s genitals" in the aggregate were sufficiently conscience shocking to assert a bodily integrity claim. *Id*. The court reasoned that the teacher sliding his hand across the student's genitals "fits most naturally within the definition of sexual molestation". This touching happened in school during school hours after the teacher dropped an item in the student's lap to give him a pretense to retrieve the item and make contact with the student's genitals. *Id*. The opinion did not specifically indicate whether M.F. was clothed or unclothed or whether skin to skin contact occurred when this touching took place. Paragraphs 37 and 38 of M.F.'s complaint describe the touching in more detail and state that M.F. and other students were seated outside of the Defendant's classroom when he approached her and dropped the lip gloss into her lap. It logically follows that M.F. was clothed while sitting

outside of a classroom with other students present. The complaint also does not make the allegation of under the clothes contact or skin to skin contact. *Id*.

In the instant case Defendant Archuleta had more serious instances of sexual touching or molestation with each student than what was alleged in *N.F. on behalf of M.F.* PAF FFF, GGG, TTT, UUU, WWW, XXX. The fact record in the instant case indicates prolonged touching and manipulation of the genitals of each plaintiff rather than a motion where the Defendant's hand was merely dragged over the plaintiffs' genitals. *Id*. What's more Mr. Archuleta used his power and authority to commit these acts of molestation under color of law to a much greater degree than the Defendant in *N.F. on behalf of M.F.* Mr. Archuleta in some instances isolated the children and searched them and touched them without anyone else being present. *Id*.

This contrasts sharply with dropping lip gloss on to a student's lap to create a pre-text to touch her. The teacher created this opportunity without relying on his authority as a teacher. Mr. Archuleta did rely on his authority as a security guard to provide himself with the opportunity and means to sexually touch each plaintiff. Furthermore, the record also indicates that Mr. Archuleta attempted but failed to touch J.S.'s genitals on three occasions in addition to the two occasions that he successfully touched J.S.'s genitals. PAF RRR, YYY, ZZZ. Mr. Archuleta additionally verbally taunted D.M. and J.S. where no such allegation was made against the teacher in *N.F. on behalf of M.F.* PAF LLL and SSS. Mr. Archuleta's actions as described in this response and in Plaintiffs' Statement of Additional Undisputed Material Facts are conscience shocking when viewed individually – they are clearly conscience shocking when viewed in the aggregate. The facts in the record establish that Mr. Archuleta violated each of the Plaintiff's right to bodily integrity. *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996);

*M.S. v. Belen Consol. Sch. Dist.*, No. 15-CV-912-MCA-SCY, 2017 WL 3057662, at *2 (D.N.M. July 18, 2017).

I.   Response to Defendant's Argument that Plaintiff Must Prove that Defendant's Acts were Improperly Motivated

On page eight of the Defendant's motion he asserts that when subjective intent is an element of the plaintiff's claim the plaintiff must point to specific evidence that the officials actions were improperly motivated citing *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 649 (10th Cir. 1988) in support of that assertion. The subjective intent of the actor is not an essential element in proving a 4th Amendment Violation, the standard is one of objective reasonableness. See *A.M. v. Holmes*, 830 F.3d 1123, 1138 (10th Cir. 2016). While a Defendant's subjective motivations may be relevant evidence in proving a bodily integrity violation case law does not require that a Defendant's subjective intentions be proved as an element. Instead, a conscience shocking standard is used. *Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1256 (10th Cir. 1996)("[W]e held that when a school official's conduct is shocking to the conscience, brutal, or offensive to human dignity, it offends the Due Process Clause.") That is an objective standard. *See Browder v. City of Albuquerque*, 787 F.3d 1076, 1078–79 (10th Cir. 2015)(In determining whether infringement of a right based on executive action Supreme Court directs lower courts to ask whether that action bears a "reasonable justification in the service of a legitimate governmental objective" or if instead it might be "characterized as arbitrary, or conscience shocking.")

Assuming for the sake of argument that Plaintiffs do need to point to specific evidence that the official's actions were improperly motivated Plaintiffs offer the following undisputed material facts which when considered together demonstrate the Defendant's actions were motivated by sexual gratification and/or the desire to bully and belittle the Plaintiffs. PAFs Y, AA, JJ, KK, LL,

OO, QQ, FFF, GGG, HHH, III, KKK, LLL, SSS, TTT, VVV, WWW, XXX, YYY, ZZZ, BBBB, CCCC, IIII.

## CONCLUSION

The law has been clearly established in the 10th Circuit since 1996 that children have a right to not be molested by school officials including teachers, principals, security officers and any other school employee acting under color of law. While most of these cases concerning the right to a child's bodily integrity at school focus on teachers inappropriately touching students and the present case concerns a security guard that is not a fact that could make a constitutional difference. The common thread amongst bodily integrity cases is the abuse of government power through color of law to deprive an individual of their right to bodily integrity. While a teacher and a security guard may exert their power and authority over students in slightly different ways those differences do not matter for purposes of determining whether the law was clearly established at the time Mr. Archuleta groped and fondled the Plaintiffs. This is even more clear in light of *Taylor v. Riojas* and *Truman v. Orem City*. For the foregoing reasons Defendants' motion for summary judgment should be denied.

The law is likewise clearly established that a search must be both reasonable at its inception and that its scope is reasonably related to the circumstances that initially justified the interference. Case law also draws a clear and significant distinction between a search of a persons outer clothing and the search of the inside of a person's pocket. Here there was no need to go into any of the Plaintiff's pockets during a search. Mr. Archuleta and Mr. Mangin both clearly state that searches are to not take place in a student's pocket and that the area below the waist and three inches above the knee should never be touched by a security guard. Both Mr. Archuleta and Mr. Mangin state a student's genitals should not be touched during a search – even if the touching were to be incidental. Mr. Archuleta stated that if he followed the training on how to conduct searches provided to him by RRPS that it would not be physically possible for him to incidentally touch a

student's genitals during a search.  Mr. Archuleta also stated he did not in fact commit any incidental touching.

The Plaintiffs evidence supports constitutional violations of both the 4th and 14th Amendments to the United States Constitution. Any reasonable security officer would know that he was violating the Plaintiffs' rights by searching them for devices used to smoke nicotine or THC by patting down the children's genitals, grabbing and fondling their penises and testicles, placing their hands in the children's pockets and then moving the interior of the pocket to reach the children's genitals and manipulate the genitals. Mr. Archuleta admitted that if he had done what the children state he did that his actions were morally wrong. Even if the law were not clearly established by 10th Circuit cases or the weight of opinions in other circuits this is such an obvious case of constitutional violation that it violates clearly established law for that reason as well. The Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Jason Bowles*
Jason Bowles
Bowles Law Firm
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM 87109
505-217-2680
jason@bowles-lawfirm.com

-and-
Todd J. Bullion
Law Office of Todd J. Bullion
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM 87109
(505) 494-4656
todd@bullionlaw.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

36

     I HEREBY CERTIFY that on the 24th day of January 2024, I filed the foregoing electronically through the Court's CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Carlos M. Quiñones
Jerry Walz
Alisha Walz
quinoneslaw@cybermesa.com
jerryawalz@walzandassociates.com
awalz@walzandassociates.com

*Counsel for Plaintiffs*

*/s/ Todd J. Bullion*
Todd J. Bullion