**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MARK MONDRAGON,

      Plaintiff,

vs.                                                                Civ. No. 21-427 KK/JMR

RIO RANCHO PUBLIC SCHOOLS
BOARD OF EDUCATION, *et al.*,

      Defendants,

*and*

SARAH MONTOYA,

      Plaintiff,

vs.                                                                Civ. No. 21-648 KK/JMR

RIO RANCHO PUBLIC SCHOOLS
BOARD OF EDUCATION, *et al.*,

      Defendants,

*and*

ANGELA SALAZAR,

      Plaintiff,

vs.                                                                Civ. No. 21-751 KK/JMR

RIO RANCHO PUBLIC SCHOOLS
BOARD OF EDUCATION, *et al.*,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court in these consolidated cases is Defendants Archuleta's and Rio Rancho

Public Schools Board of Education's Joint Motion and Memorandum for Summary Judgment on

the Basis of Governmental Immunity (Doc. 67)[1] ("Motion"), filed September 11, 2023. Plaintiffs filed a response in opposition to the Motion on April 5, 2024, and Defendants filed a reply in support on May 22, 2024. (Docs. 81, 86.) The Court, having considered the parties' submissions, the record, and the relevant law, FINDS that the Motion is WELL TAKEN IN PART and should be GRANTED IN PART and DENIED IN PART as follows.

## BACKGROUND

In each of these consolidated cases, Plaintiff is the parent of a student who attended V. Sue Cleveland High School ("Cleveland") in Rio Rancho, New Mexico. (Doc. 1-3 at 7; Civ. No. 21-648, Doc. 1-3 at 1-2; Civ. No. 21-751, Doc. 1-3 at 2.) Plaintiffs allege that Defendant George Archuleta touched the student Plaintiffs inappropriately while searching them for contraband.[2] (*Id.*) At the time of the alleged unlawful searches, Defendant Rio Rancho Public Schools Board of Education ("RRPS") employed Defendant Archuleta as a campus security aide at Cleveland. (*Id.*)

In 2021, each Plaintiff filed a lawsuit in state court asserting claims against Defendants under 42 U.S.C. § 1983 (Count I) and the New Mexico Tort Claims Act ("NMTCA") (Counts II, III, and IV). (Doc. 1-3 at 6-13; Civ. No. 21-648, Doc. 1-3; Civ. No. 21-751, Doc. 1-3.) Defendants removed the cases to this Court, where they were consolidated on the parties' joint request. (Docs. 1, 48, 49; Civ. 21-648, Doc. 1; Civ. No. 21-751, Doc. 1.)

---

[1] Except as otherwise noted, all citations to the record are to documents filed in the lead case, *Mondragon v. Rio Rancho Public Schools, et al.*, Civ. No. 21-427 KK/JMR.

[2] All three of the student Plaintiffs appear to have been minors at the time of the incidents forming the basis of Plaintiffs' complaints, not only because they were high school students, but also because they did not bring suit independently and have appeared in these actions only by their initials. *See* Fed. R. Civ. P. 5.2(a) (electronic or paper filing that identifies minor "may include only … the minor's initials"). However, the record reflects that at least one student Plaintiff, J.M., is now an adult. (Doc. 65-11 at 12.) The Court therefore refers to these parties as the "student Plaintiffs" rather than the "minor Plaintiffs."

In the present Motion, Defendants move for summary judgment in their favor on Counts II, III, and IV of Plaintiffs' complaints. (Doc. 67.) In the challenged counts, Plaintiffs assert the following claims:

- In Count II, Plaintiffs bring intentional tort claims against Defendants RRPS and Archuleta under Section 41-4-12 of the NMTCA, which provides that governmental immunity under the Act does not apply to liability for injuries resulting from enumerated torts caused by law enforcement officers, (Doc. 1-3 at 10-11; Civ. No. 21-648, Doc. 1-3 at 4-5; Civ. No. 21-751, Doc. 1-3 at 5-6); N.M. Stat. Ann. § 41-4-12;

- In Count III, Plaintiffs bring negligent supervision claims against Defendant RRPS under Section 41-4-12, (Doc. 1-3 at 11; Civ. No. 21-648, Doc. 1-3 at 5-6; Civ. No. 21-751, Doc. 1-3 at 6-7); and,

- In Count IV, Plaintiffs bring negligence claims against Defendants RRPS and Archuleta under Section 41-4-6 of the NMTCA, which provides that governmental immunity under the Act does not apply to liability for injuries resulting from public employees' negligent operation or maintenance of a public facility. (Doc. 1-3 at 11-12; Civ. No. 21-648, Doc. 1-3 at 6-7; Civ. No. 21-751, Doc. 1-3 at 7-8); N.M. Stat. Ann. § 41-4-6(A).

Defendants argue that they are entitled to summary judgment on the claims asserted in Counts II, III, and IV because the cited exceptions to the NMTCA's general grant of governmental immunity do not apply to the conduct forming the basis of those claims. (Doc. 67.) Specifically, Defendants contend that they are entitled to summary judgment:

- On Count II, because Defendant Archuleta is not a law enforcement officer and thus Section 41-4-12 does not apply to him or to Defendant RRPS as his employer;

- On Count III, because Defendant RRPS is not a law enforcement officer and Plaintiffs have not identified any supervisory law enforcement officer for whose negligence it could be vicariously liable under Section 41-4-12; and,

- On Count IV, because Plaintiffs cannot support an essential element of their claims under Section 41-4-6, *i.e.*, that Defendant RRPS knew or should have known of a dangerous condition at Cleveland.

(*Id.*)

For the reasons explained below, the Court finds that: (1) Defendants RRPS and Archuleta are entitled to summary judgment on Count II; (2) Defendant RRPS is entitled to summary judgment on Count III; and, (3) Defendant Archuleta is entitled to summary judgment on Count IV, but Defendant RRPS is not.[3]

## SUMMARY JUDGMENT STANDARDS

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a), (c). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when

---

[3] In Count IV, Plaintiffs assert negligence claims under Section 41-4-6 against both Defendants. (Doc. 1-3 at 11-12; Civ. No. 21-648, Doc. 1-3 at 6-7; Civ. No. 21-751, Doc. 1-3 at 7-8.) However, Defendants argue, and Plaintiffs concede, that Section 41-4-6 does not apply to Defendant Archuleta. (Doc. 67 at 13-15; Doc. 81 at 13-14.) The Court will therefore grant summary judgment in Defendant Archuleta's favor on Count IV.

it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017); *Wellington v. Daza*, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

A summary judgment movant bears the initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). If the movant meets its initial summary judgment burden, "the burden then shifts to the nonmovant," *id.*, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted). "[T]he moving party bears the ultimate burden of establishing its right to summary judgment as a matter of law even when it does not have

the ultimate burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir. 2002).

## ANALYSIS

I.    <u>**Defendant Archuleta is entitled to summary judgment on Count II.**</u>

A.    **Legal Standards**

In general, the NMTCA grants governmental entities and public employees acting within the scope of their duties immunity from state tort liability. N.M. Stat. Ann. § 41-4-4(A); *Milliron v. Cnty. of San Juan*, 2016-NMCA-096, ¶ 9, 384 P.3d 1089, 1093. However, the NMTCA also sets forth "eight categories of exceptions to that general immunity." *Methola v. Eddy Cnty.*, 1980-NMSC-145, ¶ 10, 622 P.2d 234, 236; *see* N.M. Stat. Ann. §§ 41-4-5 through 41-4-12. If there is a genuine issue of material fact regarding whether one of these exceptions applies, summary judgment based on the NMTCA's general grant of immunity is inappropriate as to that exception. *See, e.g., Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 18, 310 P.3d 611, 619 (reversing summary judgment where nonmovant "established the existence of a genuine issue of material fact" regarding whether Section 41-4-6 of NMTCA applied); *Baptiste v. City of Las Cruces*, 1993-NMCA-017, ¶ 10, 848 P.2d 1105, 1108 (reversing summary judgment where evidence failed to establish as matter of law that Section 41-4-12 of NMTCA did not apply).

Section 41-4-12 of the NMTCA provides that the Act's general grant of immunity does not apply to liability for injuries resulting from certain torts caused by law enforcement officers. N.M. Stat. Ann. § 41-4-12. Specifically, Section 41-4-12 provides that

> [t]he immunity granted pursuant to [Section 41-4-4(A) of the NMTCA] does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights, the independent tort of negligent spoliation of evidence or the independent tort of intentional spoliation of evidence, failure to comply with duties

6

established pursuant to statute or law or any other deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.

On its face, Section 41-4-12 applies only if the public employee who caused the plaintiff's injuries is a "law enforcement officer." *Id.*; *Methola*, 1980-NMSC-145, ¶ 16, 622 P.2d at 237. Section 41-4-3, the definitions section of the NMTCA, provides that for purposes of the Act, the term "law enforcement officer" means

a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes.

N.M. Stat. Ann. § 41-4-3(D). Section 41-4-12, in turn, was amended in 2020 to provide that,

[f]or purposes of this section, "law enforcement officer" means a public officer or employee vested by law with the power to maintain order, to make arrests for crime or to detain persons suspected of or convicted of committing a crime, whether that duty extends to all crimes or is limited to specific crimes.

N.M. Stat. Ann. § 41-4-12.

**B.    Analysis**

Defendants argue that Defendant Archuleta is entitled to summary judgment on Count II because, as a matter of law, he was not a law enforcement officer under Section 41-4-12 at the time of the incidents forming the basis of Plaintiffs' complaints. (Doc. 67 at 6-12.) In support, Defendants contend that, for a public employee to be a law enforcement officer, the employee's principal duties under law must consist of maintaining public order, making arrests, or holding in custody persons accused of committing a crime. (*Id.*) Defendants further contend that Defendant Archuleta's principal duties at Cleveland did not fall into any of these categories. (*Id.*)

In response, Plaintiffs argue that the 2020 amendments to Section 41-4-12 changed the standard for determining who is a law enforcement officer. (Doc. 81 at 2-6.) According to Plaintiffs, to prove that a public employee is a law enforcement officer under the amended version of Section 41-4-12, one need show only that the employee was vested by law with the power to maintain order, make arrests, or detain persons suspected or convicted of committing a crime, regardless of his principal duties. (*Id.*) Plaintiffs further contend that as a campus security aide at Cleveland, Defendant Archuleta was vested by law with the power to maintain order and detain criminal suspects. (*Id.* at 6.)

In their reply, Defendants counter that the 2020 amendments to Section 41-4-12 do not apply here. (Doc. 86 at 8-14.) Defendants also assert that, even if the amendments did apply, Plaintiffs still could not show that Defendant Archuleta was a law enforcement officer because the undisputed facts establish that he was not vested by law with the power to maintain order, make arrests, or detain persons suspected or convicted of committing a crime. (*Id.* at 14-18.)

As a threshold matter, the Court must resolve the parties' legal dispute regarding whether the 2020 amendments to Section 41-4-12 apply in these cases. Concluding that they do, the Court must next determine whether the amendments modified the standard for determining whether a public employee is a law enforcement officer under Section 41-4-12, and if so, what the new standard is. Finally, the Court must determine whether Defendants have met their summary judgment burden to show that, as a matter of law, Defendant Archuleta was not a law enforcement officer under the applicable test.

### 1.    The 2020 amendments to Section 41-4-12 apply in these cases.

The state legislature amended Section 41-4-12 twice in 2020, effective May 20, 2020, and September 20, 2020, respectively. N.M. Stat. Ann. § 41-4-12 (citing L. 2020, Ch. 5, § 14, eff. May

20, 2020; L. 2020, 1st Sp. Sess., Ch. 7, § 3, eff. Sept. 20, 2020). In the May 2020 amendment, the legislature added the following language to Section 41-4-12:

> For purposes of this section, "law enforcement officer" means a public officer vested by law with the power to maintain order, to make arrests for crime or to detain persons suspected of committing a crime, whether that duty extends to all crimes or is limited to specific crimes.

L. 2020, Ch. 5, § 14, eff. May 20, 2020. In the September 2020 amendment, in turn, the legislature added: (1) to the provision's enumerated torts, "the independent tort of negligent spoliation of evidence" and "the independent tort of intentional spoliation of evidence"; and, (2) to the provision's enumerated "power[s]," the power "to detain persons … convicted of committing a crime." L. 2020, 1st Sp. Sess., Ch. 7, § 3, eff. Sept. 20, 2020.

Defendants argue that the 2020 amendments do not apply here because they postdate the alleged tortious misconduct forming the basis of Plaintiffs' complaints. (Doc. 67 at 7 n.2; Doc. 86 at 8-14.) Plaintiffs, conversely, assert that the 2020 amendments do apply, because under *Methola*, 1980-NMSC-145, 622 P.2d at 234, the applicable version of the statute is the one that was in effect when they filed these cases in 2021. (Doc. 81 at 2-6.) As explained below, the Court agrees with Plaintiffs.

In *Methola*, the New Mexico Supreme Court considered whether the defendants in three cases were law enforcement officers under Section 41-4-12. 1980-NMSC-145, ¶¶ 1, 15, 622 P.2d at 235, 237. The alleged misconduct giving rise to the claims in one of the cases occurred in 1976, before the legislature amended Section 41-4-12 in 1977. *Id.* at ¶¶ 2, 13, 622 P.2d at 235-36. However, none of the cases were filed until after the 1977 amendment was in effect. *See id.* at ¶¶ 2-4, 13-14, 622 P.2d at 235-36.

The *Methola* court held that the 1977 amendment governed all three of the cases before it, including the case in which the alleged misconduct occurred in 1976. *Id.* at ¶ 14, 622 P.2d at 236-

37. The court first noted that the NMTCA "is a remedial act which applies only prospectively, in the absence of expressed legislative intent to make it retroactive." *Id.* However, the court then concluded that "[s]ince the right to sue governmental entities and their officials [is] governed entirely by statute, the applicable statutes are those which were in effect when the suits became pending cases."[4] *Id.*

In these cases, it is undisputed that the alleged misconduct giving rise to Plaintiffs' claims occurred before the 2020 amendments to Section 41-4-12 became effective. Specifically, the student Plaintiffs testified that Defendant Archuleta touched them inappropriately before March 14, 2020, when he resigned from his employment at Cleveland. (Doc. 65-5; *see, e.g.*, Doc. 76-8 at 4-8.) Critically, however, it is also undisputed that Plaintiffs did not file these cases until 2021, well after the 2020 amendments took effect.[5] (Doc. 1-3 at 6; Civ. No. 21-648, Doc. 1-3 at 1; Civ. No. 21-751, Doc. 1-3 at 1.) *Methola* therefore dictates that the 2020 amendments apply here.

In support of their contrary position, Defendants cite to six cases in which courts found that the 2020 amendments did not apply. (Doc. 86 at 10-12.) But all of these cases are materially distinguishable. The first four cases were filed between 2014 and 2019, *i.e.*, before the 2020 amendments became effective.[6] Thus, they are clearly distinguishable from the cases at issue here, all of which were filed after the 2020 amendments took effect.

---

[4] In so holding, the court did *not* find that the 1977 amendment applied retroactively. *See Methola*, 1980-NMSC-145, ¶ 14, 622 P.2d at 236-37.

[5] The Court notes that a case becomes "pending," not necessarily when it is filed, but rather when it is "in the process or course of litigation" and has "not been concluded, finished, or determined by a final judgment." *Rutherford v. Buhler*, 1976-NMCA-083, ¶ 20, 555 P.2d 715, 718. However, the precise contours of this distinction are immaterial here, because Plaintiffs' cases undoubtedly became pending sometime after the 2020 amendments' effective dates in May and September 2020, either when the cases were filed in 2021 or at some later point in the litigation.

[6] Specifically, the Court takes judicial notice that: (1) the action in *Sanders v. New Mexico Corrections Department*, 2023-NMCA-030, 528 P.3d 716 was filed on July 21, 2014, in D-202-CV-2014-04792 (N.M. 2nd Jud. Dist. Ct.); (2) the action in *Hernandez v. Fitzgerald*, 840 F. App'x 333 (10th Cir. 2020) was filed on August 14, 2014, in D-202-CV-2014-05396 (N.M. 2nd Jud. Dist. Ct.); (3) the action in *Enriquez v. New Mexico Department of Corrections*, 2022 WL 17413723 (N.M. App. Dec. 5, 2022) was filed on May 2, 2018, in D-101-CV-2018-01352 (N.M. 1st Jud. Dist. Ct.);

The last two cases, in turn, were filed after the first amendment to Section 41-4-12 took effect on May 20, 2020, but before the second amendment took effect on September 20, 2020.[7] And importantly, at issue in those two cases was whether the September 2020 amendment applied, because it was the September 2020 amendment that expanded the definition of "law enforcement officer" to include corrections officers, the position held by one or more of the alleged law enforcement officers in those cases. *Ortega v. Edgman*, 2022 WL 796374, at *7 (D.N.M. Mar. 16, 2022); *Trujillo v. Cent. New Mexico Corr. Facility,* 2021 WL 3674782, at *8–*10 (D.N.M. Aug. 19, 2021). The *Ortega* and *Trujillo* courts' determination that the September 2020 amendment did not apply to cases filed before September 2020 is thus consistent with *Methola* and with this Court's conclusion that the 2020 amendments do apply to cases filed after both amendments' effective dates.[8] For all of these reasons, the Court concludes that the amended version of Section 41-4-12 governs in these cases.

> **2.    The Court construes the definitions of "law enforcement officer" in Sections 41-4-3(D) and 41-4-12 harmoniously, giving effect to both.**

Plaintiffs argue that the 2020 amendments to Section 41-4-12 significantly changed the

---

and, (4) the action in *Garcia v. Martinez,* 2020 WL 2615533 (D.N.M. May 22, 2020) was filed on May 14, 2019, in D-101-CV-2019-01334 (N.M. 1st Jud. Dist. Ct.). Notably, although the *Sanders* and *Enriquez* courts stated that they would apply the version of the statute in effect when the conduct underlying the claims occurred, they did so by footnote without any substantive analysis. *Sanders*, 2023-NMCA-030, ¶ 1 n.1, 528 P.3d at 718; *Enriquez*, 2022 WL 17413723, at *1 n.1.

[7] Specifically, the Court takes judicial notice that: (1) the action in *Trujillo v. Central New Mexico Correctional Facility*, 2021 WL 3674782 (D.N.M. Aug. 19, 2021) was filed on June 11, 2020, in D-1314-CV-2020-00536 (N.M. 13th Jud. Dist. Ct.); and, (2) the action in *Ortega v. Edgman*, 2022 WL 796374 (D.N.M. Mar. 16, 2022) was filed on June 23, 2020, in D-101-CV-2020-01340 (N.M. 1st Jud. Dist. Ct.).

[8] The *Trujillo* court noted that the plaintiff in that case failed to cite any caselaw to support "the proposition that the [c]ourt should look to the law in effect at the time of removal rather than the law in effect at the time of the alleged tort." *Trujillo*, 2021 WL 3674782, at *10. In particular, the plaintiff does not appear to have alerted the court to the holding in *Methola*, and thus, this Court cannot look to *Trujillo* for guidance in how that holding should be applied. *See Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1231 (10th Cir. 2004) ("Cases are not authority for propositions not considered.") (brackets omitted).

way the NMTCA defines the term "law enforcement officer," such that the "principal duties" test derived from Section 41-4-3(D) no longer applies. (Doc. 81 at 2-6.) In support, Plaintiffs contend that "the statutory language the principal duties test is rooted in is replaced with different language in the statutory amendment discussing the power to act rather than an obligation to act." (*Id.* at 5-6.) In essence, Plaintiffs argue that the state legislature repealed the definition of "law enforcement officer" in Section 41-4-3(D) and replaced it with the definition in Section 41-4-12. (*Id.* at 2-6.)

The Court disagrees. The Court's primary goal in construing the NMTCA must be to ascertain and give effect to legislative intent. *New Mexico v. Thompson*, 2022-NMSC-23, ¶ 17, 521 P.3d 64, 68.

> The primary indicator of legislative intent is the plain language of a statute. And yet, [courts] must exercise caution in applying the plain meaning rule.... Statutes are enacted as a whole, and consequently each section or part should be construed in connection with every other part or section, giving effect to each, and each provision is to be reconciled in a manner that is consistent and sensible so as to produce a harmonious whole.

*Id.* (citations and quotation marks omitted).

Section 41-4-3(D) has not been expressly repealed and judicial repeals by implication are not favored. *Citation Bingo, Ltd. v. Otten*, 1996-NMSC-003, ¶ 21, 910 P.2d 281, 287; *New Mexico ex rel. Bird v. Apodaca*, 1977-NMSC-110, ¶ 12, 573 P.2d 213, 217. Thus, the Court must "strive to construe" Sections 41-4-3(D) and 41-4-12 harmoniously and give effect to both. *Alarcon v. Albuquerque Pub. Schs. Bd. of Educ*, 2018-NMCA-021, ¶ 23, 413 P.3d 507, 517; *see also New Mexico ex rel. Clinton Realty Co. v. Scarborough*, 1967-NMSC-152, ¶ 9, 429 P.2d 330, 333 ("It is … a cardinal rule of construction that, where possible, effect must be given to every part of a statute. The court's duty is to, so far as practicable, reconcile different provisions so as to make them consistent, harmonious and sensible."). In doing so, the Court considers not only the statute's

language but also its object and legislative history and the context in which it was enacted.[9] *New Mexico v. Maestas*, 2007-NMCA-001, ¶¶ 17, 19, 149 P.3d 933, 938; *New Mexico v. Davis*, 2003-NMSC-022, ¶ 6, 74 P.3d 1064, 1067; *In re Portal*, 2002-NMSC-011, ¶ 5, 45 P.3d 891, 892.

The amendment whose effect the parties dispute is the May 2020 amendment adding a definition of the term "law enforcement officer" to Section 41-4-12. (Doc. 81 at 2-6; Doc. 86 at 8-14.) In pertinent part, the title of the bill adopting the May 2020 amendment is "Clarifying Duties of a Law Enforcement Officer in the Tort Claims Act." L. 2020, Ch. 5, § 14, eff. May 20, 2020. The legislative intent this title evinces is straightforward, *i.e.*, to "[c]larify[]" the "[d]uties" that make a public employee a law enforcement officer under the NMTCA. *Id.* Manifestly, it does *not* evince an intent to repeal the term "duties" in Section 41-4-3(D) and replace it with the term "powers" for purposes of defining who is a law enforcement officer under the Act.

Further, the body of the May 2020 amendment also continues to refer to duties. The amendment defines law enforcement officers as public employees vested by law with the "power" to maintain order, make arrests, or detain criminal suspects, and then adds, "whether *that duty* extends to all crimes or is limited to specific crimes." *Id.* (emphasis added); N.M. Stat. Ann. § 41-4-12 (emphasis added). The legislature's continued references to "duties" in the title and text of the May 2020 amendment clearly indicate that the legislature intended the nature of a public employee's duties to remain the determinative factor in assessing whether the employee is a law enforcement officer under the Act.

---

[9] At first blush, it appears that one could give effect to the respective definitions of "law enforcement officer" in Sections 41-4-3 and 41-4-12 by construing Section 41-4-12's definition as applying only to that section, and Section 41-4-3's definition as applying to the rest of the NMTCA. This is the construction Plaintiffs urge. (Doc. 81 at 5.) However, such a construction would actually render Section 41-4-3's definition superfluous, because the only section of the NMTCA in which the term "law enforcement officer" appears, other than Section 41-4-3, is Section 41-4-12. In other words, if the Court were to construe Section 41-4-12's definition to supplant Section 41-4-3's for purposes of applying Section 41-4-12, Section 41-4-3's definition would no longer have any effect at all. Such a construction would therefore be improper. *See Alarcon*, 2018-NMCA-021, ¶ 65, 413 P.3d at 527 ("Statutes must be construed so that no part of the statute is rendered surplusage or superfluous.") (quotation marks and citation omitted).

On the other hand, the Court cannot ignore the May 2020 amendment's new reference to "power[s]" any more than it can ignore the amendment's continued references to "duties." Rather, the Court must strive to give effect to both of these terms as used in Sections 41-4-3(D) and the amended version of Section 41-4-12. *Thompson*, 2022-NMSC-23, ¶ 17, 521 P.3d at 68. Fortunately, the title of the May 2020 amendment clearly states how the legislature intended this to be done, *i.e.,* by using the amendment to Section 41-4-12 to "[c]larify[]" the scope of the "[d]uties" to which Section 41-4-3(D) refers. L. 2020, Ch. 5, § 14, eff. May 20, 2020. Read together in this way, and incorporating the additional "power" enumerated in the September 2020 amendment, Sections 41-4-3(D) and 41-4-12 indicate that the test for whether a public employee is a law enforcement officer under the NMTCA is whether the employee's principal duties under law include maintaining public order, making arrests, or detaining persons suspected or convicted of committing a crime, where the employee's duties under law are those duties the law vests the employee with the power to perform. N.M. Stat. Ann. §§ 41-4-3(D), 41-4-12; *see also Limacher v. Spivey*, 2008-NMCA-163, ¶ 14, 198 P.3d 370, 373 ("When deciding whether a particular employee is a law enforcement officer as defined in Section 41–4–3(D), our jurisprudence tells us to first look to the statutory definition of that particular employee's duties and then determine whether the employee's primary duties match any of the statutory criteria.").[10]

### 3.    Plaintiffs have failed to show a genuine factual dispute regarding whether Defendant Archuleta's principal duties under law included

---

[10] In 2014, the New Mexico Court of Appeals stated that,

> [s]ignificantly, [Section 41-4-3(D)] directs us to determine a public employee's "principal duties *under law.*" However, not all duties of public employees are enumerated in a statute or regulation. Accordingly, our cases have also considered such sources as departmental job descriptions and affidavits in determining the duties of public employees.

*Rayos v. New Mexico ex rel. New Mexico Dep't of Corr., Adult Prob. & Parole Div.*, 2014-NMCA-103, ¶ 8, 336 P.3d 428, 431 (citation omitted) (emphasis in original). However, as just discussed, the May 2020 amendment clarified that "principal duties under law" must, in fact, be "vested by law," *i.e.*, by a statute or regulation. L. 2020, Ch. 5, § 14, eff. May 20, 2020.

**maintaining public order, making arrests, or detaining persons suspected or convicted of a criminal offense.**

Defendants argue that Defendant Archuleta was not a law enforcement officer at the relevant times because his principal duties under law did not include maintaining public order, making arrests, or detaining persons suspected or convicted of committing a crime. (Doc. 67 at 9-11; Doc. 86 at 14-18.) Plaintiffs disagree, arguing that Defendant Archuleta was "vested by law with the power to both maintain order and … detain individuals suspected of committing crimes." (Doc. 81 at 6.) As explained below, however, Plaintiffs fail to show a genuine factual dispute on this point.

Under Section 41-4-3(D), the duty to "maintain public order" is limited to "traditional law-enforcement duties that directly impact public order." *Hernandez v. Fitzgerald*, 840 F. App'x 333, 338 (10th Cir. 2020) (quoting *Limacher*, 2008-NMCA-163, ¶ 15, 198 P.3d at 374) (brackets omitted). This "inquiry is fact-specific and informed by a practical, functional approach as to what law enforcement entails today." *Id.* (quoting *Coyazo v. New Mexico*, 1995-NMCA-056, ¶ 18, 897 P.2d 234, 237-38) (quotation marks omitted). "[A] connection to law enforcement activity, even being a member of [a] law-enforcement team, is insufficient by itself to make one a law enforcement officer"; rather, "the person's duties must directly impact public order." *Dunn v. McFeeley*, 1999-NMCA-084, ¶ 25, 984 P.2d 760, 767. "Traditional law-enforcement duties that directly impact public order include preserving the public peace, preventing and quelling public disturbances, and enforcing state laws." *Hernandez*, 840 F. App'x at 338 (quoting *Limacher*, 2008-NMCA-163, ¶ 23, 198 P.3d at 376) (quotation marks omitted).

In their Motion, Defendants cite to evidence that, as a campus security aide at Cleveland, Defendant Archuleta's principal duties under law did not include maintaining public order, making arrests, or detaining persons suspected or convicted of committing a crime. (Doc. 67 at 9-11.)

15

Among other things, Defendants rely on RRPS Security Manager Donald Mangin's attestation that campus security aides "do not … have power or authority vested to law enforcement officers pursuant to federal, state, or local laws." (Doc. 65-2 at 3.)

Nevertheless, Plaintiffs fail to present any evidence or argument to show that a statute, regulation, or other law did in fact vest Defendant Archuleta with the power or duty to maintain public order, make arrests, or detain persons suspected or convicted of committing a crime. (*See generally* Doc. 81.) Regarding statutes, campus security aides are certainly subject to state statutory obligations as "school employees," but these broadly applicable duties do not include arresting or detaining suspects or engaging in other traditional law enforcement activities. *See, e.g.,* N.M. Stat. Ann. § 22-10A-5.1 (requiring "school employee[s]" to report ethical misconduct by other school employees to state public education department or school superintendent).

Nor have Plaintiffs presented any evidence or argument tending to show that campus security aides are members of any narrower group of school employees who have the statutory power or duty to maintain public order, make arrests, or detain persons suspected or convicted of a criminal offense. (*See generally* Doc. 81.) Initially, Plaintiffs have not cited to any state statute that refers to campus security aides specifically. Further, Plaintiffs have made no attempt to demonstrate that campus security aides qualify as "school security personnel" under state law. N.M. Stat. Ann. § 22-10A-40. School security personnel are "retired or former certified and commissioned law enforcement officers who are employed by a school district and authorized by department rules and local school board policy to carry a firearm on school premises." N.M. Stat. Ann. § 22-10A-40(A)(5). But Plaintiffs have not presented any evidence or argument tending to

show that, as a campus security aide, Defendant Archuleta either carried a firearm in the course of his duties or met the stringent requirements that would have allowed him to do so.[11]

Also, Plaintiffs have not cited to any statutory provision indicating that campus security aides are "licensed school employee[s]." *Cf., e.g.,* N.M. Stat. Ann. §§ 22-10A-3 (requiring licensure for teachers, instructional supervisors, school administrators, and school healthcare providers), 22-10A-17 (requiring licensure for enumerated instructional support providers), 22-10A-17.1 (requiring licensure for educational assistants). And only "licensed school employee[s]" are statutorily obligated to "enforce all laws and rules applicable to the employee's public school" and "exercise supervision over students."[12] N.M. Stat. Ann. § 22-10A-3(F)(1), (3).

Similarly, Plaintiffs have not cited to any regulations at all, much less a regulation that vests campus security aides with the power or duty to maintain public order, make arrests, or detain persons suspected or convicted of a criminal offense. (*See generally* Doc. 81.) Further, the Court has located only one specific reference to campus security aides in state regulations, and this reference merely indicates that they fall within the definition of "[s]chool personnel," *i.e.*, "all members of the staff, faculty, and administration employed by the local school board" and "authorized agents of the schools, such as volunteers or chaperones, whose responsibilities include

---

[11] The record does include evidence—not discussed in either side's statement of material facts—that Defendant Archuleta worked as a corrections officer before he worked as a campus security aide at Cleveland. (Doc. 65-16 at 3; Doc. 76-4 at 4.) However, even assuming this means he was a retired or former certified and commissioned law enforcement officer, Plaintiffs have not pointed to any evidence to show that he met the other statutory and regulatory qualifications for school security personnel. *See* N.M. Stat. Ann. § 22-10A-40(C)-(G) (setting forth school security personnel qualifications); N.M. Admin. Code §§ 6.12.12.8, 6.12.12.9, 6.12.12.11 (same). Moreover, although Defendant Archuleta testified that "they were going to give guns to the security aid[e]s" at Cleveland, (Doc. 65-6 at 3), there is no evidence in the record that Defendant RRPS actually did so before Defendant Archuleta resigned.

[12] The Court is skeptical that this statutory provision vests licensed school employees with the power or duty to maintain public order, make arrests, or detain persons suspected or convicted of a criminal offense. However, the Court need not reach that question because Plaintiffs have neither argued nor presented evidence to show that Defendant Archuleta was a licensed school employee.

supervision of students." N.M. Admin. Code § 6.11.2.7(Z) (providing that the term "school personnel" includes "school security officers … *and their aides*") (emphasis added).

Not surprisingly, there *is* a state regulation that gives "[p]ublic school authorities, which include all officials, employees and authorized agents of public schools, whose responsibilities include supervision of students … comprehensive authority within constitutional bounds to maintain order and discipline in school." N.M. Admin. Code § 6.11.2.8(A). But Plaintiffs have not argued, and the Court is not persuaded, that this regulation confers a power or duty to maintain public order within the meaning of Sections 41-4-3(D) and 41-4-12. First, maintaining order and discipline in a school is substantively different from maintaining public order in the traditional law-enforcement sense, because the rules, policies, and procedures that govern behavior in school settings are necessarily far stricter and more comprehensive than the laws that govern the behavior of the general public.[13] Second, if the regulation were construed to confer the power to maintain public order, it would make law enforcement officers of virtually every public school employee whose principal duties include student supervision, a result that is patently absurd.

Further, although a state regulation does authorize "certified school personnel," "school security personnel," and "school bus drivers" to conduct searches, N.M. Admin. Code § 6.11.2.10(B)(2), Plaintiffs have not argued or submitted evidence to show that campus security aides fall within any of these categories. (*See generally* Doc. 81.) Rather, campus security aides appear to derive their authority to search from an authorized person's request for assistance with a particular search, which extends to "that search only." N.M. Admin. Code § 6.11.2.10(B)(2); (*accord* Doc. 65-2 at 4 (Defendant Archuleta's job duties included "[a]ssist[ing] with searches");

---

[13] Of course, by definition, laws governing the behavior of the general public also apply to adults and students in school settings. However, school rules, policies, and procedures obviously restrict much conduct that is legally permissible outside of the educational context.

Doc. 65-6 at 4 (Defendant Archuleta "couldn't search [students] on [his] own without an administrator being present or giving [him] the authorization to do so"); Doc. 65-16 at 4 (Security Manager Mangin's subordinates "are told they will not conduct a search unless requested by an administrator").)

In sum, Plaintiffs have not cited to, and the Court has not located, any law that vests campus security aides like Defendant Archuleta with the power or duty to maintain public order, make arrests, or detain persons suspected or convicted of committing a crime. Rather, to the extent campus security aides engage in any of these activities, their power or duty to do so appears to arise out of school board policy, contract, or an administrator's request.[14] (Docs. 65-2, 65-3, 65-4; Doc. 65-6 at 4; Doc. 65-16 at 4.) Plaintiffs have therefore failed to show a genuine factual dispute regarding whether Defendant Archuleta was a law enforcement officer subject to suit under Section 41-4-12 at the relevant times, and Defendant Archuleta is entitled to summary judgment on Count II of Plaintiffs' complaints. N.M. Stat. Ann. §§ 41-4-3(D), 41-4-12.

## II.    <u>Defendant RRPS is entitled to summary judgment on Count II.</u>

In their Motion, Defendants argue that Defendant RRPS is also entitled to summary judgment on Count II of Plaintiffs' complaints. (Doc. 67 at 6-12.) In Count II, Plaintiffs assert intentional tort claims under Section 41-4-12 against both Defendants. (Doc. 1-3 at 10-11; Civ. No. 21-648, Doc. 1-3 at 4-5; Civ. No. 21-751 at 1-3 at 5-6.) But they do not, in that count, make any allegations about what Defendant RRPS did or failed to do. (*See generally id.*) It thus appears that Plaintiffs' Count II claims against Defendant RRPS are based on a theory of vicarious liability for Defendant Archuleta's alleged misconduct pursuant to the doctrine of *respondeat superior*. (*Id.*;

---

[14] Because Plaintiffs have failed to show a genuine factual dispute regarding whether the law vested Defendant Archuleta with traditional law enforcement powers or duties, the Court need not address the nature of the powers and duties with which policy, contract, and/or administrators' instructions vested him.

*see also* Doc. 81 at 8 (arguing that Defendant RRPS is "vicariously liable" pursuant to "the doctrine of respondeat superior," "due to the actions of [its] employee [Defendant] Archuleta").)

Under the NMTCA, a public employer may be held vicariously liable for injuries resulting from its employee's commission of a tort "for which immunity has been waived." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, ¶ 14, 916 P.2d 1313, 1318. But as explained in Section I., *supra*, as a matter of law Section 41-4-12 does *not* waive Defendant Archuleta's immunity. Thus, Defendant RRPS cannot be held vicariously liable for injuries caused by Defendant Archuleta's alleged intentional torts under that section, and the Court will grant summary judgment in favor of Defendant RRPS as well as Defendant Archuleta on Count II.

### III.    Defendant RRPS is entitled to summary judgment on Count III.

Defendants also argue that the Court should grant Defendant RRPS summary judgment on Count III of Plaintiffs' complaints. (Doc. 67 at 12-13.) In Count III, Plaintiffs bring claims against Defendant RRPS under Section 41-4-12 based on its alleged negligent supervision of Defendant Archuleta. (Doc. 1-3 at 11; Civ. 21-648, Doc. 1-3 at 5-6; Civ. 21-751, Doc. 1-3 at 6-7.) According to Defendants, Defendant RRPS is entitled to summary judgment on these claims because (1) as a governmental entity, it cannot be a law enforcement officer under Section 41-4-12, and (2) Plaintiffs have not identified any supervisory law enforcement officer or other employee for whose negligence Defendant RRPS could be vicariously liable under that section. (Doc. 67 at 10-13.) As explained below, the Court agrees.

First, Section 41-4-12 does not apply to Plaintiffs' negligent supervision claims against Defendant RRPS based on a theory of direct liability for its own acts because, as a matter of law,

it is not a law enforcement officer under the NMTCA.[15] As a governmental entity, Defendant RRPS cannot be a "full-time salaried public employee of a governmental entity," a "certified part-time salaried police officer employed by a governmental entity," or a "public officer or employee." N.M. Stat. Ann. §§ 41-4-3(D), 41-4-12; *see Fernandez v. Mora-San Miguel Elec. Co-op., Inc.*, 462 F.3d 1244, 1250 (10th Cir. 2006) ("[A]n agency cannot be a 'full-time salaried public employee' as required by the definition of 'law enforcement officer.'"); *Dunn*, 1999-NMCA-84, ¶ 23, 984 P.2d at 766 ("[A]n agency could not be a 'full-time salaried public employee.'").

Second, Plaintiffs have not shown a genuine factual dispute regarding whether Section 41-4-12 applies to their negligent supervision claims against Defendant RRPS based on a theory of vicarious liability for the acts of a supervisory employee. It is true that a negligence claim against a law enforcement officer is cognizable under Section 41-4-12 when the officer's negligent supervision of a subordinate proximately causes the subordinate to commit one of the section's enumerated intentional torts. *Quezada v. County of Bernalillo*, 944 F.2d 710, 719-20 (10th Cir. 1991), *overruled on other grounds by Saucier v. Katz,* 533 U.S. 194 (2001); *Ortiz v. N.M. State Police*, 1991-NMCA-031, ¶¶ 2-14, 814 P.2d 117, 118-20. It is also true that, in such circumstances, the public entity that employs the supervisory law enforcement officer can be held vicariously liable for injuries caused by the officer's negligence. *Quezada*, 944 F.2d at 719-20; *Ortiz*, 1991-NMCA-031, ¶ 2 n.1, 814 P.2d at 118 n.1. However, Plaintiffs' reliance on this theory of liability is misplaced, because they have not argued, much less cited to any evidence to show, that any of Defendant Archuleta's supervisors were law enforcement officers.[16] (*See* Doc. 81 at 8-9.)

---

[15] "[D]irect tort liability is based on a defendant's own tortious acts." *Cruz v. City of Deming*, Civ. No. 22-957, 2023 WL 7222828, at *9 (D.N.M. Nov. 2, 2023).

[16] There is evidence that Security Manager Mangin supervised Defendant Archuleta at the relevant times. (Doc. 65-2 at 2.) However, in their response to Defendants' Motion, Plaintiffs do not argue or point to any evidence tending to show that Mr. Mangin was a law enforcement officer under Section 41-4-12.

Plaintiffs try to salvage their negligent supervision claims against Defendant RRPS by citing to *Turner v. City of Portales*, Civ. No. 98-1367, 1999 WL 35808310, at *2 (D.N.M. Nov. 18, 1999). (Doc. 81 at 9.) However, *Turner* is distinguishable. The court in that case did deny summary judgment on the plaintiff's negligence claims under Section 41-4-12 in light of *Ortiz* and *Quezada*. *Id.* But in *Turner*, the plaintiff sued not only the defendant city, but also a captain in the city police department, *i.e.*, a supervisory law enforcement officer whom the city employed. *Id.* Thus, even assuming the *Turner* plaintiff brought negligence claims under Section 41-4-12 against the city as well as the captain—a point the decision does not address—the city could have been vicariously liable for the captain's negligence. *Id.*; *Ortiz*, 1991-NMCA-031, ¶ 2 n.1, 814 P.2d at 118 n.1. Here, in contrast, Plaintiffs have not identified any supervisory law enforcement officer for whose conduct Defendant RRPS could be vicariously liable under Section 41-4-12. (*See generally* Doc. 81.) The Court will therefore grant Defendant RRPS summary judgment on Count III.

## IV.    **Defendant RRPS is not entitled to summary judgment on Count IV.**

Finally, Defendants argue that Defendant RRPS is entitled to summary judgment on Count IV of Plaintiffs' complaints, in which Plaintiffs assert negligence claims under Section 41-4-6 of the NMTCA.[17] (Doc. 67 at 15-20; *see* Doc. 1-3 at 11-12; Civ. 21-648, Doc. 1-3 at 6-7; Civ. 21-751, Doc. 1-3 at 7-8.) Section 41-4-6 provides that the NMTCA's general grant of immunity does not apply to liability for injuries caused by public employees' negligent operation or maintenance of a public facility. N.M. Stat. Ann. § 41-4-6(A). Defendants argue that Defendant RRPS is entitled to summary judgment on Plaintiffs' claims under Section 41-4-6 because the undisputed facts show that it "had no knowledge of a dangerous condition on the premises of [Cleveland]" and so "there

---

[17] As noted above, Plaintiffs assert Count IV against Defendant Archuleta as well as Defendant RRPS. (Doc. 1-3 at 11-12; Civ. No. 21-648, Doc. 1-3 at 6-7; Civ. No. 21-751, Doc. 1-3 at 7-8.) However, Defendants argue, and Plaintiffs concede, that Section 41-4-6 does not apply to Defendant Archuleta. (Doc. 67 at 13-15; Doc. 81 at 13-14.) Thus, the Court will grant summary judgment in Defendant Archuleta's favor on Count IV.

is no waiver of governmental immunity." (Doc. 67 at 15-20.) Plaintiffs, conversely, contend that Defendant RRPS is not entitled to summary judgment on these claims because it "had actual knowledge of the danger [Defendant] Archuleta posed to students and did not follow [its] own policies … designed to make sure searches happened in a way that was safe for students." (Doc. 81 at 13.) As explained below, the Court finds that genuine issues of material fact preclude summary judgment on Plaintiffs' claims under Section 41-4-6.

A.    **Legal Standards**

Section 41-4-6 of the NMTCA provides that

> [t]he immunity granted pursuant to [Section 41-4-4 of the NMTCA] does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M. Stat. Ann. § 41-4-6(A).

To assess the viability of a claim under this section, courts must first "determine… as a matter of law" whether the defendant owed the plaintiff a duty. *Sanders v. New Mexico Corr. Dep't*, 2024-NMSC-027, ¶ 57, 562 P.3d 572, 584. In making this determination, courts should remain mindful that "the waiver of liability in Section 41-4-6(A) incorporates the concepts of premises liability found in [New Mexico] case law." *Id.* at ¶¶ 45, 57, 562 P.3d at 582, 584. Thus, under this section, a "duty of ordinary care originates with the property but is not limited by geography or a physical defect on the property." *Id.* at ¶ 58, 562 P.3d at 584. Rather, the duty to use ordinary care in maintaining or operating a public facility may arise out of property ownership, statute, regulation, or contract. *Id.* at ¶¶ 53-55, 562 P.3d at 583-84. Among other things, the New Mexico Supreme Court has recognized a public school's duty to protect students from foreseeable risks of assault on the school's campus. *Encinias*, 2013-NMSC-045, ¶¶ 2, 17-18, 310 P.3d at 614, 619.

"Once duty has been established," courts must next assess whether the plaintiff can show that the alleged negligence at issue falls within the "spectrum" of conduct to which Section 41-4-6 applies. *Sanders*, 2024-NMSC-027, ¶ 59, 562 P.3d at 584-85. Section 41-4-6 does not apply "when negligence creates an unsafe condition for a single individual." *Id.* at ¶ 74, 562 P.3d at 587. Rather, to be actionable under this provision, "the negligent operation or maintenance must create a dangerous condition that threatens the general public or a class of users of the [facility]." *Vanhorn v. Carlsbad Mun. Sch. Dist.*, 2024-NMCA-035, ¶ 6, 545 P.3d 1182, 1185 (quoting *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 8, 141 P.3d 1259, 1261) (quotation marks omitted). Specifically, the negligence must consist of either (1) "an operational failure to respond to or discover conditions which can pose a danger to a class of persons involved in or affected by an activity on the [public] property," or (2) "a failure to create and/or to implement reasonably appropriate safety policies and operational procedures to make public properties safe for the public who use them." *Sanders*, 2024-NMSC-027, ¶¶ 50, 59, 562 P.3d at 583-85 (quoting *Gebler v. Valencia Reg'l Emergency Commc'ns Ctr.*, 2023-NMCA-070, ¶ 26, 535 P.3d 763, 769).

In addition, because it is ultimately a negligence claim, a plaintiff asserting a claim for negligent operation or maintenance of a public facility under Section 41-4-6 must show not only that (1) the defendant owed the plaintiff a duty of care, but also that (2) the defendant breached the duty, (3) the plaintiff was injured, and (4) the defendant's breach proximately caused the plaintiff's injury. *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 22, 335 P.3d 1243, 1249. Regarding the second element,

> determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances.

*Lujan v. New Mexico Dep't of Transp.*, 2015-NMCA-005, ¶ 13, 341 P.3d 1, 5. In general, these "[q]uestions of 'reasonableness' are quintessential issues for a jury to resolve." *Id.* at ¶ 33, 341 P.3d at 10. Regarding the fourth element, in turn, "[p]roximate cause is that which, in a natural or continuous sequence, produces the injury and without which the injury would not have occurred." *Id.* at ¶ 35, 341 P.3d at 10. Ordinarily, "[d]etermining proximate cause is a question of fact for the jury," and "[o]nly when the facts are undisputed and the reasonable inferences from those facts are plain and consistent, does proximate cause become an issue of law." *Id.* (quotation marks omitted).

**B.    There are genuine issues of material fact regarding whether Defendant RRPS negligently created a dangerous condition at Cleveland that proximately caused the student Plaintiffs' injuries.**

Defendants argue that Defendant RRPS is entitled to summary judgment on Count IV of Plaintiffs' complaints "because the undisputed material facts show that there was no known dangerous condition on the premises of [Cleveland] because [Defendant] Archuleta was not known by [Defendant RRPS] to be a danger to anyone." (Doc. 67 at 17.) Defendants further argue that "there are no facts in the record to suggest that Defendant [RRPS], in the exercise of ordinary care, could have discovered that [Defendant] Archuleta would sexually assault any student" and "no facts to show that Defendant [RRPS] could have protected [the student] Plaintiffs from the alleged assaults." (*Id.* at 20.) As explained below, the Court disagrees on all three of these points.

Defendants contend it is undisputed that Defendant RRPS (1) never received any "complaint regarding or relating to [Defendant] Archuleta," and (2) never "had any notice or knowledge that [Defendant] Archuleta had ever engaged in any prior improper behavior of any kind." (Doc. 65 at 7-8.) In fact, however, Plaintiffs dispute these factual contentions, pointing to J.M.'s deposition testimony that he met with Cleveland's principal, Scott Affentranger, to report that Defendant Archuleta had "touched [him] in a sexually inappropriate manner." (Doc. 76 at 6;

Doc. 76-10 at 2-3.) In this regard, J.M. testified that he told Principal Affentranger "essentially what happened," including that: (1) "the last time that [he] had been searched … there was some really weird and off-putting things that had went on"; (2) "something went on that is … outside the guidelines of how a security guard is supposed to perform a search"; (3) Defendant Archuleta "was getting really high on the thigh area" of J.M.'s leg; and, (4) as J.M. was facing the wall, he was "kind of in shock, and then [his] brain registered that [his] left testicle had been touched." (Doc. 76-10 at 3.) J.M. further testified: "I told Mr. Affentranger how I felt about it, and he didn't care. He kind of told me that essentially, he doesn't have to deal with it. He has, you know, bigger stuff to deal with."[18] (*Id.*)

Defendants argue that J.M.'s statements to Principal Affentranger are "vague" and "insufficient as a matter of law to show that Defendant [RRPS] ever had actual knowledge or any notice whatsoever of improper sexual touching by [Defendant] Archuleta against any student." (Doc. 67 at 18.) In fact, however, J.M.'s testimony about what he told Principal Affentranger is easily clear enough to create a genuine factual dispute regarding whether the principal had actual knowledge that Defendant Archuleta had touched J.M. in a sexually inappropriate way. Moreover, actionable negligence under Section 41-4-6 extends not only to public employees' negligent response to a known dangerous condition, but also to their negligent failure to discover a dangerous condition. *Sanders*, 2024-NMSC-027, ¶¶ 50, 59, 562 P.3d at 583-85. And even if J.M.'s testimony about what he told Principal Affentranger were not specific enough to show that the principal had actual notice of Defendant Archuleta's alleged misconduct, it is far more than adequate to support

---

[18] At his deposition, Principal Affentranger denied that any student ever complained to him about Defendant Archuleta. (Doc. 76-5 at 16.) However, J.M.'s testimony squarely contradicts Principal Affentranger's testimony, thereby creating a genuine factual dispute.

a finding that in the exercise of ordinary care the principal should have discovered the misconduct, *e.g.*, by simply asking J.M. for more information.

Of course, the parties' genuine factual disputes regarding Defendant RRPS's actual or constructive knowledge of the danger Defendant Archuleta allegedly posed are material only if there is evidence that it acquired such knowledge before the last time Defendant Archuleta touched or tried to touch a student Plaintiff inappropriately. Only then can Plaintiffs show that the school's failure to act reasonably in response to its actual or constructive knowledge proximately caused them injury. *Zamora*, 2014-NMSC-035, ¶ 22, 335 P.3d at 1249; *Lujan*, 2015-NMCA-005, ¶ 35, 341 P.3d at 10. But as explained below, the Court finds that there are genuine factual disputes on this point as well.

An incident report indicates that Defendant Archuleta first searched J.M. in Principal Affentranger's office on October 4, 2019, and that Principal Affentranger and Assistant Principal Millan Baca were present for this search. (Doc. 65-17.) The record does not include any testimony from J.M. about this particular search, though he did testify that he was searched many times that school year. (Doc. 65-11 at 4.) Rather, on the present record, the four searches about which J.M. testified in detail occurred in the school security office with no one else present, and these are the searches during which he claims Defendant Archuleta touched or tried to touch him inappropriately. (Doc. 76-10 at 4-12.) Specifically, J.M. testified that during the first inappropriate search, Defendant Archuleta touched his left testicle; during the second, Defendant Archuleta grabbed him between his legs and "tried to grab everything"; and, during the third and fourth,

Defendant Archuleta tried to touch his genitals but he prevented the contact by slapping Defendant Archuleta's hand away or backing up.[19] (*Id.*)

The record evidence does not indicate precisely when these allegedly inappropriate searches occurred. J.M. testified that he believes they occurred "towards the end of the year." (*Id.* at 4-5, 11.) But it is not clear whether he meant the end of the calendar year, *i.e.*, the year 2019, or the end of the school year, *i.e.*, 2019-2020.[20] (*Id.*) Moreover, J.M. testified that "a few weeks or something like that, a month," passed between the first and second inappropriate searches, "[p]robably a few months[, p]robably like a month or two" between the second and third, and "two weeks, a week and a half" between the third and fourth. (Doc. 65-11 at 9; Doc. 76-10 at 8, 11-12.) Assuming the fourth inappropriate search occurred shortly before Defendant Archuleta's March 14, 2020 resignation and subtracting the intervals to which J.M. testified from that date, a reasonable factfinder could infer that the third inappropriate search occurred in February 2020, the second in November 2019, and the first in October 2019. (*Id.*; Doc. 65-5.)

Further, J.M. testified that he believes he told Principal Affentranger about Defendant Archuleta's alleged inappropriate conduct "after the second incident." (Doc. 76-10 at 3.) But when he testified about exactly what he told Principal Affentranger, he described the first alleged instance of inappropriate sexual contact, when Defendant Archuleta touched his left testicle, and not the second, when Defendant Archuleta grabbed his entire crotch. (*Id.* at 3-9.) Moreover, the record does not clearly indicate what J.M. meant by "after the second incident." (*See id.* at 3.) For

---

[19] J.M. also testified to a fifth search during which Defendant Archuleta tried to touch him inappropriately, but the record does not include detailed testimony about what happened during this search. (*See* Doc. 76-10 at 11-12.)

[20] J.M. testified that the inappropriate searches occurred during his sophomore year, *i.e.,* the 2019-2020 school year, and Defendant Archuleta undisputedly resigned from his employment at Cleveland on March 14, 2020. (Doc. 65 at 15; Doc. 65-5 at 1; Doc. 65-11 at 2, 5-6.) Thus, if J.M. meant to testify that the searches occurred towards the end of a calendar year, the year in question would be 2019.

example, though he could have meant after the crotch-grabbing search, he could also have meant after the left-testicle search, because even though he said this was the first time Defendant Archuleta touched him inappropriately, there is evidence that it was the second time Defendant Archuleta searched his person. (*See* Doc. 65-17.) Viewing these disputed facts in Plaintiffs' favor, a reasonable factfinder could infer that J.M. told Principal Affentranger about Defendant Archuleta's misconduct after the left-testicle search in October 2019 but before the crotch-grabbing search a few weeks to a month later. (Doc. 76-10 at 2-3.)

Moreover, even if J.M. did not tell Principal Affentranger about the alleged left-testicle search until after the alleged crotch-grabbing search, as noted above, a reasonable factfinder could conclude that the crotch-grabbing search occurred in November 2019, and there is record evidence that Defendant Archuleta touched or tried to touch at least two of the student Plaintiffs inappropriately after that month. First, as just discussed, J.M. testified that after the crotch-grabbing search, Defendant Archuleta tried to touch his genital area again during three additional searches. (Doc. 76-10 at 11-12.) And second, there is record evidence that Defendant Archuleta touched D.M.'s penis and buttocks during a search on March 5, 2020.[21] (Doc. 65-10 at 8-12; Doc. 76-2; Doc. 76-8 at 3-8, 11-12.)

Although both sides' arguments about Count IV focus on J.M.'s testimony about his meeting with Principal Affentranger, the Court notes that other evidence also supports Plaintiffs'

---

[21] Moreover, Defendants have not met their initial summary judgment burden to show that the inappropriate searches L.M. claims he experienced undisputedly occurred before J.M.'s meeting with Principal Affentranger. Specifically, they have neither submitted affirmative evidence to show that these two searches occurred before the meeting nor made any attempt to show that Plaintiffs' evidence is insufficient to prove they occurred afterward. (*See generally* Docs. 67, 86); *Tesone*, 942 F.3d at 994. Also, the Court notes that the record evidence on this point is inconclusive and, viewed in Plaintiffs' favor, would likely allow a reasonable factfinder to infer that at least one of these searches occurred after the meeting, if the meeting took place in the fall of 2019. Asked whether the inappropriate searches he experienced happened "more towards the beginning of the year," "during the middle," or "towards the end," or were "interspersed throughout the [2019-2020 school] year," L.M. responded that they were "interspersed between, like, the whole" school year. (Doc. 76-11 at 8.)

position that Defendant RRPS knew of or should have discovered the danger Defendant Archuleta posed to Cleveland students before the last time he touched or tried to touch a student Plaintiff inappropriately. First, L.M. testified that during a search at which Assistant Principal Rudy Galindo was present, he said "[w]hoa, dude," and took a step back when Defendant Archuleta "felt [him]."[22] (Doc. 76-11 at 7-10, 15.) According to L.M., he was "kind of protesting about" Defendant Archuleta touching him inappropriately. (*Id.* at 7.) L.M. further testified that this happened the first time Defendant Archuleta touched him inappropriately, and that Defendant Archuleta touched him inappropriately again during another search. (*Id.* at 7-10, 15.)

Second, D.M. testified that just before Defendant Archuleta touched his penis and buttocks on March 5, 2020, he told Defendant Archuleta, in Assistant Principal Baca's presence, "[d]on't touch my dick."[23] (Doc. 76-8 at 2-3, 8, 11-12.) D.M. testified that he said this because Defendant Archuleta had also touched his penis during a search the previous school year. (*Id.* at 8.) Particularly when viewed cumulatively and in the light most favorable to Plaintiffs, *Ricci*, 557 U.S. at 586, the foregoing evidence supports the reasonable inference that RRPS administrators either knew of or in the exercise of ordinary care should have discovered the danger Defendant Archuleta posed to Cleveland students before the last time he touched or tried to touch a student Plaintiff inappropriately.

And if all of this were not enough, Plaintiffs also point to evidence that Defendant RRPS created a dangerous condition at Cleveland by failing in multiple ways to "implement reasonably appropriate safety policies and operational procedures to make public properties safe for the public

---

[22] L.M. testified that, during this search, Defendant Archuleta touched his penis and testicles. (Doc. 76-11 at 9, 15.)

[23] According to D.M., Assistant Principal Baca responded to D.M.'s telling Defendant Archuleta not to touch his penis by getting angry and telling D.M. to "shut up." (Doc. 76-8 at 8.) D.M. further testified that he did not tell Assistant Principal Baca that Defendant Archuleta nevertheless proceeded to touch his penis and buttocks because Assistant Principal Baca "is the type of person to not believe students." (*Id.* at 11.)

who use them." *Gebler*, 2023-NMCA-070, ¶ 26, 535 P.3d at 769. Among other things, Plaintiffs note the record evidence that RRPS policy required searches of students to be video recorded whenever possible, and to be conducted only in the presence and at the request of an administrator. (Doc. 81 at 10-13; *see, e.g.,* Doc. 65-7 at 2-3, Doc. 76-1 at 6, 9; Doc. 76-4 at 15, 18; Doc. 76-5 at 8, 11; Doc. 76-8 at 6.) Nevertheless, it is undisputed that there are no video recordings of Defendant Archuleta searching any of the student Plaintiffs. (Doc. 65-6 at 10; Doc. 76-4 at 16-18; Doc. 76-6 at 7.) And both J.M. and D.M. testified that Defendant Archuleta touched them inappropriately while searching them when no one else was present. (Doc. 65-10 at 5-6; Doc. 76-8 at 4-6; Doc. 76-10 at 4-10.)

Defendants argue that even if Defendant RRPS did fail to implement school policies in these ways, Plaintiffs cannot show that consistent implementation of the policies would have prevented the student Plaintiffs' injuries, because D.M. and L.M. testified that Defendant Archuleta also touched them inappropriately while searching them in an administrator's presence.[24] (Doc. 86 at 27; *see* Doc. 65-15 at 2-8; Doc. 76-8 at 7-8, 11-12; Doc. 76-11 at 4, 7-11.) But there are two problems with this argument. First, the argument does not address Defendant RRPS's alleged failure to implement its policy requiring that searches of students be video recorded whenever possible.[25] Moreover, a reasonable factfinder could infer that video recording Defendant Archuleta's searches of students would have either deterred him from touching students

---

[24] Although Defendants contend J.M. testified that Defendant Archuleta touched him inappropriately while searching him in an administrator's presence, the testimony to which Defendants cite does not support this proposition. (Doc. 86 at 27 (citing Doc. 76-10 at 6-7); *see* Doc. 76-10 at 6-8.)

[25] Defendants suggest that it was not possible for Defendant Archuleta to video record the searches he conducted because Defendant RRPS did not provide him with a working lapel camera. (Doc. 86 at 27.) However, Defendants point to no evidence that Defendant RRPS could not have provided Defendant Archuleta with a working lapel camera, nor do they point to any evidence that Defendant Archuleta could not have video recorded searches some other way, *e.g.*, by using another employee's lapel camera or by conducting searches in view of a school surveillance camera.

inappropriately or affirmatively exposed his misconduct before the last time he touched or tried to touch a student Plaintiff inappropriately.[26]

Second, while it is true that consistent enforcement of Defendant RRPS's policy requiring an administrator to be present for searches would not have prevented all of the sexual assaults the student Plaintiffs describe, it does not necessarily follow that consistent enforcement of the policy would not have prevented any of these assaults. The alleged inappropriate searches that occurred outside an administrator's presence involved different circumstances than the alleged inappropriate searches that occurred in an administrator's presence, and a reasonable factfinder could infer that these different circumstances would have deterred Defendant Archuleta's misconduct or allowed an administrator to discover it, had an administrator been present.[27]

In sum, the Court finds that there are genuine factual disputes regarding whether Defendant RRPS (1) either knew of or should have discovered the danger of sexual assault that Defendant Archuleta posed to Cleveland students, and (2) failed to implement reasonably appropriate policies and procedures that would have mitigated or led to the discovery of this danger. There are also genuine factual disputes regarding whether Defendant RRPS's actual or constructive knowledge and failure to implement appropriate policies and procedures occurred before the last time Defendant Archuleta touched or tried to touch a student Plaintiff, and thus proximately caused the

---

[26] For example, a reasonable factfinder could infer that, if Defendant RRPS had video recorded Defendant Archuleta's searches, then school administrators could have reviewed the recordings and seen him touching one or more students inappropriately after J.M.'s meeting with Principal Affentranger, L.M.'s "whoa dude" protest, and/or D.M.'s "don't touch my dick" comment alerted them to a potential problem with the way Defendant Archuleta was conducting searches.

[27] For example, J.M. testified that Defendant Archuleta asked him to take off the gym shorts underneath his pants during an inappropriate search that occurred outside an administrator's presence, while there is no evidence that Defendant Archuleta made such a request during any inappropriate search that occurred in an administrator's presence. (*See* Doc. 65-11 at 7-8; Doc. 76-10 at 6-7.) An administrator might well have been alerted to a problem with how Defendant Archuleta was conducting searches had he or she been present to hear Defendant Archuleta effectively asking J.M. to remove his pants and shorts during a purported pat-down search.

student Plaintiffs injury. For these reasons, the Court will deny Defendants' Motion insofar as it seeks summary judgment in Defendant RRPS's favor on Count IV of Plaintiffs' complaints. *See Encinias*, 2013-NMSC-045, at ¶ 18, 310 P.3d at 619 (reversing summary judgment on Section 41-4-6 claims when there were genuine factual disputes regarding "whether there was a dangerous condition on the premises of the high school").

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendants Archuleta's and Rio Rancho Public Schools Board of Education's Joint Motion and Memorandum for Summary Judgment on the Basis of Governmental Immunity (Doc. 67) insofar as the Motion seeks summary judgment (1) in favor of both Defendants on Count II; (2) in Defendant RRPS's favor on Count III; and, (3) in Defendant Archuleta's favor on Count IV. However, the Court DENIES the Motion insofar as it seeks summary judgment in Defendant RRPS's favor on Count IV.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent